# 21-2088-CV

## United States Court of Appeals

*for the*

## Second Circuit

RELEVENT SPORTS, LLC,

*Plaintiff-Appellant,*

– v. –

UNITED STATES SOCCER FEDERATION, INC.,
FÉDÉRATION INTERNATIONALE DE FOOTBALL ASSOCIATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

LINDA T. COBERLY
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
(312) 558-5600

JEFFREY L. KESSLER
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700

*Attorneys for Plaintiff-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Plaintiff-Appellant Relevent Sports, LLC hereby makes the following corporate disclosure statement: Relevent Sports, LLC is a privately held company, wholly owned by RSE Ventures, LLC (not publicly traded). No publicly traded corporation holds more than 10% of Relevent Sports, LLC's stock.

Dated: October 7, 2021

Respectfully submitted,

WINSTON & STRAWN LLP

*/s/ Jeffrey L. Kessler*

Jeffrey L. Kessler

AmericasActive:15975192.13

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF JURISDICTION ........................................................... 6

STATEMENT OF THE ISSUES ............................................................... 12

STATEMENT OF THE CASE ................................................................. 13

    I.    Through FIFA, the National Associations, leagues, and teams adopt and agree to follow common rules, including rules that restrict economic competition among them......... 13

    II.    In response to a proposed official game in the United States between non-U.S. teams promoted by Relevent, the Council adopted a policy prohibiting official games outside each league's home territory. ....................................................... 17

    III.    Relevent filed this suit, and the district court dismissed its Sherman Act claim for failure to allege an "agreement." .... 24

SUMMARY OF ARGUMENT ................................................................. 28

STANDARD OF REVIEW ...................................................................... 31

ARGUMENT ......................................................................................... 32

    I.    The district court erred in holding that the Amended Complaint fails to plead an "agreement" under Section 1...32

        A.    The Amended Complaint pleads direct evidence of an agreement .................................................................. 33

            1.    A published association policy through which market participants regulate one another's competitive activities is direct evidence of an agreement ......................................................... 33

            2.    The Amended Complaint alleged more than enough facts to plausibly show such direct evidence. ......................................................... 43

        B.    Alternatively, Relevent alleged sufficient "plus factors" under this Court's cases to plausibly plead an agreement through circumstantial evidence............... 46

AmericasActive:15975192.13

1. The Amended Complaint sufficiently pleaded the three most common "plus factors." ..................... 48

2. The district court's analysis distorted the "plausibility" standard. ....................................... 52

3. The district court's opinion turned the economic interest analysis on its head. ............................ 56

4. The district court did not give Relevent every reasonable inference regarding co-conspirator communications. ................................................. 60

5. The opinion below would cripple antitrust conspiracy pleading. .......................................... 62

II. FIFA is not an indispensable party for purposes of Rule 19. ................................................................ 64

A. FIFA is not a "necessary" party. .................................. 64

B. FIFA is not an "indispensable" party. ........................ 68

CONCLUSION ........................................................................ 69

CERTIFICATE OF COMPLIANCE ....................................... 71

CERTIFICATE OF SERVICE .................................................. 72

SPECIAL APPENDIX .............................................................. 73

AmericasActive:15975192.13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
181 F.3d 216 (2d Cir. 1999) ........................................................... 40, 41

*Aguinaga v. UBS AG,*
2010 WL 5093433 (S.D.N.Y. Dec. 14, 2010) ...................................... 66

*Allied Tube & Conduit Corp. v. Indian Head,*
486 U.S. 492 (1988) ....................................................................... 33, 45

*Am. Needle, Inc. v. NFL,*
560 U.S. 183 (2010) ....................................................................... 33, 34

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.,*
456 U.S. 556 (1982) ............................................................................. 34

*Anderson News, L.L.C. v. Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012) ..................................................... *passim*

*Anderson v. Shipowners Ass'n of Pac. Coast,*
272 U.S. 359 (1926) ............................................................................. 36

*Arizona v. Maricopa County Med. Soc'y,*
457 U.S. 332 (1982) ............................................................................. 37

*Associated Press v. United States,*
326 U.S. 1 (1945) ........................................................ 29, 33, 34, 35

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .......................................................... 31, 32, 52, 63

*Cal. Dental Ass'n v. FTC,*
526 U.S. 756 (1999) ............................................................................. 37

*ChampionsWorld, LLC v. United States Soccer Fed'n, Inc.,*
726 F. Supp. 2d 961 (N.D. Ill. 2010) ................................................... 67

iv

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018) ....................................................8, 9

*City of Philadelphia v. Bank of Am. Corp.*,
  498 F. Supp. 3d 516 (S.D.N.Y. 2020) ..................................52

*Dentons U.S. LLP v. Republic of Guinea*,
  208 F. Supp. 3d 330 (D.D.C. 2016) ......................................10

*Fed. Ins. Co. v. SafeNet, Inc.*,
  758 F. Supp. 2d 251 (S.D.N.Y. 2010) ..................................66

*Fraser v. MLS*,
  7 F. Supp. 2d 73 (D. Mass. 1998) .........................................68

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986).................................................................37

*Gelboim v. Bank of America Corp.*,
  823 F.3d 759 (2d Cir. 2016) ..............................48, 55, 57

*Goldfarb v. Virginia State Bar*,
  421 U.S. 773 (1975).................................................................37

*Hinds Cty. v. Wachovia Bank N.A.*,
  700 F. Supp. 2d 378 (S.D.N.Y. 2010)..................................52

*Hospital Bldg. Co. v. Trustees of Rex Hosp.*,
  425 U.S. 738 (1976)..................................................................62

*Kreutter v. McFadden Oil Corp.*,
  71 N.Y.2d 460 (1988) ................................................................9

*Licci v. Lebanese Canadian Bank*,
  732 F.3d 161 (2d Cir. 2013) ....................................................9

*Monsanto v. Spray-Rite Service Corp.*,
  465 U.S. 752 (1984).................................................................38

*NASL v. United States Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2018) ..........................................*passim*

v

*NASL v. United States Soccer Fed'n, Inc.*
2017 WL 5125771, at *10 (E.D.N.Y. Nov. 4, 2017) ........................ 39

*NASL v. NFL*,
670 F.2d 1249 (2d Cir. 1982) .................................................. 35, 39, 42

*Nat'l Collegiate Athletic Ass'n v. Alston et al.*,
141 S.Ct. 2141 (2021) ................................................................ 34, 37

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978) ............................................................................ 37

*National Collegiate Athletic Ass'n v. Bd. of Regents*,
468 U.S. 85 (1984) ........................................................... 4, 34, 37

*Palmer v. BRG of Georgia, Inc.*,
498 U.S. 4650 (1990) .......................................................................... 3

*Peregrine Myanmar Ltd. v. Segal*,
89 F.3d 41 (2d Cir. 1996) ................................................................ 66

*Petruzzi's IGA Supermarkets v. Darling-Delaware*,
998 F.2d 1224 (3d Cir. 1993) ......................................................... 47

*In re Project Orange Assocs., LLC*,
431 B.R. 363 (Bankr. S.D.N.Y. 2010) ............................................ 10

*Pullman v. Alpha Media Pub., Inc.*,
2013 WL 1290409 (S.D.N.Y. Jan. 11, 2013) ............................ 66, 67

*Iowa Pub. Emp.'s Ret. Sys. v. Merrill Lynch, Pierce, Fenner &
Smith Inc.*,
340 F. Supp. 3d 285 (S.D.N.Y. 2018) .......................................... 59, 61

*Robertson v. Sea Pines Real Estate Cos.*,
679 F.3d 278 (4th Cir. 2012) ................................................ 35, 36, 38

*Starr v. Sony BMG Music Entm't.*,
592 F.3d 314 (2d Cir. 2010) ................................................ 31, 57, 60

*Tae. H. Kim v. Ji Sung Yoo*,
776 F. Appx. 16 (2d Cir. 2019) ................................................. 68, 69

vi

*United States v. Apple,*
    791 F.3d 290 (2d Cir. 2015) ................................... 29, 47, 62

*United States v. National City Lines, Inc.,*
    334 U.S. 573 (1948) ............................................. 10

*United States v. Paramount Pictures, Inc.,*
    334 U.S. 131 (1948) ............................................. 36

*United States v. Scophony Corp.,*
    333 U.S. 795 (1948) ............................................. 11

*United States v. Sealy, Inc.,*
    388 U.S. 350 (1967) ............................................. 49

*United States v. Topco Assocs.,*
    405 U.S. 596 (1972) ........................................ 3, 4, 37

*Viacom Int'l, Inc. v. Kearney,*
    212 F.3d 721 (2d Cir. 2000) ................................... 64

*World Skating Fed'n v. Int'l Skating Union,*
    357 F. Supp. 2d 661 (S.D.N.Y. 2005) ....................... 10

## Statutes

15 U.S.C. § 1 ...................................................*passsim*

15 U.S.C. § 12 .............................................10, 11

15 U.S.C. § 22 .............................................8, 10

28 U.S.C. § 1291 .............................................6

28 U.S.C. §§ 1331 and 1337 ...............................7

36 U.S.C. §220501, *et seq.* ............................. 14, 67

## Other Authorities

7 Areeda & Hovenkamp, Antitrust Law, ¶ 1408c, 1475 (3d
    ed. 2010) ................................................... 34, 45

vii

C.P.L.R. § 302(a)(1) ...................................................................... 8

Fed. R. Civ. P. 12(b)(6) ...................................................... 11, 31, 55, 69

Fed. R. Civ. P. 12(b)(7) ...................................................................... 8

Fed. R. Civ. P. 19.......................................................................... *passim*

SCHWEIZERISCHES ZIVILGESETZBUCH [ZGB] [Civil Code], Dec.
10, 1907 (rev. Jan. 1, 2019), SR 210, RS 210, art. 60-62
(Switz.), https://www.admin.ch/opc/en/classified-
compilation/ 19070042/202101010000/210.pd ................................... 10

Rory Smith, *A Final for All time, Sacrificed on the Alter of
the Modern Game*, NEW YORK TIMES.COM (Nov. 30,
2018),
https://www.nytimes.com/2018/11/30/sports/soccer/copa-
libertadores-boca-rivermadrid.html .................................................. 21

Alejandro Casar González, *La Conmebol fijó que la final de
la Copa Libertadores se juegue en el Santiago Bernabéu,
de Madrid, el 9 de diciembre*, LA NACION (Nov. 29,
2018),
https://www.lanacion.com.ar/deportes/futbol/destino-
impensado-final-copa-libertadores-se-jugaranid2197523............ 21, 22

Richard A. Posner, *Economics Analysis of Law* 265–66 (3d
ed. 1986) ........................................................................................ 46

viii

# PRELIMINARY STATEMENT

Some conspiracies are in secret, and their existence is the subject of inference and dispute. Other conspiracies are out in the open, printed in the rulebooks of trade associations and sports leagues. This case involves an open conspiracy, and yet the district court dismissed it on the pleadings, holding that the conspiracy was not plausibly alleged. That dismissal is wrong as a matter of law.

Defendant U.S. Soccer Federation ("USSF") claims the right to govern professional and amateur soccer in the United States. Major League Soccer ("MLS") is USSF's exclusive top-tier men's professional league. Unfortunately, MLS teams—like the New York City Football Club and the Chicago Fire—struggle to maintain the same U.S. fan base as teams from elsewhere in the world, where soccer is more prominent. In fact, the most-attended U.S. soccer game of all time was an exhibition game between non-U.S.-based Manchester United and Real Madrid.

When it comes to "official-season" games in the United States, USSF and MLS—which are economically intertwined—want to maintain a monopoly. They have successfully blocked overseas leagues

AmericasActive:15975192.13

and teams (and promoters) from bringing official-season games into the United States to compete with MLS. To accomplish this, they turned to Defendant Fédération Internationale de Football Association ("FIFA"), the self-proclaimed international governing body for professional soccer. FIFA is a private membership organization made up of USSF and its fellow National Associations from around the world, each of which is economically connected with its own top-tier men's professional soccer league and represents those collective interests in FIFA decision-making.

Based on a proposal by a committee that included representatives of USSF and MLS, as well as several other National Associations and top-tier men's professional soccer leagues, the FIFA Council—one of FIFA's official rule-making bodies—voted to adopt a policy prohibiting any league or team from playing an official-season game outside its home country. Backing up this policy is the threat of severe sanctions for non-compliance. Effectively, the National Associations and their respective leagues agreed to stay home, so that each league will be free from competition within its own territory. In antitrust terms, this is a classic horizontal geographic market division agreement. It gives each

professional soccer league a monopoly on official games within its own territory and protects it from having to compete with other leagues for home-country fans and sponsors. This, in turn, furthers the economic interests of each National Association, which directly or indirectly reaps the benefits of its league's success.

USSF has taken full advantage of this anticompetitive agreement, invoking it to put a stop to foreign-league official-season games that Plaintiff Relevent and other promoters have tried to host in the United States. And because the leagues and teams that would have played in those games are all affiliated with FIFA—and have agreed to adhere to all FIFA policies, on pain of sanctions—they were coerced into complying with the agreement and withdrew from the games. In other words, although it would have been lucrative for these leagues and teams to play official-season games in the United States—giving their U.S. fans the ability to attend a game in person—they declined to do so because of a global agreement to prevent such competition.

This horizontal market division agreement is a per se violation of Section 1 of the Sherman Act. *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49–50 (1990); *United States v. Topco Assocs.*, 405 U.S. 596, 602–03,

3

608 (1972) (citing cases).  As the Supreme Court has repeatedly

explained, such "'territorial limitations . . . are naked restraints of trade

with no purpose except stifling of competition.'"  *Topco Assocs.*, 405 U.S.

at 608 (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263

(1963)).[1]

Even so, the district court dismissed the complaint, concluding

that it did not plausibly allege concerted action.  In reaching this

surprising conclusion, the court missed the forest for the trees.  Despite

direct evidence of an agreement—well-pled allegations of a mandatory,

horizontal restraint adopted by market participants through a

membership organization—the district court strained to require

something more.  According to the court, Relevent had to plead that

each participant privately agreed on how its representative would vote

and subjectively believed that the policy would be advantageous.

Further, according to the court, it was not enough for the

complaint to identify many of the people involved and provide details

about when and why they reached the agreement.  Instead, the court

---

[1] Alternatively, if the per se rule does not apply, the agreement is a "quick look" violation of the rule of reason.  *See National Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85 (1984).

4

chastised Relevent for failing to plead the subjective motivations of these people and their organizations, name the source of that information, and describe the basis for that source's knowledge. Under this approach, it would be virtually impossible for an antitrust plaintiff to state a conspiracy claim, unless one of the wrongdoers became a whistleblower and confessed the details before any discovery. Fortunately, this Court's authorities say otherwise.

In this case, there was no need to plead that the policy was the subject of any secret, behind-the-scenes "agreement to agree to vote" in a particular way, as the district court required. *The policy itself* is the agreement. Nothing more was needed. But even if it were, the Amended Complaint provided more than enough detail—names, dates, communications, objective motivations—to plausibly establish the agreement through circumstantial evidence. Indeed, as the Amended Complaint explains, the Department of Justice has issued a letter warning USSF and FIFA that the policy could violate Section 1 of the Sherman Act, as it is a horizontal geographical market division agreement restricting competition within the United States. Given these well-pled facts, the only way the district court could reach its

conclusion was to deviate from the pleading standard for antitrust conspiracy cases, which does not permit the court to choose between competing inferences at the pleading stage. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).

As this Court has observed, "[r]arely do co-conspirators plainly state their purpose." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 39 (2d Cir. 2018) ("*NASL*"). Here, they did. A prominent FIFA committee member—who is also the Commissioner of MLS and a member of the USSF board—publicly explained the reason for the market division agreement: "[T]he [majority of the] respective leagues [including MLS], don't believe it's in their best interest" to compete with one another by permitting official-season games outside their home markets. A-506; A-529 ¶¶ 51, 137 (quoting media accounts). Defendants' adoption of, adherence to, and enforcement of this market division agreement violates the Sherman Act. The dismissal cannot stand.

## STATEMENT OF JURISDICTION

This is an appeal under 28 U.S.C. § 1291 from a final judgment entered by a district court. The court entered the final judgment on

AmericasActive:15975192.13

July 28, 2021 (SPA-42), and Relevent filed a timely notice of appeal on August 26, 2021 (A-735). The district court had subject matter jurisdiction over Relevent's antitrust claim under 28 U.S.C. §§ 1331 and 1337. The court had personal jurisdiction over Defendant USSF because, among other things, it is a not-for-profit corporation organized under the laws of the State of New York and transacts substantial business in the Southern District. A-509; A-512–513 ¶¶ 66, 83.[2]

The parties disagree about whether the Amended Complaint sufficiently alleges a basis for personal jurisdiction over Defendant FIFA, and the district court did not resolve the dispute. The original complaint did not name FIFA as a defendant, so it did not need to allege facts that would establish personal jurisdiction over FIFA in New York. In granting USSF's motion to dismiss the original complaint, the court held that even if the complaint had stated a claim under the antitrust laws, the claim for injunctive relief would still be subject to dismissal

---

[2] In its Amended Complaint, Plaintiff also asserted tortious interference with existing and prospective business relationships. A-542–544 ¶¶ 179–192. Along with its dismissal of the antitrust claim in the original complaint, the court granted Defendants' motion to compel arbitration as to the tort claims. Relevent has made clear that it does not intend to pursue those claims in arbitration and does not intend to appeal the decision to compel arbitration.

7

for failure to join FIFA, which the court concluded was an indispensable party.  SPA-15 n.12; SPA-19; *see* Fed. R. Civ. P. 12(b)(7).

In its Amended Complaint, Relevent added FIFA as a defendant and provided ample allegations to support personal jurisdiction.  Among other things, Relevent alleged that FIFA transacts substantial business in the Southern District, authorizes USSF (a New York entity) to act on its behalf, participated in a conspiracy that involved overt acts in this district, and is the Swiss equivalent of a corporation with substantial aggregate and regular business contacts within the Southern District and the United States.   A-499; A-506–509; A-513–514 ¶¶ 24, 52–65, 84.

The new allegations provide ample basis for personal jurisdiction over FIFA, consistent with due process and in accordance with (1) the test in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018); (2) New York's long-arm statute, C.P.L.R. § 302(a)(1); and (3) 15 U.S.C. § 22.

*First*, the *Schwab* test is "extraordinarily broad" and allows jurisdiction where the complaint alleges that the defendant participated in a conspiracy and "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-

8

conspirator to jurisdiction in that state." *Schwab*, 883 F.3d at 87. The Amended Complaint here plausibly alleges that FIFA participated in the conduct underlying Relevent's claim—that is, a geographic market division conspiracy intended to, among other things, block foreign men's top-tier professional soccer leagues from playing official games in the United States, including in New York. The Amended Complaint also plausibly alleges that USSF (a New York corporation and co-conspirator with FIFA) took specific, repeated, and overt actions in New York in furtherance of that conspiracy. A-502–504; A-506 ¶¶ 37, 39–40, 45–46, 50–51.

*Second*, and independently, New York's long-arm statute is a single-act statute that does not require a causal link between the act and the plaintiff's injury. *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988); *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168–69 (2d Cir. 2013). The Amended Complaint plausibly alleges that FIFA or its agent (USSF) engaged in at least one and, in fact, far more than just one transaction in New York in furtherance of the conspiracy that is the subject of Relevent's antitrust claim. A-502–504; A-506 ¶¶ 37, 39–40, 45–46, 50–51.

9

*Third*, the Amended Complaint pleads jurisdiction over FIFA under Section 12 of the Clayton Act. *See* 15 U.S.C. § 22. Congress enacted the Clayton Act "to provide broader and more effective relief, both substantively and procedurally, for persons injured by violations of its antitrust policy." *United States v. Nat'l City Lines, Inc.*, 334 U.S. 573, 581 (1948). FIFA is a Swiss verein,[3] which is the Swiss legal equivalent of a corporation for purposes of the Clayton Act,[4] and it transacted business and violated U.S. antitrust laws directed at commerce in, among other places, the Southern District of New York. A-499; A-506–509; A-513–514 ¶¶ 24, 52–65, 84. It then retreated to its

---

[3] SCHWEIZERISCHES ZIVILGESETZBUCH [ZGB] [Civil Code], Dec. 10, 1907 (rev. Jan. 1, 2019), SR 210, RS 210, art. 60-62 (Switz.), https://www.admin.ch/opc/en/classified-compilation/ 19070042/202101010000/210.pdf (English trans.); A-590 ¶ 3.

[4] *In re Project Orange Assocs., LLC*, 431 B.R. 363, 368, n.2 (Bankr. S.D.N.Y. 2010); *accord, e.g., Dentons U.S. LLP v. Republic of Guinea*, 208 F. Supp. 3d 330, 344 (D.D.C. 2016). In briefing below, FIFA relied on a single district court decision holding that a different Swiss organization was not subject to jurisdiction under the Clayton Act. *See World Skating Fed'n v. Int'l Skating Union*, 357 F. Supp. 2d 661 (S.D.N.Y. 2005). But that court faced only the argument that "Swiss associations shar[e] some similarities with corporations" and did not consider the defendant's *actual* corporate status in Switzerland or the relevant Swiss civil code provisions governing that entity, as Relevent presents here. *See id.* at 665–66.

AmericasActive:15975192.13

headquarters in Switzerland and contested personal jurisdiction in this case. FIFA's assertion that its status as a Swiss verein should exempt it from Section 12 is an attempt to invoke the kind of "hair-splitting legal technicality" that Section 12 defeats. *United States v. Scophony Corp.*, 333 U.S. 795, 808 (1948). The very purpose of Section 12 is to prevent overseas actors—including those with corporate forms that may differ in some respects from a U.S. corporation—from inflicting antitrust harm in the United States and then claiming a lack of jurisdiction to redress the harm they caused. *Id.*

The district court dismissed the Amended Complaint under Rule 12(b)(6), so it did not need to rule on whether the Amended Complaint adequately pleads personal jurisdiction over FIFA. It also did not need to rule on Relevent's alternative request for jurisdictional discovery. This Court may resolve the jurisdictional sufficiency of the allegations in the first instance. In doing so, the Court should conclude—on any one, or all three, of the independent grounds discussed above—that the Amended Complaint adequately alleges jurisdiction over FIFA.

Either way, Plaintiff's claim should proceed with respect to both injunctive relief and damages. For the reasons discussed below (in Part

11

II of the Argument), the district court erred in holding that the claim for injunctive relief cannot proceed without FIFA. As a result, the presence or absence of FIFA from this case should make no difference in terms of how this case moves forward.

## STATEMENT OF THE ISSUES

1a.    Whether a written policy adopted by a membership organization to restrain the competitive activities of its members and their constituents—which the Amended Complaint plainly alleges in this case—constitutes "direct evidence" of concerted activity for purposes of Section 1 of the Sherman Act.

1b.    Alternatively, whether the Amended Complaint provides sufficient "circumstantial evidence" or "plus factors" supporting a plausible inference of concerted action by alleging facts showing that the co-conspirators had a common motive to conspire to enter into a geographic market division policy (as USSF's own representative has publicly conceded), that at least some co-conspirators were coerced into adhering to the policy even when doing so was not in their individual economic interests, and that representatives of the co-conspirators

12

engaged in both public and private communications in furtherance of the agreement.

2. Whether the district court erred in holding that FIFA was a necessary and indispensable party for purposes of injunctive relief. (The Court need not reach this question if it holds that the Amended Complaint *does* sufficiently allege personal jurisdiction over FIFA.)

## STATEMENT OF THE CASE

**I.  Through FIFA, the National Associations, leagues, and teams adopt and agree to follow common rules, including rules that restrict economic competition among them.**

This case involves professional soccer—a wildly popular and lucrative commercial enterprise.  FIFA is the sport's self-declared international governing body.  It is a private, membership-based entity organized as a Swiss verein, and its voting members consist of 211 National Associations, including USSF in the United States.  A-499, ¶¶ 24–25; A-590 ¶¶ 2–3.  Each National Association is made up of and represents various professional soccer leagues and teams from its own country.  A-500–501 ¶¶ 29–31.  Every top-tier professional soccer league and team in the world is a member of, and is economically intertwined with, its own National Association and is subject to FIFA's rules and policies.  A-500–501; A-515–516 ¶¶ 29–31, 91.  A league or team that

13

fails to comply is subject to severe sanctions, including the sanction of having its players excluded from the World Cup (FIFA's preeminent global soccer competition, held once every four years). A-518–519 ¶ 100.

As the National Association for the United States, USSF has authority to act on FIFA's behalf within U.S. borders. A-501 ¶ 31. USSF has authorized MLS to serve as its exclusive top-tier men's professional soccer league (A-498 ¶ 20), and it is economically intertwined with MLS, including through their shared relationship with Soccer United Marketing (A-515–516 ¶ 91). USSF represents MLS for purposes of FIFA decision-making. A-500-501 ¶¶ 30–31. By federal law, USSF is also the governing body for *amateur* soccer. *See* 36 U.S.C. §220501, *et seq* ("Ted Stevens Olympic and Amateur Sports Act"). For *professional* soccer, however, USSF asserts its authority solely through its membership in FIFA, in which all the top-tier professional soccer leagues in the world have agreed to participate. A-509–510 ¶¶ 68–70.

Through FIFA, the National Associations (and the leagues they represent) come together to adopt rules and policies that govern professional soccer across the world. A-499–500 ¶ 26. These include rules of the game—like the size of the field and the number of players—

14

as well as policies that restrict how the various leagues compete with one another economically. *Id.* When those policies impact economic competition within a particular jurisdiction, they must comply with that jurisdiction's antitrust laws. *Id.*

FIFA's supreme legislative body is the FIFA Congress, which is made up of delegates from each National Association. A-501 ¶ 32. The Congress is responsible for adopting and amending the FIFA Statutes, which contain many of FIFA's rules and policies. *Id.* ¶ 33. Among other things, the National Associations have voted to require one another (and their constituent leagues and teams) to "comply fully with the Statutes, regulations, directives and decisions of FIFA bodies." *Id.* ¶ 34. Failure to do so can result in suspension or expulsion from FIFA. *Id.*

FIFA members also come together through their representatives to elect a smaller body—the FIFA Council—which interprets the FIFA Statutes and adopts rules and policies that the statutes do not specifically address. A-502 ¶ 36. The Council is made up of individuals elected by the members of each of the six regional subdivisions of FIFA, knows as "confederations." *Id.* Each National Association can propose one candidate to its confederation for election to the Council. *Id.* The

AmericasActive:15975192.13

Council currently has 37 members, 5 of whom are elected by the members of the Confederation of North, Central America and Caribbean Association Football, including USSF.  *Id.*

By virtue of their continued participation in FIFA, the National Associations (and their leagues and teams) agree to comply with all rules, policies, and other requirements of FIFA—including those adopted by the Council—whether or not their own delegates specifically voted for them.  A-501 ¶ 34.  Indeed, the FIFA Statutes require such adherence as a condition of membership.  *Id.*  In other words, by submitting themselves to FIFA's authority, the National Associations, leagues, and teams *agree to adhere* to FIFA requirements, regardless of whether they agree with those requirements as a matter of individual preference.

USSF's own agreement to abide by FIFA rules and policies appears in its bylaws, which are also binding on MLS.  These bylaws provide that "[USSF] and its members are, to the extent permitted by governing law, obliged to respect the statutes, regulations, directives and decisions of FIFA . . . and to ensure that these are likewise respected by their members."  A-502 ¶ 35 & n.12 (quoting BYLAWS OF

16

THE UNITED STATES SOCCER FEDERATION, INC., Bylaw 103 § 1) ("USSF Bylaws").

## II. In response to a proposed official game in the United States between non-U.S. teams promoted by Relevent, the Council adopted a policy prohibiting official games outside each league's home territory.

Relevent is one of the premier soccer event promoters in the world, staging games between FIFA-affiliated professional teams. A-498 ¶¶ 17–18. It does so through its in-house "match agent," who must be registered with FIFA and seek FIFA's approval (through USSF) for any game held in the United States. A-507 ¶ 56. Relevent has built its business by, among other things, hosting "friendlies"—that is, exhibition games that have no impact on the teams' official league standings. A-498 ¶¶ 17–18.

The response of U.S. soccer fans to these events has been overwhelming. In fact, "friendlies" between foreign teams account for three of the five highest-attended professional soccer games ever played in the United States. *Id.* ¶ 18. The 2014 "friendly" between Real Madrid (Spain) and Manchester United (England) in Ann Arbor, Michigan is still the most highly attended U.S. soccer game ever, with more than 109,000 fans in the stands. *Id.*

17

Recognizing the enthusiasm of U.S. fans for non-U.S. teams, Relevent planned to promote an *official-season* game in the United States between two foreign top-tier professional soccer teams. Initially, one foreign league agreed to join this effort. La Liga—the top-tier men's professional soccer league in Spain—entered into a joint venture with Relevent that would bring official-season La Liga soccer games to the United States. *Id.* ¶ 19. By August 2018, they had reached an agreement to host an official-season game in Miami between two La Liga teams: Barcelona and Girona. A-521–522 ¶ 111. Relevent met with USSF about getting its approval for this event, and then-USSF President Carlos Cordeiro said that Relevent would first have to obtain approval from the National Association for Spain and the confederation representing Europe (UEFA). *Id.*

From USSF's perspective, the proposed entry of overseas soccer teams into the United States to play official games threatened to undermine MLS's support from U.S. fans and sponsors. Games like the one proposed by Relevent and La Liga would put well-respected foreign leagues in direct, live, official-season competition with their U.S. counterpart, MLS. A-498; A-522 ¶¶ 20, 112. This would threaten the

18

economic interests of both MLS and USSF itself. USSF and MLS are intertwined economically, including through their shared marketing partner, Soccer United Marketing, which markets USSF's broadcast and sponsorship rights in combination with the rights of MLS and constitutes the largest source of USSF's annual revenues. A-515–516; 520–521; 537 ¶¶ 91, 105–110, 165. Both USSF and FIFA were concerned about the competitive impact of the Relevent/La Liga match on MLS; FIFA President Gianni Infantino told the press, "I think I would prefer to see a great MLS game in the U.S. rather than La Liga being in the U.S." A-522 ¶ 113.

It was no surprise, then, when the Council, in response to a request from USSF and others, promptly adopted a policy that would enable USSF to protect itself and MLS from this competition, while also conferring the same protection on their counterparts worldwide. A-523 ¶ 116–117. The written FIFA policy reads:

> Following a request for guidance from the Spanish FA, US Soccer[,] and [the North American confederation], the FIFA Council discussed La Liga's proposal to host an official 2018/19 regular season league match outside of Spain (in Miami).

AmericasActive:15975192.13

> Consistent with the opinion expressed by the
> Football Stakeholders Committee, the [FIFA]
> Council emphasi[zed] the sporting principle that
> official league matches must be played within the
> territory of the respective member association.

*Id.* ¶ 117 (quoting A-601).  FIFA immediately published this policy on

its website.  *Id.* n.33.  In substance, the policy is a horizontal geographic

market division that gives each National Association's top-tier soccer

league monopoly rights over official games within its geographic

borders.

Current and former USSF officials actively participated in

formulating and implementing this agreement.  As its statement makes

clear, the Council adopted the policy at the recommendation of the

Football Stakeholders Committee, which is a standing committee

created by a vote of the National Associations in 2016 and includes

representatives of several National Associations and top-tier leagues.

A-504–505 ¶¶ 43–47.  The Football Stakeholders Committee included

then-USSF President and Board Member Carlos Cordeiro, as well as

USSF Board Member Don Garber, who is also the Commissioner of

MLS.  A-504; A-510–511; A-522 ¶¶ 44, 73, 79, 114–115.  And former

USSF President and MLS executive Sunil Gulati served on the Council

itself during the policy's consideration and adoption.  A-502–503; A-523 ¶¶ 38–39, 116.

Shortly after the Council issued its market division policy, Relevent approached USSF with another proposal.  Because of safety concerns, Argentinian officials and FIFA's South American confederation (CONMEBOL) had determined that a scheduled South American championship game could not proceed in Argentina.  A-524 ¶ 119.  Relevent approached Cordeiro to seek approval to promote the game in Miami, aware that USSF's marketing representative, Soccer United Marketing, had been previously allowed to promote a similar Mexican championship game in the United States.  *Id.*  Cordeiro refused to discuss the matter and instead "'made his opposition clear'" to the South American confederation.  *Id.* ¶ 120.[5]  A confederation official later explained "that the game was not played in Miami because 'Carlos Cordeiro (the president of US Soccer) did not want to.'"  *Id.*[6]

---

[5] Quoting Rory Smith, *A Final for All time, Sacrificed on the Alter of the Modern Game*, NEW YORK TIMES.COM (Nov. 30, 2018), https://www.nytimes.com/2018/11/30/sports/soccer/copa-libertadores-boca-rivermadrid.html.

[6] Quoting Alejandro Casar González, *La Conmebol fijó que la final de la Copa Libertadores se juegue en el Santiago Bernabéu, de Madrid, el 9 de*

21

Days later, Barcelona withdrew from its commitment to

participate in Relevent's proposed La Liga official-season game in the

United States.  A-525 ¶121.  The team issued the following statement

(translated from Spanish):

> The Board of Directors of FC Barcelona has
> decided to withdraw its decision to play the
> match against Girona FC in Miami, after
> confirming a lack of consensus on the proposal.
> FC Barcelona was and remains willing to play a
> La Liga match in Miami . . . but acknowledges
> that while there is no agreement between all
> parties, this project will not succeed.

*Id.*  This "lack of consensus" was a reference to the geographic market

division policy adopted by the Council—and to USSF's insistence that

other National Associations, teams, and leagues must comply with it or

face FIFA sanctions.

Later, Relevent identified two Ecuadorian teams with an interest

in playing an official game in the United States, and it proposed a game

between them in Miami for May 5, 2019.  *Id.* ¶ 123.  Relevent booked

Hard Rock Stadium in Miami and obtained written approval for the

---

*diciembre*, LA NACION (Nov. 29, 2018),
https://www.lanacion.com.ar/deportes/futbol/destino-impensado-final-
copa-libertadores-se-jugaranid2197523.

game from the teams' league (LigaPro), the National Association in Ecuador, and the South American confederation.  A-525–526 ¶ 125. Relevent attached proof of these approvals to its application to USSF to be able to hold this game in the United States.  *Id*.

USSF denied the application, stating that it would not allow the game because it had agreed to follow the market division policy adopted by the Council.  A-527 ¶ 129.  The denial also stated that USSF had communicated with FIFA, which had confirmed that the game was prohibited by the policy.  *Id*. ¶ 130.  In the following months, USSF took the same position with respect to another foreign official-season game proposed by another promoter.  A-527–528 ¶¶ 131–34.

Since then—and after the filing of the complaint in this case— USSF officials have continued their efforts to enforce and strengthen the geographic market division policy.  In 2020, the Football Stakeholders Committee, including Mr. Garber and Mr. Cordeiro, recommended that the policy be elevated in importance and made part of the FIFA Statutes.  A-528–529 ¶¶ 136–138.  Mr. Garber spoke publicly about this effort in his role as co-chair of the World Leagues Forum—an association of more than 40 top-tier professional leagues

AmericasActive:15975192.13

from around the world. After conferring with members of the Forum, he disclosed that "the [majority of the] respective leagues [including MLS] don't believe it's in their best interest" to compete with one another for official games outside their home markets. A-506; A-529 ¶¶ 51, 137. Although Mr. Garber acknowledged that "[t]here may be one or two" leagues that feel differently, MLS was not one of them. *Id.*

Following the publicity generated by the Football Stakeholder Committee's recommendation and Mr. Garber's comments, the United States Department of Justice informed USSF and FIFA in writing that their implementation of this geographic market division agreement "could violate U.S. antitrust laws by restricting the territory in which teams can play league games." A-529 ¶ 139. Despite this warning, USSF and FIFA have continued to enforce the anticompetitive geographic market division policy. A-496–497; A-529 ¶¶ 11, 140.

## III. Relevent filed this suit, and the district court dismissed its Sherman Act claim for failure to allege an "agreement."

After its La Liga game was cancelled and USSF refused to allow the Ecuador game in Miami, Relevent filed this lawsuit against USSF. A-13–43. Relevent alleged that the policy constituted an unlawful agreement among the National Associations and the actually and

potentially competing leagues and teams they represent, in violation of Section 1 of Sherman Act.   A-15–16; A-37; A-49-50 ¶¶ 1, 8, 86, 126–27.

On USSF's motion, the court initially dismissed the Sherman Act claim without prejudice, finding that the original complaint did not allege sufficiently detailed facts to show an agreement in restraint of trade.  SPA-12–18.  Further, the court stated that even if Relevent had adequately alleged such an agreement, its injunctive relief claim would fail for not joining FIFA, which the court concluded was a necessary and indispensable party under Rule 19.  SPA-15 n.12.  According to the court, FIFA's policy was "the heart" of Relevent's antitrust claim and would remain in effect for all other FIFA-affiliated bodies unless FIFA itself were subject to a ruling by the Court.  *Id.*  The court also observed that the initial complaint did not contain sufficient allegations of personal jurisdiction against FIFA—which was no surprise, as Relevent did not join FIFA as a defendant.  *Id.*

Relevent then filed its Amended Complaint, joining FIFA as a defendant (with new jurisdictional allegations) and adding many additional factual allegations that further demonstrate the existence of a horizontal agreement to divide markets among the leagues and teams

AmericasActive:15975192.13

that agree to abide by FIFA's rules and policies.  *See* A-493–546.

Specifically, Relevent alleged that the FIFA market division policy

thwarts competition in the market for men's top-tier official-season

professional soccer games in the U.S.  The consumers in that market

are both the fans who would purchase tickets to the games and the

businesses who would sponsor them.  Absent the anticompetitive

agreement, MLS and other top-tier men's professional soccer leagues

(which work in combination with promoters like Relevent) would

actually or potentially compete with one another to conduct official-

season games in the United States.  A-495; A-516 ¶¶ 5, 92.

USSF and FIFA each moved to dismiss the Amended Complaint

for failure to state a claim under the Sherman Act, while FIFA also

moved to dismiss the claim against it on personal jurisdiction grounds.

ECF Nos. 66, 69.  The court granted the motions to dismiss, holding

that the Amended Complaint did not sufficiently plead concerted action

for purposes of Section 1 of the Sherman Act.  SPA-20–40.

Among other things, the court held that the adoption and public

announcement of the FIFA market division policy and "USSF's

admitted compliance" with it were "insufficient to constitute direct

AmericasActive:15975192.13

evidence of an unlawful agreement." SPA-29. According to the court, it was not enough for Relevent to point to the undisputed existence of the policy itself—or to the fact that it was adhered to by the National Associations, leagues, and teams involved in Relevent's proposed games, under threat of sanctions. SPA-32. Instead, the court held that Relevent was also required to allege an "antecedent 'agreement [among horizontal competitors] to agree to vote a particular way' to adopt such a policy." SPA-33. In other words, the court believed it was necessary for Relevent to allege specific facts showing that each of the members of the Council privately *agreed in advance* with each other to vote in support of the policy in furtherance of the competitive desires of the leagues they represent. *Id.*

The court also found insufficient allegations of circumstantial evidence to establish the existence of the challenged agreement. Among other things, the court rejected Relevent's detailed allegations about the role of USSF executives in bringing about the market division policy, stating that these allegations were "wholly unsupported and conclusory." SPA-35. According to the court, Relevent could not rely on the executives' public statements about the policy, or on their

undisputed participation on the committee that recommended the policy and the Council that voted to enact it.  Instead, Relevent was required to provide details about USSF's behind-the-scenes, private, one-on-one "role in pressing others on the FIFA Council to adopt the Policy," as well as to describe the "sources" of that information and "the sources' asserted basis for knowledge."  SPA-34 n.15.

Further, the court concluded that the withdrawal of the foreign leagues and teams from the proposed games was not evidence of concerted action.  According to the court, those leagues and teams may have feared their players would be "deemed ineligible for World Cup play," which the court believed would be an "obvious rational reason[]" to adhere to the policy that would not show them to be "part of an unlawful agreement."  SPA-30–31 & n.10; *see also* SPA-38.  But the court did not explain why such coerced adherence, however rational, would not itself be concerted action in restraint of trade.

## SUMMARY OF ARGUMENT

Second Circuit law is clear: to plead a Section 1 Sherman Act violation, a plaintiff may plead either direct evidence of an anticompetitive agreement or circumstantial facts supporting a

AmericasActive:15975192.13

plausible inference of an agreement.  *United States v. Apple*, 791 F.3d 290, 315 (2d Cir. 2015).  The Supreme Court has long held that a membership association's adoption of a mandatory policy restraining competition by its participants is an "agreement" subject to Section 1 of the Sherman Act.  *See, e.g.*, *Associated Press v. United States*, 326 U.S. 1, 19 (1945).  The Amended Complaint in this case pleads direct evidence of just such an agreement by pointing to FIFA's horizontal market division policy, published openly on its website, along with the requirement that all FIFA members, leagues, and teams comply with that policy.  Under these well-pled facts, the policy itself *is* the agreement.  The court erred by concluding that no "agreement" had been pled.

Even if circumstantial evidence of an agreement were required here, the Amended Complaint amply met that requirement.  The Supreme Court has held that pleading standards evaluate plausibility, not probability.  The court need not consider alternatives; the only question is whether the complaint plausibly pleads an agreement. Here, it does.  The Amended Complaint alleges that identified representatives of USSF advanced a market division agreement that

reflected the leagues' common motive to be protected from competition

in their home markets. The Amended Complaint also plausibly alleges

that the parallel act of adhering to the market division policy was

against the individual economic interests of some of the foreign leagues

and teams bound by FIFA's rules, as they wanted to play official-season

games in the United States. Indeed, while those leagues and teams

initially expressed a willingness to "cheat" on the policy, they ultimately

were coerced into complying with the agreement. And the Amended

Complaint includes ample allegations of meetings and interfirm

communications—as reflected in FIFA's public announcements, media

accounts, and the public statements of Defendants' own

representatives—that make it at least plausible that the co-conspirators

had an opportunity to (and did) reach an agreement to restrain trade.

These allegations are more than sufficient under this Court's cases.

Finally, if this Court does not decide now that the Amended

Complaint sufficiently alleges jurisdiction over FIFA, it should go on to

review and reverse the district court's conclusion that FIFA is

indispensable to the claim for injunctive relief. The district court was

wrong to assume that without including FIFA in any injunction against

USSF, Relevent would not be able to obtain the approvals necessary to proceed with official-season games. Indeed, it *already had* all necessary approvals except for the approval of USSF. And holding that FIFA is an indispensable party would risk leaving Relevent with no forum in which to advance its injunctive claims against a U.S. antitrust violation. Rule 19 does not require such a result.

## STANDARD OF REVIEW

An appellate court conducts a de novo review of a district court's dismissal for failure to state a claim. *Starr v. Sony BMG Music Entm't.*, 592 F.3d 314, 321 (2d Cir. 2010). "While for purposes of a summary judgment motion, a Section 1 plaintiff must offer evidence that tend[s] to rule out the possibility that the defendants were acting independently, to survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only allege enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 321 (internal citations and quotation marks omitted). There is no "probability requirement at the pleading stage;" rather a plaintiff need only plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556

31

(2007). In fact, the Supreme Court has stated that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*.

## ARGUMENT

## I. The district court erred in holding that the Amended Complaint fails to plead an "agreement" under Section 1.

The district court found that Relevent failed to allege facts plausibly showing an "agreement" for purposes of Section 1. This ruling misses the point. The market division policy *itself* is the agreement. And its existence is not dispute. The Council adopted it, and FIFA published it on its website—all of which was pleaded in detail in the Amended Complaint. Nothing more was required.

Even if circumstantial evidence or "plus factors" *were* required, the allegations in the Amended Complaint were more than sufficient to provide them. The level of detail the district court demanded goes well beyond what *Iqbal* and *Twombly* require and would render it virtually impossible to plead an antitrust conspiracy. This Court should vacate the district court's order of dismissal.

### A. The Amended Complaint pleads direct evidence of an agreement.

#### 1. A published association policy through which market participants regulate one another's competitive activities is direct evidence of an agreement.

Competitors "cannot simply get around antitrust liability by acting through a third-party intermediary," like a trade association or sports organization. *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 202 (2010) (citations omitted); *see also Associated Press*, 326 U.S. 1 at 19 ("arrangements or combinations designed to stifle competition cannot be immunized by adopting a membership device accomplishing that purpose"). When market participants impose "duties and restrictions in the conduct of their separate businesses"—whether directly or through an association—those rules constitute "agreements" for purposes of Section 1 of the Sherman Act. *Associated Press*, 326 U.S. at 8; *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 500–01 (1988) (standards set by a private industry organization constitute an "agreement" among market participants subject to Section 1). No separate proof is necessary; the rules that an association adopts to govern its members' competitive activities necessarily reflect "concerted

AmericasActive:15975192.13

decisions by the members." 7 Areeda & Hovenkamp, Antitrust Law ¶ 1475 (3d ed. 2010).

Indeed, membership associations like FIFA may themselves be liable for adopting rules that restrain competition among their constituents. *See, e.g., Am. Needle*, 560 U.S. at 191–92; *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 99–100 (1984); *Associated Press*, 326 U.S. at 19. As the Supreme Court has explained:

> When [an industry association's] agents act in its name, they are able to affect the lives of large numbers of people and the competitive fortunes of businesses throughout the country. By holding [an industry association] liable under the antitrust laws for the antitrust violations of its agents committed with apparent authority, we recognize the important role of [the industry association] and its agents in the economy, and we help to ensure that standard-setting organizations will act with care when they permit their agents to speak for them.

*Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 577–78 (1982); *Nat'l Collegiate Athletic Ass'n v. Alston et al.*, 141 S.Ct. 2141, 2168 (2021) (Kavanaugh, J., concurring) ("The NCAA is not above the law.").

When an association adopts a policy restricting competitive activities of its constituents and puts it in writing, the existence of an

AmericasActive:15975192.13

"agreement" is beyond dispute. *The policy itself* is the agreement. *Associated Press*, 326 U.S. at 8. This Court has recognized as much. In another case against USSF, this Court observed that when a plaintiff challenges an association's policy or standards themselves as anticompetitive, the very "promulgation" of the policy or standards "constitute[s] direct evidence of § 1 concerted action." *See NASL*, 883 F.3d 32, 41 (2d Cir. 2018). Although not every action by an association is concerted action in restraint of trade, the "association's express regulation of its members' market" is "direct evidence" supporting a Section 1 claim. *Id.*; *accord NASL v. NFL*, 670 F.2d 1249, 1261 (2d Cir. 1982) (striking down NFL rule restricting investment activities of NFL owners under Section 1).

In such a case, it is not necessary to plead "circumstantial" evidence establishing a meeting of the minds—like which members proposed it, what motivated them, or what they said to one another privately about the agreement. Again, *the policy itself* is the agreement, and its existence "is not a matter of inference or dispute." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 290 (4th Cir. 2012). Once the policy is adopted, there can be no doubt about "concerted action," and

such allegations are "superfluous." *Id.* at 289. As the district court noted, direct evidence of an agreement might include "a 'recorded phone call in which two competitors agreed to fix prices.'" SPA-27 (quoting *Mayor & City Council v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)). An agreement among association members to adhere to an association rule is even easier to plead; it is published on the association's website.

Nor is it necessary to plead that each association member subjectively agrees with the policy as adopted. By virtue of their membership, the association's members have "surrendered [their] freedom of action" in all relevant respects, "agree[ing] to abide by the will of the association[]." *Anderson v. Shipowners Ass'n of Pac. Coast*, 272 U.S. 359, 364–65 (1926). And "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948).

Case after case has treated association rules as "concerted decisions" or "agreements" subject to Section 1, without any examination of behind-the-scenes discussions to find an antecedent

36

meeting of the minds or an agreement to agree. *See, e.g., Alston*, 141 S.Ct. at 2166 (affirming district court judgment striking down NCAA rules prohibiting member conferences and schools from competing to provide education-related benefits for student-athletes); *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 759–60 (1999) (rule restricting advertising by association members); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986) (rule prohibiting members from giving insurers access to x-rays); *Bd. of Regents*, 468 U.S. at 99 (restriction on members' broadcast licensing rights); *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 356–57 (1982) (rule limiting member competition on prices); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 681 (1978) (rule against competitive bidding by members); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 781–83 (1975) (rule against fee schedules by bar members); *Topco*, 405 U.S. at 602–03 (bylaws of joint venture that allocated territories among members ). It is no answer to say—as the district court did—that the existence of the agreement in these cases was not in dispute. SPA-33 n.13. In each, the existence of the agreement was *beyond* dispute, because the policy restricting member activities was in writing, for all the world to see. As a result,

AmericasActive:15975192.13

there could be no "uncertainty . . . about the terms of the agreement, let alone whether one was made." *Robertson*, 679 F.3d at 289.

Indeed, the allegations here go farther than just pointing to the policy itself; they also address USSF's efforts to promulgate and invoke the policy to control the behavior of MLS's potential competitors. As discussed above, the Amended Complaint pleads that USSF and its executives invoked the policy in order to stop the proposed official-season games from proceeding. *See supra* at 21–23. This too is "*direct* evidence" of the agreement. *See Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 765 (1984) (emphasis in original) (referring to testimony about Monsanto's efforts to force others to comply with the agreement). The district court relied on *Monsanto* for the unremarkable principle that a plaintiff must allege direct or circumstantial evidence of "'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" SPA-37 (quoting *Monsanto*, 465 U.S. at 768). But *Monsanto* itself makes clear that allegations of direct evidence of such a common scheme, like the policy invoked by USSF, are more than sufficient.

38

The district court's decision misreads this Court's cases on this subject, holding that the FIFA policy cannot be considered "concerted action" unless there was "an antecedent 'agreement [among horizontal competitors] to agree to vote a particular way' to adopt such a policy.'" SPA-33 (quoting *NASL*, 883 F.3d at 39).[7] The court missed the key distinguishing feature of the cases it cited: none of those cases involved a challenge to a written policy explicitly restricting economic competition among the association's constituents. Again, the Court in *NASL* specifically stated that if the plaintiff in that case had challenged the association's rules themselves—as Relevent does here—the mere promulgation of those rules would suffice as direct evidence of an

---

[7] The district court misunderstood the phrase "'agreement to agree to vote in a particular way'" to be a requirement imposed or adopted by this Court. SPA-33. In fact, when it used that phrase in *NASL*, this Court was simply quoting from the lower court's discussion. *See* 883 F.3d at 39 (quoting *NASL v. United States Soccer Fed'n, Inc.*, 2017 WL 5125771, at *10 (E.D.N.Y. Nov. 4, 2017)). Although this Court affirmed the denial of a preliminary injunction in that case, it did not state any requirement that a plaintiff must plead "an agreement to agree to vote a particular way." Instead, the Court found that the promulgation of certain USSF rules was circumstantial evidence of the alleged conspiracy—which was larger than the rules themselves—and must be evaluated with other allegations of circumstantial evidence. *Id*. at 41. Further, the issue before the Court was whether NASL had met the very high burden for seeking a mandatory preliminary injunction, not whether it had met pleading standards. *Id*. at 45.

39

agreement subject to Section 1.  883 F.3d at 41 ("If NASL were challenging the Standards themselves—in totality—as violative of the antitrust laws, then the USSF Board's promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking.").

The court below also erred by relying on cases involving allegations of an *undisclosed* agreement—the existence of which had to be *inferred*.  *See* SPA-33–34.  That is why the courts in those cases were forced to look for circumstantial evidence to give rise to a "reasonable inference of concerted action."  *AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 234 (2d Cir. 1999).  In *AD/SAT*, for example, the plaintiff was challenging the business conduct of the association itself—the Associated Press—and alleged that certain AP-member newspapers must be part of a conspiracy simply by virtue of their membership in the association.  As this Court noted, the claims did not challenge any bylaws or rules of the Associated Press that governed its members' own businesses.  *Id.* at 233, 235.  Unwilling to infer a conspiracy from the newspapers' membership status alone, and without any challenge to a written association policy, this Court had to examine whether there was circumstantial evidence showing that

AmericasActive:15975192.13

association members, "in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *Id.* at 234.

Similarly, in *LaFlamme v. Societe Air France*, the plaintiff alleged what it said "'appears'" to have been an agreement among airlines in a trade association to adopt certain prices. 702 F. Supp. 2d 136, 142 (E.D.N.Y. 2010) (quoting complaint). Yet the plaintiff could not allege "when, where, how, or whether this decision was collectively agreed to." *Id.* The case did not involve a challenge to any association rule—written or otherwise—governing the pricing behavior of members. Instead, the plaintiff argued that the agreement should be inferred from the defendants' parallel conduct and "open participation in regulated, recorded, immunized trade association meetings." *Id.* at 153. The court rejected the claim, holding (among other things) that absent an explicit association rule, the plaintiff was required to allege some factual context that would show that the defendants' individual pricing conduct was not just "independent, though parallel, action." *Id.* (internal quotation marks omitted).

41

This Court has never imposed such a burden in a case that *does* challenge an explicit association policy that governs its constituents' conduct. To the contrary, as noted above, this Court has explained that when a plaintiff challenges an association's written policies themselves, the association's "promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking." *NASL*, 883 F.3d at 41. This was not mere "dicta," as the court below suggested. SPA-32 n.12. Instead, it was integral to the Court's reasoning in *NASL*, which specifically distinguished the claim in that case (a hidden conspiracy to *apply* rules in a discriminatory manner to favor one competitor at the expense of another) from a challenge to "an association's express regulation of its members' market." 883 F.3d at 40.

As discussed below, this case challenges the written FIFA market division policy itself. Relevent challenges *the policy*—on its own, and in its totality—as an agreement restraining economic competition among FIFA leagues and teams, and the National Associations with whom they are economically joined, in violation of Section 1. It is undisputed that the market division policy *exists*, and the National Associations, leagues, and teams have all agreed to adhere to it. That is direct

evidence of an agreement restraining trade, and the district court erred in requiring anything more.

> ### 2. The Amended Complaint alleged more than enough facts to plausibly show such direct evidence.

The Amended Complaint alleges in detail that the Council—a member-elected board with authority to issue binding rules—adopted and announced a policy prohibiting FIFA leagues and teams from conducting official-season games in any location except the league's FIFA-allocated home territory. A-502 ¶ 37; *see also* A-521–523 ¶¶ 111–117. The policy states, in relevant part: "official league matches must be played within the territory of the respective member association." *Id.* ¶ 117.[8] On its face, the policy restricts how FIFA members—the National Associations and their constituent teams and leagues—may operate their individual businesses. Under the authorities discussed above, this is more than sufficient direct evidence to establish a Section 1 "agreement," especially at the pleading stage.

---

[8] Quoting *FIFA Council makes key decisions for the future of football development*, FIFA.COM (Oct. 26, 2018), https://www.fifa.com/about-fifa/who-we-are/news/fifa-council-makes-key-decisions-for-the-future-offootball-development).

AmericasActive:15975192.13

The allegations in the Amended Complaint also plausibly show that FIFA members consciously committed themselves to comply with this FIFA market division policy. In enacting the FIFA Statutes, the National Associations and leagues—acting through their representatives to the FIFA Congress—voted to require all FIFA members, including the leagues and teams they represent, to "comply fully with the Statutes, regulations, directives and decisions of FIFA bodies." A-501 ¶ 34. As a result, by virtue of their continued participation in FIFA, every National Association, league, and team agrees to comply with these policies, whether it individually approves of a particular policy or not. *Id.*

Contrary to the district court's holding, it does not matter that some members may disagree with a particular policy and would find it in their individual economic interests not to comply (such as the Spanish and Ecuadorian teams that sought to participate in games to be promoted by Relevent in the United States). SPA-39. As a condition of participating in FIFA, members subject themselves to *all* FIFA requirements and expose themselves to severe sanctions if they fail to comply. A-518–519 ¶ 100 (citing FIFA DISCIPLINARY CODE, tit. 6-7,

AmericasActive:15975192.13

I.6(c). And "[c]oncerted efforts to *enforce* (rather than just agree upon)" common standards of behavior [are] not [exempt]; they should "face *more rigorous* antitrust scrutiny." *Allied Tube*, 486 U.S. at 501 n.6 (1988) (emphasis added). The threat of sanctions is what gives the agreement force—and what enabled USSF to invoke the agreement to pressure teams in Spain and Ecuador to withdraw from scheduled games in the United States. As Areeda and Hovenkamp explain, cartel agreements frequently require enforcement mechanisms, so a defendant cannot avoid liability merely because the participation of some conspirators was coerced. *See* Areeda & Hovenkamp, Antitrust Law ¶ 1408c ("[s]ome cartels would remain uncontrolled if coercion meant that no conspiracy existed").

Finally, the Amended Complaint makes clear that it was this written FIFA policy—and USSF's and FIFA's enforcement of it—that caused the cancellation of Relevent's planned official games. Indeed, USSF admitted as much. The Amended Complaint recounts that in both a state court filing and separate correspondence, USSF said it would not allow the games *because they violated the policy*. A-527 ¶¶ 129–130. And USSF also made clear its intention to enforce the FIFA

AmericasActive:15975192.13

policy against the Spanish and Ecuadorian leagues and teams that would otherwise have found it in their individual interests to play official games in the United States. A-521–522; A-524–528 ¶¶ 111, 120–26, 128–34 & n.37. The fact that those leagues and teams had bound themselves to adhere to FIFA rules on pain of sanctions—notwithstanding their individual economic interests—is the very essence of concerted action in restraint of trade subject to Section 1. *See, e.g., Shipowners*, 272 U.S. at 364–65. Indeed, it is well-established in antitrust economics that a cartel needs an enforcement mechanism to survive, because without it, the incentives for individual cartel members to cheat are too great. Richard A. Posner, *Economics Analysis of Law* 265–66 (3d ed. 1986).

**B.** **Alternatively, Relevent alleged sufficient "plus factors" under this Court's cases to plausibly plead an agreement through circumstantial evidence.**

Even if the direct evidence were not so clear, the district court also erred in holding that Relevent failed to plead an agreement through *circumstantial* evidence. *See* SPA-36–39. A plaintiff may state a conspiracy claim by alleging either "direct evidence that the defendants entered into an agreement" *or* "circumstantial facts"—also known as

46

"plus factors"—that, "when viewed in conjunction with parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apple*, 791 F.3d at 315 (2d Cir. 2015).

The function of these two kinds of evidence is the same:  it enables the court to find the existence of the agreement to be plausible. Further, the difference between them is not always distinct.  After all, even the proverbial "smoking gun" is circumstantial evidence unless the witness saw it fired.  *Cf. Petruzzi's IGA Supermarkets v. Darling-Delaware*, 998 F.2d 1224, 1230 n.5, 1233 (3d Cir. 1993) ("in Section 1 cases, it is unnecessary for a court to engage in the exercise of distinguishing strong circumstantial evidence of concerted action from direct evidence of concerted action for both are sufficiently unambiguous") (internal quotation marks omitted).

Here, there can be no dispute that the Amended Complaint pleaded unambiguous parallel conduct—that is, the undisputed adherence of USSF and other National Associations, leagues, and teams to the FIFA market division policy.  *See* A-494; A-499–502; A-537–538 ¶¶ 4, 26, 34–35, 165–66.  And, as discussed below, the Amended Complaint not only alleged the policy itself but also pleaded all the well-

47

accepted "plus factors" used by this Court to infer the existence of an agreement.

In rejecting these allegations, the district court distorted the pleading standards, turned the economic interest analysis on its head, and adopted an approach that would make it virtually impossible for an antitrust plaintiff to state a conspiracy claim without a whistleblower providing details before discovery. Its analysis should not be allowed to stand.

> 1. **The Amended Complaint sufficiently pleaded the three most common "plus factors."**

Under this Court's cases, the three most common plus factors are (1) "a common motive to conspire;" (2) "evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators;" and (3) "evidence of a high level of interfirm communications." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (citation omitted). Relevent provided detailed allegations of all of these and more.

*First*, Relevent alleged that each league (and by extension, its National Association) has a motive to protect itself from competition from other leagues for fans within its allocated territory. *See*, *e.g.*, A-

48

495; A-498–499; A-536–537 ¶¶ 7, 21, 161–63, 165. Indeed, USSF Board Member and MLS Commissioner Don Garber has admitted this motive, telling the media that as co-chair of the World Leagues Forum—an association of more than 40 top-tier professional leagues from around the world—he understood "the [majority of the] respective leagues [including MLS] don't believe it's in their best interest" to compete with one another for official games outside their home markets. A-506; A-529 ¶¶ 51, 137. This is the classic common economic motive for a market division agreement. *See, e.g., United States v. Sealy, Inc.*, 388 U.S. 350, 356 (1967) (market division agreement "gave [] each licensee an enclave… free from the danger of outside incursions").

*Second*, Relevent alleged that complete adherence to the policy was contrary to the individual interests of some of the leagues and teams that were ultimately forced to comply. The Amended Complaint detailed at least two separate instances in which leagues and teams from Ecuador and Spain took steps to play official-season games within the United States (promoted by Relevent) but ultimately abandoned those plans, against their individual economic interests, in compliance with the market division agreement. A-499; A-521–522; A-524–528; A-

AmericasActive:15975192.13

537–38 ¶¶ 23, 111, 120–26, 128–34 & n.37, 166–67.  As discussed above, this behavior does not *undermine* the existence of the conspiracy; it *proves* it—as, but for the market division policy, these four teams would not have engaged in the parallel conduct of refraining from playing official-season games in the United States.  *See supra* page 45.

*Third*, the Amended Complaint pleaded extensive examples of communications between and among FIFA, USSF, the confederations, the National Associations acting on behalf of their league and teams, and the leagues themselves to adopt, implement, and enforce the market division policy.  A-499–506; A-522–524; A-526–529 ¶¶ 26–51, 114, 116–17, 120, 127, 130, 134, 136, 138.  These communications and meetings were revealed in public reports of conduct by individuals up to the very top of USSF and FIFA.  The Amended Complaint provides details about exactly when the relevant meetings were held and who attended them.  *E.g.*, A-523 ¶ 116 (October 26, 2018 Council meeting adopting the FIFA policy, which included USSF's Sunil Gulati); A-524 ¶ 120 (communications between then-USSF President Cordeiro and the South American confederation about the FIFA policy, as reported in *The New York Times*); A-525 ¶ 121 (communication from the Spanish team,

50

expressing the reasons for its withdrawal as being due to the "lack of consensus" because of the FIFA policy); A-526 ¶ 127 (USSF letter explaining that it was contacting the Ecuadorian National Association and confederation to discuss the fact that the proposed match was official and not "friendly" and thus in violation of the FIFA policy); A-528–529 ¶¶ 136–38 (detailing meetings and a vote about making the policy part of the FIFA Statutes, including dates and attendees); A-505 ¶¶ 47–48 (attendance by USSF, MLS, and other National Association and top-tier league representatives at meetings of the Football Stakeholders Committee in which action was taken to recommend that the Council adopt (and later, elevate) the FIFA market division policy); A-506 ¶ 51 (admission by MLS Commissioner and USSF Board member Garber that most top-tier professional leagues discussed and supported the policy). And FIFA's announcement of the market division policy itself confirmed that it was adopted in response to inquiries about Relevent's proposed La Liga game in the U.S. *See* A-601.

In addition to these well-pled allegations, the Department of Justice's warning letter to FIFA and USSF is a further plus factor supporting a plausible inference of a restraint of trade. *See* A-529 ¶¶

51

139–140; A-548–549 ("We specifically are concerned that FIFA could violate U.S. antitrust law by restricting the territory in which teams can play games.").  As courts have recognized, government actions "may be used to bolster the plausibility of § 1 claims" at the pleading stage. *Hinds Cty. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010); *accord City of Philadelphia v. Bank of Am. Corp.,* 498 F. Supp. 3d 516, 531 (S.D.N.Y. 2020).

Despite these extensively detailed allegations—which support a more-than-plausible inference of concerted action to adopt and adhere to the FIFA policy—the district court somehow found that Relevent "fail[ed] to allege circumstantial evidence" of an agreement.  SPA-36. That finding is rife with errors that contravene the law of this Circuit.

### 2. The district court's analysis distorted the "plausibility" standard.

Throughout its opinion—and particularly in its analysis of Relevent's alleged circumstantial evidence—the district court misapplied the pleading standard prescribed by *Twombly* and other cases.  *See*, *e.g.*, *Anderson News*, 680 F.3d 162, 185 (2d Cir. 2012). Again and again, the court either held Relevent to a standard higher than plausibility or rejected plausible inferences by overlooking well-

AmericasActive:15975192.13

pleaded facts.  The court's examination of one of Relevent's strongest circumstantial facts—the public statements by USSF's Don Garber regarding his communications with other top-tier professional leagues, discussed below—illustrates both errors.

The court dismissed as "tenuous at best" Relevent's allegations regarding Mr. Garber's statement to the press in February 2020.  *See* SPA-39.  As the Amended Complaint details, Mr. Garber admitted publicly that based on discussions with FIFA-affiliated leagues, he understood that "the respective leagues don't believe it's in their best interest" to permit other leagues to play official-season games in their home markets, and he shared his intention to use his role on the Football Stakeholders Committee to work to codify the FIFA market division policy in the FIFA Statutes.  *See* A-506 ¶¶ 50–51.  The court's assessment of these allegations was that "Mr. Garber's expression of MLS or USSF's opinion regarding the benefits of the Policy does not necessarily signify an underlying conspiracy among all National Associations, leagues, and teams to enforce the Policy."  SPA-39.  The court also found these allegations unhelpful because the statement was made "two years after the Policy was announced."  *Id.*

AmericasActive:15975192.13

Both of these assessments are unmoored from the "plausibility" standard. "[T]o present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages . . . ." *Anderson News*, 680 F.3d at 184. "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible . . . ." *Id*. at 189. At issue here is thus not what Mr. Garber's statement "*necessarily* signif[ied]" (SPA-39 (emphasis added)) but whether that alleged statement, in context, *plausibly* suggested an agreement among the leagues to support and agree to the FIFA market division policy.

It certainly did. As the Amended Complaint details, Mr. Garber openly admitted that based on his communications with other top-tier leagues in his role as co-chair of the World Leagues Forum, he understood that "the respective leagues"—not just USSF and MLS— "don't believe it's in their best interest" to allow official-season games from other leagues to be played in their home markets. A-506; A-529

54

¶¶ 50–51, 137–138. It is plainly plausible to infer from this statement that the policy reflects an agreement among "the respective leagues," acting through, and in conjunction with, their respective National Associations. And to the extent some leagues *did* want to compete in other markets, as Mr. Garber also stated, he was going to work to use the FIFA policy to preclude that from happening. A-506 ¶ 51.

Likewise, application of the plausibility standard means that "[s]kepticism of a conspiracy's existence is insufficient to warrant dismissal; 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (citations omitted). The court may have believed that the alleged connection between the FIFA Policy and Mr. Garber's statement was "tenuous at best," but that does not foreclose a reasonable inference otherwise. *Anderson News*, 680 F.3d at 185 ("Even if their truth seems doubtful, Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.") (citations omitted). This is especially so where the necessary context is alleged only a few paragraphs earlier in the

AmericasActive:15975192.13

complaint:  Mr. Garber's February 26, 2020 statement was made just before the Football Stakeholders Committee's February 27, 2020 recommendation, in which Mr. Garber and other league representatives participated, that the market division policy be formally added to the FIFA Statutes.  A-504–506 ¶¶ 46–50.  At a minimum, Mr. Garber's statement makes it plausible that "the respective leagues" shared a common motivation to divide their markets and give one another a geographic monopoly—in the FIFA Statutes as well as in the already-existing Council policy.

### 3. The district court's opinion turned the economic interest analysis on its head.

The district court also departed from this Court's cases in its analysis of economic interests.  Relevent alleged three separate instances in which foreign leagues, teams, and National Associations took material steps to have an official-season game conducted in the United States, notwithstanding the FIFA market division policy.  In each case, however, USSF's enforcement of the policy forced the participants to abandon those plans.  A-521–525 ¶¶ 111–118, 121 (Relevent's La Liga (Spain) 2018 official-season game); A-525–527 ¶¶ 123–130 (Relevent's LigaPro (Ecuador) May 2019 official-season

AmericasActive:15975192.13

game); A-527–528 ¶¶ 131–134 (another promoter's LigaPro (Ecuador) April 2019 official-season game).

Each of these alleged instances provides "evidence that shows that the parallel acts"—here, adhering to the market division policy—"were against the apparent individual economic self-interest of the alleged conspirators." *Gelboim*, 823 F.3d at 781. The allegations plausibly support the inference that each team, league, and National Association that agreed to play in the United States had determined that such a game would be in its individual economic interest. A-541 ¶ 175. The market division policy forced these entities to cancel their plans, against their individual economic interests, but in service of the anticompetitive market division policy that USSF, MLS, and other FIFA members and leagues had adopted through their representatives and agreed to follow. *Id.* This is precisely the type of behavior that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *See Starr*, 592 F.3d at 322 (2d Cir. 2010) (citations omitted).

AmericasActive:15975192.13

The district court's decision (which barely acknowledges any of these alleged instances) turns the above analysis on its head. The court seized on Relevent's proposed Ecuadorian game and concluded that it was not probative of an agreement: "[t]o the contrary, Plaintiff alleges that Ecuador's National Association agreed to allow two Ecuadorian teams to participate in Plaintiff's proposed Official Game in 2019, notwithstanding the FIFA Policy." SPA-31 n.10; *see also* SPA-39 ("To the contrary, Mr. Garber's statement that there are leagues who do *not* support the FIFA Policy undermines Plaintiff's argument by suggesting that there is, in fact, no 'agreement' among *all* of the National Associations, leagues, and teams to adhere to the Policy.").

But as this Court has acknowledged, "there is nothing implausible about coconspirators' starting out in disagreement as to how to deal conspiratorially with their common problem," so it is important for courts to account for the path the conspirators ultimately take. *See Anderson News,* 680 F.3d at 191 ("The court's reliance on the variety of defendants' original reactions failed to take into account that, notwithstanding their responses initially, some two weeks later every defendant . . . acted . . . to cut [plaintiff] off."). And in any event,

AmericasActive:15975192.13

"individual [horizontal antitrust conspirators] always have an incentive to cheat and will do so [by competing on their own] when cheating seems profitable," unless the other conspirators enforce the agreement. Areeda ¶ 2002(f)(1); *see also Iowa Pub. Emp.'s Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 319 (S.D.N.Y. 2018) ("the presence of some divergent conduct does not negate the allegations of other, parallel conduct"). It is in La Liga's and the Spanish National Association's individual economic self-interest, for example, to cheat on the market division agreement by playing an official game in the United States, while also enforcing the market division agreement if any other league attempts to stage an official-season game in Spain. It is only the cartel's enforcement mechanism— the threat of FIFA sanctions—that causes each league and team to fall in line. That is exactly what happened here.

Given these facts, the inference of an agreement is clearly plausible, if not undeniable. Here, the district court cited the Ecuadorian National Association's initial agreement to allow the official-season game in the United States, but it ignored the fact that the game was never played after USSF refused to allow the game, citing

the FIFA policy. *Compare* SPA-31 n.10; SPA-39 *with* A-526; A-528 ¶¶ 127, 134. USSF's successful *enforcement* of the market division policy against National Associations, leagues, and teams that would otherwise be non-compliant underscores the existence of an agreement, because the "alleged behavior . . . would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals." *Starr*, 592 F.3d at 327 (internal quotation marks omitted).

### 4. The district court did not give Relevent every reasonable inference regarding co-conspirator communications.

As demonstrated above, the Amended Complaint pleads numerous opportunities for USSF, FIFA, and various leagues, teams, and National Associations to agree upon and enforce the policy, identifying specific meetings of the Council (A-523 ¶¶ 116), the Football Stakeholders Committee (A-528–529 ¶¶ 136–138), an association of more than 40 top-tier professional soccer leagues chaired by MLS Commissioner Garber (A-504 ¶ 44); communications involving FIFA, USSF, and other National Associations and confederations (A-524–528 ¶¶ 120, 121, 127, 130–134); and even an announcement stating that the FIFA policy was adopted *in direct response* to the efforts by Relevent to

60

promote an official-season game in the United States. (A-117 (quoting A-601)). Similar allegations have been found sufficient both to plead a high level of interfirm communications and to support an inference of agreement. *See*, *e.g.*, *Iowa Pub. Emp.'s Ret. Sys.*, 340 F. Supp. 3d at 322 (finding allegations of "multiple interfirm meetings at conferences, private dinners, and [] board meetings" sufficient).

The district court ignored most of the Amended Complaint's allegations about conspirator communications, stating (incorrectly) that they focused "merely" on "Mr. Garber['s] and others' participation on the [Football] Stakeholders Committee" and on "the fact that the members of the FIFA Council met and subsequently announced a Policy." SPA-36–37. But Relevent alleged far more facts relating to interfirm communications than mere committee membership or attendance at a meeting. A-504–505; A-523–529 ¶¶ 44, 48, 50–51, 116, 120–121, 127, 130–134, 136–138; A-523 ¶ 117 (quoting A-601).

Moreover, the district court's reference to the "absence of any factual allegations supporting an inference of an actual agreement" (SPA-39) reflects a piecemeal approach to the complaint rather than reading it "as a whole," which allows for inferences that may not

otherwise be apparent.  *See Anderson News*, 680 F.3d at 190 (finding

permissible inference of conspiracy when complaint read "as a whole");

*Apple*, 791 F.3d at 319 (2d Cir. 2015) ("the character and effect of a

conspiracy are not to be judged by dismembering it and viewing its

separate parts, but only by looking at it as a whole").  This too reflects a

fundamental error under this Court's cases.

### 5.   The opinion below would cripple antitrust conspiracy pleading.

If the district court's approach prevails, it will be virtually

impossible for an antitrust plaintiff to state a conspiracy claim.  In

antitrust conspiracy cases, "where the proof is largely in the hands of

the alleged conspirators, dismissals prior to giving the plaintiff ample

opportunity for discovery should be granted very sparingly." *Hosp.*

*Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (internal

citations and quotation marks omitted).

Here, in contrast, the district court distorted the standard and

required that Relevent plead highly specific facts that it—or any

antitrust plaintiff—would be very unlikely to have before discovery

without a whistleblower.  For example, while noting "that the terms of

the FIFA Policy indicate that it is 'consistent with the opinion expressed

by the Football Stakeholders Committee[]'" (SPA-37), the district court deemed Relevent's allegations insufficient on the ground that there were "no facts" showing that a committee recommendation "had . . . bearing on whether the members of the FIFA Council formed a conscious commitment to a common scheme" or "precipitated an[] unlawful underlying agreement among the members of the FIFA Council." SPA-37–38.

This is not the pleading standard, nor could it be. Such a standard would relegate nearly all antitrust conspiracy claims to dismissal because a plaintiff rarely, if ever, has access to specific detail about co-conspirators' subjective motivations or private communications or actions before discovery. It is instead well-established that the plausibility requirement "does not impose a *probability* requirement at the pleading stage." *Anderson News,* 680 F.3d at 185 (quoting *Twombly*, 550 U.S. at 555). To the extent it reaches the issue of circumstantial evidence, then, this Court should reaffirm the pleading standard of *Twombly* and *Anderson News*, which the district court got wrong, and overturn the lower court's decision on this basis as well.

63

## II.    FIFA is not an indispensable party for purposes of Rule 19.

If this Court concludes that the Amended Complaint adequately alleges jurisdiction over FIFA, it need not consider any issues other than those discussed above.  Otherwise, this Court should proceed to review the district court's conclusion that any demand for injunctive relief should be dismissed for failure to join FIFA as an indispensable party.  SPA-15 n.12.  As discussed below, the court erred on this issue: FIFA is not an indispensable party for any aspect of Relevent's claim. At a minimum, this Court should allow Relevent the opportunity to conduct jurisdictional discovery.

A complaint may be dismissed for failure to join an indispensable party only if the court is satisfied that (i) the absent party is "necessary," (ii) joinder of the party is not feasible; *and* (iii) the party is "indispensable."  *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 724 (2d Cir. 2000) (citing Fed. R. Civ. P. 19(a)–(b)).  Even if the second requirement were met here, the first and third are not.

### A.    FIFA is not a "necessary" party.

The district court concluded (in a footnote) that FIFA was "necessary" to any request for injunctive relief because the court could not "accord [Relevent] the relief it seeks, the ability to promote and host

64

Official Games in the United States, in FIFA's absence." SPA-15 n.12.

The court explained that, if only USSF were enjoined from enforcing the FIFA Policy, Relevent would "have difficulty obtaining the other approvals it needs to host a match," and thus FIFA had to be joined. *Id*. This was error.

To begin with, the district court ignored the allegations that Relevent *had already obtained* all the necessary approvals—except USSF's, on behalf of FIFA—to host an official game between two Ecuadorian teams in Miami in April 2019. A-41–42 ¶ 96. If USSF had authorized the game, it would have taken place. So would the Spanish game involving La Liga, which had already agreed to participate in a joint venture with Relevent when USSF's officials pushed for the market division policy to be adopted. A-39 ¶ 90.

FIFA also cannot be considered "necessary" under the other necessary-party factors, which the court did not address below. Under the remaining factors, a party is only necessary where the person claims an interest relating to the subject matter of the action and is situated such that disposing of the action without the person's presence

AmericasActive:15975192.13

will (a) impede the person's ability to protect that interest or (b) subject an existing party to inconsistent obligations.  Fed. R. Civ. P. 19(a)(1)(B).

As for the first of these, USSF cannot avoid the fact that FIFA did not move to intervene or take any other action to claim an interest in this litigation before it was joined to the case.  These steps are "plainly require[d] by Rule 19" to provide a basis for dismissal.  *Fed. Ins. Co. v. SafeNet, Inc.*, 758 F. Supp. 2d 251, 259 (S.D.N.Y. 2010); *Aguinaga v. UBS AG*, 2010 WL 5093433, at *10 (S.D.N.Y. Dec. 14, 2010) ("a party cannot qualify as 'required' under either subsection of Rule 19(a)(1)(B) if it does not *claim*[] *an interest* relating to the subject of the action") (internal quotation marks omitted, emphasis in original); *accord Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) (rejecting defendant's "attempt to assert on behalf of the [absent party] its supposed concern" about the subject of the action).

Nor is there any basis to conclude that FIFA's nonjoinder would leave USSF "subject to a substantial risk of incurring . . . inconsistent obligations."  Fed. R. Civ. P. 19(a)(1)(B)(ii).  Courts have made clear that inconsistent obligations occur only "when a party is unable to comply with *one court's order* without breaching *another court's order*

66

concerning the same incident." *Pullman v. Alpha Media Pub., Inc.*, 2013 WL 1290409, at *32 (S.D.N.Y. Jan. 11, 2013) (emphases added). No such circumstance exists here.

USSF's rejoinder on this issue below was that it is obligated by the Ted Stevens Olympic and Amateur Sports Act to comply with FIFA rules, so it would be subject to inconsistent U.S. legal requirements if the injunction does not also apply to FIFA. It is not clear why this would be a conflict between one "court's order" and another.

But in any event, the premise of this argument is false. The Act applies only to *amateur* sports, not professional soccer. *See ChampionsWorld, LLC v. United States Soccer Fed'n, Inc.*, 726 F. Supp. 2d 961, 969–70 (N.D. Ill. 2010) (USSF has "no clear mandate from Congress to govern the whole of professional soccer in the U.S."). And USSF's own bylaws expressly provide that it need not comply with any FIFA rule that is unlawful. *See* USSF Bylaws 103 § 1 (USSF is only "obliged to respect the statutes, regulations, directives, and decisions of FIFA . . . *to the extent permitted by governing law*.") (emphasis added). Having adopted bylaws that *allow* it to avoid complying with an unlawful requirement, USSF cannot now complain that a ruling in this

AmericasActive:15975192.13

case (without FIFA) would leave it in an impossible position. Indeed, when USSF faced an antitrust challenge to its agreement to comply with another FIFA policy, it settled the claim by stipulating that it would cease participating in the unlawful policy. *Fraser v. MLS*, 7 F. Supp. 2d 73, 75 & n.1 (D. Mass. 1998).

## B. FIFA is not an "indispensable" party.

After concluding that joinder was infeasible because it lacked jurisdiction over FIFA, the district court concluded that "a judgment rendered in FIFA's absence would be inadequate," again relying on the erroneous assumption that even if USSF were enjoined from complying with the FIFA policy, Relevent "will likely be unable to obtain the requisite approvals to promote an official game." SPA-15 n.12. As set forth above, however, the complaint plausibly alleged that Relevent would, in fact, be able to obtain the requisite approvals to host an official-season game in the United States.

Punctuating the conclusion that FIFA should not be deemed indispensable is the fact that dismissal of Relevent's injunctive claims would leave Relevent without any forum to seek injunctive relief for a violation of the U.S. antitrust laws. Such a result would fly squarely in

the face of Rule 19's required consideration of "equity and good conscience." Fed. R. Civ. P. 19(b); *see Tae. H. Kim v. Ji Sung Yoo*, 776 F. Appx. 16, 20 (2d Cir. 2019).

## CONCLUSION

The existence of an "agreement" in restraint of trade in this case is not in doubt; it appears in writing on FIFA's website. Relevent alleged detailed facts providing direct evidence of that agreement. Moreover, though it faced no requirement to do so, Relevent also included detailed "plus factor" allegations separately supporting an inference of the agreement based on circumstantial evidence. The allegations in the Amended Complaint were more than sufficient to plausibly plead an agreement subject to scrutiny under Section 1 of the Sherman Act. This Court should vacate the district court's order of dismissal under Rule 12(b)(6) and remand for further proceedings. It should also either find personal jurisdiction over FIFA or hold that FIFA is not an indispensable party for injunctive relief for purposes of Rule 19.

AmericasActive:15975192.13

Respectfully submitted,

**WINSTON & STRAWN LLP**

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
jkessler@winston.com

Linda T. Coberly
35 W. Wacker Drive
Chicago, Illinois 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
lcoberly@winston.com

*Counsel for Appellant Relevent Sports, LLC*

AmericasActive:15975192.13

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,665 words in this brief.

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler

AmericasActive:15975192.13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing will be filed electronically on October 7, 2021 and will, therefore, be served electronically upon all counsel.

*/s/ Jeffrey L. Kessler*
Jeffrey L. Kessler

AmericasActive:15975192.13

# SPECIAL APPENDIX

AmericasActive:15975192.13

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Valerie E.
   Caproni, dated July 20, 2020 ................................ SPA-1

Opinion and Order of the Honorable Valerie E.
   Caproni, dated July 20, 2021 ................................ SPA-20

Order of the Honorable Valerie E. Caproni, dated
   July 23, 2021 ......................................................... SPA-41

Judgment, dated July 28, 2021 ................................... SPA-42

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/20/2020_

-------------------------------------------------------X
RELEVENT SPORTS, LLC,       :
      :
                Plaintiff,       :
      :
         -against-       :       19-CV-8359 (VEC)
      :
      :       <u>OPINION AND ORDER</u>
UNITED STATES SOCCER FEDERATION,       :
INC.,       :
      :
                Defendant.       :
-------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        This action stems from Plaintiff's desire to promote Official Season International Soccer

Game Events ("Official Games") in the United States. Plaintiff alleges that its attempts to

promote these Official Games have been thwarted by Defendant's refusal to sanction them.

Specifically, Plaintiff alleges that Defendant has entered into an agreement with the Fédération

Internationale de Football Association ("FIFA") and other regional confederations and national

associations to refuse to sanction Official Games in the United States and to boycott professional

leagues, clubs, and players that participate in unsanctioned Official Games. Defendant moves to

compel arbitration or in the alternative to dismiss the complaint. Dkt. 32. For the following

reasons, Defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

        The Fédération Internationale de Football Association ("FIFA") is the international

federation and world governing body of soccer. Compl., Dkt. 31 ¶ 27. It administers soccer

worldwide through its statutes, regulations, and directives. *Id.* Beneath FIFA organizationally

are six regional confederations that oversee soccer at the continental level and assist FIFA in

carrying out its regulations. *Id.* ¶ 29. The Confederation of North, Central and Caribbean

Association Football ("CONCACAF") is the regional confederation governing North American soccer. *Id.* ¶ 30.  Beneath the six regional confederations are over two hundred national associations, each of which is authorized to represent FIFA as the governing body for soccer at the national level. *Id.* ¶¶ 29-31.  The United States Soccer Federation ("USSF") is the FIFA-recognized national association for administering and overseeing soccer in the United States. *Id.* ¶ 31.  USSF is a member of CONCACAF. *Id.* ¶ 30.  Pursuant to the authority granted to the United States Olympic Committee by the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq.* (1998), USSF is also the recognized national governing body for soccer in the United States. *Id.* ¶ 22.

As FIFA's recognized national association for soccer in the United States, USSF has the authority to sanction, on behalf of FIFA, "Official Season International Soccer Game Events" ("Official Games") and "Friendly Games" held in the United States. *Id.* ¶¶ 31, 33.  Official Games are soccer matches that count towards the competing clubs' official league or tournament records; they can be between foreign countries' men's national teams, foreign professional men's soccer clubs, or foreign professional men's soccer clubs and U.S. professional men's soccer clubs. *Id.* ¶¶ 3-4.  By contrast, friendly matches are not part of an official regular season league schedule or an official tournament; in other words, they do not count towards a club's official record. *Id.*

It is a violation of FIFA statutes for a soccer club to play in the United States without USSF's sanction; USSF has agreed to notify FIFA of any international game that is played in the United States without its sanction. *Id.* ¶ 33.  In addition to obtaining a sanction from USSF, third-party promoters, such as Plaintiff, seeking to organize a game must also obtain approval from (i) each team's national association(s); (ii) each team's regional confederation(s); and (iii) the host country's regional confederation. Buterman Decl., Dkt. 34 Ex. 2, Art. 72 § 2; Ex. 4, Art.

6 § 2, Art. 8 § 2; *see* Compl. ¶ 59.  FIFA's approval is also required for certain types of games.[1]
Any player who competes in an unsanctioned game risks being deemed ineligible to participate
in FIFA-sanctioned competitions, including the FIFA World Cup.  Compl. ¶ 60.

Promoters such as Plaintiff may only seek a sanction or organize a game through a FIFA-
licensed match agent.  *Id*. ¶ 117; Def. Mem. of Law, Dkt. 33 at 6.  The match agent must be a
natural person and agree to FIFA's Match Agents Regulations.  Buterman Decl., Ex. 3, Arts. 1-3,
6.  Plaintiff's match agent is Charlie Stillitano ("Stillitano").  Def. Mem. of Law, Dkt. 33 at 2; Pl.
Opp., Dkt. 35 at 9, 13.  Through Stillitano, Plaintiff has organized and promoted numerous
friendly games in the United States.[2]  *See id*; Compl. ¶¶ 14-15.

**The FIFA Directive**

In 2018, Plaintiff announced that it intended to host an Official Game in Miami between
two La Liga teams, FC Barcelona and Girona.  Compl. ¶¶ 18, 85.  In response, FIFA's President,
Gianni Infantino, expressed doubt whether FIFA would permit an Official Game to occur outside
the teams' home territory.  *Id*. ¶ 85.  As a result, the Spanish national association ("RFEF"),
CONCACAF, and USSF sought guidance from FIFA on whether the game could occur in the
United States, rather than in Spain.  *Id*. ¶ 86.  In October 2018, the FIFA Council issued a
directive prohibiting the staging of official season games outside of the participant league's

---

[1]    Tier 1 International matches, defined as matches in which "both of the teams are the 'A' representative
teams of the members concerned, or an International Match involving a Scratch Team," must also be authorized by
FIFA.  Buterman Decl., Ex. 4, Art. 7.  No international match or competition "shall take place without the prior
permission of FIFA, the confederations and/or the member associations in accordance with the Regulations
Governing International Matches."  *Id*., Ex. 2, Art. 71.  Moreover, "notwithstanding the authorization competences
as set forth in the Regulations Governing International Matches, FIFA may take the final decision on the
authorization of any international match or competition."  *Id*.

[2]    For example, Plaintiff promotes the annual International Champions Cup, a series of "friendly"
international soccer game events.  Compl. ¶ 14.  Plaintiff also organized and promoted a friendly game between Real
Madrid and Manchester United in the United States in 2014.  *Id*. ¶ 15.

home country (the "FIFA Directive").[3]  *Id.* ¶¶ 8, 84, 86, 100.  The directive is consistent with

FIFA's statutes that require Official Games to take place in the league's home territory absent

"exceptional circumstances."[4]  *See* Buterman Decl. Ex. 2, Art. 73.  In order to maintain their

status in FIFA, all confederations, national associations, leagues, clubs, and players must comply

with FIFA directives; failure to do so may result in expulsion or discipline.  Compl. ¶¶ 32, 60,

100; Buterman Decl. Ex. 2, Art. 14.  Accordingly, following the announcement of the FIFA

Directive, FC Barcelona withdrew its commitment to participate in the match Plaintiff proposed

to sponsor in Miami.[5]  Compl. ¶ 93; Def. Mem. of Law, Dkt. 33 at 21 n.25.

In March 2019, Plaintiff, through its match agent Mr. Stillitano, submitted a sanctioning

application to USSF, seeking approval to host an Official Game between two Ecuadorian clubs

in Miami.  Compl. ¶¶ 95-96.  Prior to submitting the application to USSF, Plaintiff obtained

approval from Ecuador's governing regional confederation, the Ecuadorian national association,

and the participating teams' league.  *Id.* ¶ 96.  In April 2019, USSF denied Plaintiff's application,

explaining that sanctioning the match would violate the FIFA directive prohibiting the staging of

Official Games outside the clubs' home territory.  *Id.* ¶ 99.

---

[3]    The FIFA Council is comprised of the FIFA President, the Presidents of each Regional Confederation and additional members elected by and from the National Associations.  Compl. ¶ 32. The Council is "responsible for issuing regulations for organizing international matches and competitions."  Buterman Decl. Ex. 2, Art. 71(1).  The FIFA directive reads: "Consistent with the opinion expressed by the Football Stakeholders Committee, the [FIFA] Council emphasized the sporting principle that official league matches must be played within the territory of the respective member association."  Compl. ¶ 86.

[4]    The FIFA statute reads: "Associations, leagues or clubs that are affiliated to a member association may only join another member association or take part in competitions on that member association's territory under exceptional circumstances.  In each case, authorisation must be given by both member associations, the respective confederation(s) and by FIFA."  Buterman Decl. Ex. 2, Art. 73.

[5]    RFEF, the Spanish National Association, was vocal in its opposition to Plaintiff's proposal to host the Barcelona-Girona game in Miami.  *See Atletico Madrid v. Villareal: La Liga submits request to hold fixture in Miami*, BBC (Oct. 18, 2019), https://www.bbc.com/sport/football/50085162 (noting that "RFEF and the players' union (AFE) were both vocal in objecting" to moving the Barcelona-Girona game to Miami); *Report: Atletico Madrid and Villarreal Set For Game In United States*, BEIN Sports (Oct. 16, 2019), https://www.beinsports.com/us/laliga/video/atletico-madrid-villarreal-laliga-match-miami/1321379 (noting that the Barcelona-Girona match "fell apart due to push back from players, RFEF, FIFA and others.").

Plaintiff alleges that USSF's denial of its sanctioning application reflects an anticompetitive agreement with FIFA to limit the output of Official Games in the United States by refusing to sanction Official Games outside of the teams' home territory. *See id.* ¶¶ 124-33. Plaintiff further claims that USSF entered into an anticompetitive agreement with FIFA and "horizontally competing" regional confederations and national associations to boycott professional leagues, clubs, and players that participate in Official Games without a USSF sanction. *Id*; Pl. Opp., Dkt. 35 at 1, 39. Finally, Plaintiff alleges that USSF unlawfully exercises its sanctioning authority to enhance the competitive market position of USSF's economic partner, Soccer United Marketing ("SUM"). Compl. ¶ 127. Plaintiff asserts a separate tort claim, alleging that USSF interfered with its existing and prospective business relationships. *Id.* ¶¶ 134-147.

USSF moves to compel arbitration, or in the alternative, to dismiss Plaintiff's complaint, arguing that Plaintiff's claims are barred by the parties' prior covenant not to sue, that FIFA is an indispensable party, and that Plaintiff has failed to state an antitrust claim. *See* Dkt. 33.

## DISCUSSION

### I.   Defendant's Motion to Compel Arbitration

USSF argues, in the first instance, that this action is subject to mandatory arbitration. Def. Mem. of Law, Dkt. 33 at 11-15. Specifically, USSF claims that Plaintiff is bound by the terms of the FIFA Match Agent Regulations, which require that any "dispute between a match agent and a national association" be submitted to the "FIFA Players' Status Committee for consideration and resolution." Buterman Decl., Ex. 3, Art. 22. Plaintiff argues, *inter alia,* that it is not bound by the Arbitration Agreement and that, even if it were, FIFA's arbitral body lacks jurisdiction to rule on its claims. Pl. Opp., Dkt. 35 at 9-13. Although the Court finds that Plaintiff *is* bound by the Arbitration Agreement, it agrees that FIFA lacks jurisdiction to decide

Plaintiff's antitrust claim. Plaintiff's tortious interference claim, however, is subject to mandatory arbitration. Accordingly, Defendant's motion to compel arbitration is granted in part and denied in part.

### A. Legal Framework

Section 2 of the Federal Arbitration Act provides that a written agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 2 manifests "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* at 24-25.

### B. Plaintiff is Bound By the Arbitration Agreement

Plaintiff does not dispute that Mr. Stillitano agreed to the terms of the FIFA Match Agents Regulations; instead Plaintiff argues that it is not bound by the arbitration clause because it itself is not a party to the Agreement. Pl. Opp., Dkt. 35 at 13. The Court disagrees. As noted *supra*, promoters, such as Plaintiff, can only seek sanctions and organize matches through a FIFA-licensed match agent. Buterman Decl. Ex. 3, Art. 2. In other words, Plaintiff can only act through Mr. Stillitano; all of its sanctioning applications to USSF have been and must be submitted through him. *See* Compl. ¶ 95; Def. Mem. of Law at 11. Accordingly, under ordinary principles of agency law, Stillitano functions as Plaintiff's agent and binds Plaintiff to the agreements that he enters into on its behalf. *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 107 (S.D.N.Y. 2017) (explaining that it is "clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'") (citation omitted). Plaintiff's claim that it only "indirectly benefits" from Stillitano's position as

6

its match agent is unpersuasive; Plaintiff can only stage matches, and reap the resulting financial rewards, through Stillitano.  As such, it directly benefits from the relationship.

Indeed, this precise issue was analyzed and decided in *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980, 987 (N.D. Ill. 2007).  *ChampionsWorld* involved a dispute between now-defunct promoter, ChampionsWorld, and USSF.  Mr. Stillitano served as ChampionsWorld's FIFA-licensed Match Agent.  The court concluded that because ChampionsWorld acted "as a principal of Stillitano's," and "directly benefited" from the relationship, it could not "disclaim the match agent license application [signed by Stillitano] in order to avoid its arbitration provision." *ChampionsWorld,* 487 F. Supp. 2d at 987; *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 922 (N.D. Ill. 2012) (reiterating that "ChampionsWorld became bound [to the match agent regulations and its arbitration clause] when Stillitano applied to become a FIFA-licensed match agent").

### C.  FIFA Lacks Jurisdiction to Arbitrate Plaintiff's Antitrust Law Claim

Plaintiff argues in the alternative that FIFA lacks jurisdiction to arbitrate its antitrust law claim.  Pl. Opp., Dkt. 35 at 9-10.  On this point, the Court agrees.  The *ChampionsWorld* procedural history is informative.  After the *ChampionsWorld* court initially compelled the case, which included antitrust claims, to arbitration pursuant to the Match Agent Regulations, FIFA's legal director clarified "for the first time" that the organization was "not in a position to intervene in the [] matter" because Plaintiff's "antitrust claims were not within the categories of disputes that its regulations allowed its deciding bodies to hear." *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.,* 06-CV-5724, 2008 WL 4861522, at *1 (N.D. Ill. Nov. 7, 2008).  Rather, FIFA's arbitration tribunal could only hear claims that fell "within the scope of application of its own

statutes and regulations." Kessler Decl., Dkt. 36 Ex. G; *ChampionsWorld,* 890 F. Supp. 2d at 922.[6]

Here, Plaintiff's complaint alleges violations of U.S. antitrust law.  It is clear, based on the *ChampionsWorld* procedural history and the "correspondence from FIFA" after the *ChampionsWorld* court initially compelled the antitrust claim to arbitration, namely its statement that "antitrust claims were not within the categories of disputes that its regulations allowed its deciding bodies to hear," that FIFA's arbitration tribunal "will not entertain the antitrust" issue presented in this case. *ChampionsWorld,* 2008 WL 4861522, at *3; *see* 890 F. Supp. 2d at 922. Accordingly, Defendant's motion to compel arbitration as to Plaintiff's antitrust claim is denied. *See In re Salomon Inc. S'holders' Derivative Litig.* 68 F.3d 554, 559-60 (2d Cir. 1995) (refusing to compel arbitration when the parties had agreed to arbitrate disputes only before the NYSE, and the NYSE refused to arbitrate the particular dispute in question); *De Malmanche v. Glenrock Asset Mgmt. Assocs., L.P.,* No. 07-CV-10940, 2010 WL 2541495, at *4 (S.D.N.Y. June 22, 2010) (explaining that where an arbiter was "without the ability to assist" the parties because the claims "did not fall within the scope of work" of the agreement, the plaintiff was "free to pursue her claims in [federal] court."); *Singleton v. Grade A Mkt., Inc.,* 607 F. Supp. 2d 333, 339 (D. Conn. 2009) ("Numerous Courts, including the Second Circuit, have refused to compel

---

[6]     Following the legal director's comments, the parties returned to the district court and ChampionsWorld moved to lift the previously imposed stay pending arbitration. *ChampionsWorld,* 2008 WL 4861522, at *2 (N.D. Ill. Nov. 7, 2008).  The court explained that while it was apparent that the FIFA arbitration tribunal would not "entertain the antitrust … issues," it was still unclear whether it would arbitrate any of the other issues presented. *Id*. at *3. Ultimately, USSF reformulated the remaining claims and presented its own case for arbitration; USSF did not request that the arbitral tribunal adjudicate plaintiff's antitrust claim. *See ChampionsWorld,* 276 F.R.D. 577, 584 (N.D. Ill. 2011).  The district court ultimately ruled on the merits of the antitrust claim. *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 951 (N.D. Ill. 2012).

arbitration where the arbitral forum upon which the parties agreed is unavailable to arbitrate the dispute.").[7]

### D.  Plaintiff's Tort Claim Is Subject to Arbitration

Plaintiff's tortious interference claim alleges that Defendant "ignored, delayed, and/or ultimately rejected all of Relevent's attempts to obtain a USSF sanction," thereby interfering with its preexisting business relationships.  Compl. ¶¶ 138-39.  This claim does not implicate U.S. antitrust law; it plainly constitutes a dispute between a match agent and a national association and is therefore subject to mandatory arbitration under the Arbitration Agreement. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24 (explaining that any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").  Accordingly, Defendant's motion to compel arbitration is granted as to Plaintiff's tort claim.[8]

---

[7]        Defendant relies on the *ChampionsWorld* court's initial decision compelling ChampionsWorld's claims to arbitration to argue that Relevent's antitrust claim should similarly be sent to arbitration in the first instance. *See ChampionsWorld,* 487 F. Supp. 2d 980, 991 (N.D. Ill. 2007).  This argument ignores *ChampionsWorld's* subsequent procedural history.  Specifically, later decisions in *ChampionsWorld* explain that the initial decision to compel the antitrust claim to arbitration was made *before* the FIFA tribunal "stated for the first time that Plaintiff's … antitrust claims were not within the categories of disputes that its regulations allowed its deciding bodies to hear." *ChampionsWorld,* 2008 WL 4861522, at *1 (N.D. Ill. Nov. 7, 2008).  Thus, compelling the antitrust claim in the instant case to arbitration, knowing full well that FIFA's arbitral body has no jurisdiction to decide it, would be futile and inefficient. *See In re Salomon Inc. S'holders' Derivative Litig.* 68 F.3d at 554; *De Malmanche,* 2010 WL 2541495, at *4.

[8]        The Court notes that arbitration of Plaintiff's tortious interference claim may present additional difficulties.  Based on the *ChampionsWorld* procedural history, it is likely that USSF will need to substitute Stillitano as the opposing party and present its own case for arbitration so that the claim is limited to interpreting FIFA's own statutes and regulations. *See ChampionsWorld,* 276 F.R.D. at 584; *ChampionsWorld,* 890 F. Supp. 2d at 922.  Nevertheless, given the plain language of the Agreement and the fact that, unlike the antitrust claim, Plaintiff's tort claim appears to only require interpretation of FIFA's statutes rather than U.S. antitrust law, the claim is compelled to arbitration in the first instance.

II.     **Defendant's Motion to Dismiss for Failure to State a Claim**[9]

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  On a motion to dismiss, the Court may consider any "written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as materials "integral to plaintiffs' claims." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

**A.  Legal Framework**

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1; *United States v. Apple, Inc.,* 791 F.3d 290, 314 (2d Cir. 2015).  In order to plead a violation of Section 1, a plaintiff must first allege "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Anderson News, L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp,* 465 U.S. 752, 764 (1984) (emphasis omitted).  In other words, an antitrust plaintiff must allege an agreement; a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States,* 328 U.S. 781, 809-10, (1946); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (explaining that because section 1 of the Sherman Act does not prohibit all restraints of trade, but rather only *agreements* to restrain trade,

---

[9]     Defendant also moves to dismiss on the grounds that Plaintiff's claims are barred by the parties' prior covenant not to sue and that FIFA is an indispensable party.  Def. Mem. of Law, Dkt. 33 at 15-24.  Because the Court finds that Plaintiff fails to state an antitrust claim, the Court need not reach these other arguments.  As will be discussed briefly *infra*, however, even if Plaintiff had stated a claim, its claim for injunctive relief would be subject to dismissal under Federal Rule of Civil Procedure 19.

the "crucial question in a Section 1 case is [] whether the challenged conduct stem[s] from independent decision or from an agreement, tacit or express.") (internal quotation marks omitted). Independent action by one party is not proscribed; there is a "basic distinction between concerted and independent action," and a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto,* 465 U.S. at 760-61. Moreover, parallel conduct by itself is insufficient to prove the existence of a conspiracy because such behavior could simply be the result of "coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4 (internal quotation marks omitted). Indeed, parallel conduct that "does not result from an agreement is not unlawful even if it is anticompetitive." *Apple,* 791 F.3d at 315.

In the absence of direct evidence of an agreement, such as a "recorded phone call in which two competitors agreed to fix prices," a plaintiff must present circumstantial facts, known as "plus factors," to support an inference of a conspiratorial agreement. *Mayor & City Council of Balt. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013). Regardless of whether the plaintiff presents direct or circumstantial evidence, at "the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.,* it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News,* 680 F.3d at 184 (quoting *Twombly,* 550 U.S. at 556, 549, 557) (alteration in original). Mere "conclusory allegation[s] of [an] agreement at some unidentified point," are insufficient plausibly to allege a Sherman Act violation. *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 355 (S.D.N.Y. 2018) (quoting *Twombly* at 557). Finally, a complaint may be dismissed "where there is an obvious alternative explanation to the facts underlying the

11

alleged conspiracy among the defendants." *Id.* at 358 (citing *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826, 2017 WL 5992355, at \*10 (E.D.N.Y. Aug. 10, 2017)).

If an antitrust plaintiff sufficiently alleges an agreement, it must next allege that the agreement "constituted an unreasonable restraint of trade," either per se or under the rule of reason. *Anderson News*, 899 F.3d at 97. Few restraints of trade are unreasonable per se; conduct constituting a per se violation must be so "manifestly anticompetitive that it would almost invariably tend to restrict competition and decrease output." *Cenedella,* 348 F. Supp. 3d at 360 (citing *Hertz Corp. v. City of New York*, 1 F.3d 121, 130 (2d Cir. 1993)). As a result, the per se rule is appropriate only "in the relatively narrow circumstance[s] where courts have sufficient experience with the [alleged wrongful] activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue." *Hertz*, 1 F.3d at 129; *Caruso Mgmt. Co. v. Int'l Council of Shopping Centers*, 403 F. Supp. 3d 191, 201 (S.D.N.Y. 2019). Agreements among horizontal competitors to set prices are per se illegal, while vertical agreements, or agreements between parties at different levels of a market structure, are not. *Apple*, 791 F.3d at 313–14; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,* 551 U.S. 877, 882 (2007).

As a result of the "rigorous standard and [] presumption against applying the per se rule," courts apply the "rule of reason" in analyzing most alleged restraints of trade. *Caruso Mgmt. Co.*, 403 F. Supp. 3d at 201. At the motion to dismiss stage, the rule of reason inquiry requires the plaintiff to "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *Watkins v. Smith*, No. 12-CV-4635, 2012 WL 5868395, at \*7 (S.D.N.Y. Nov. 19, 2012), *aff'd*, 561 F. App'x 46 (2d Cir. 2014).

### B. Plaintiff Fails to Allege a Vertical Agreement Between USSF and FIFA

Plaintiff alleges that USSF entered an "anticompetitive agreement with FIFA to comply with the FIFA Policy that prohibits the sanctioning of any Official Season International Soccer

Game Event in the U.S." Compl. ¶ 127. In support, Plaintiff points to Defendant's statement

that it is "required to adhere" to FIFA's policies as "direct evidence" of the alleged

anticompetitive vertical agreement. *Id.* ¶ 100; Pl. Opp., Dkt. 35 at 28. But Defendant's admitted

compliance with the FIFA directive, without additional factual allegations, is insufficient to

constitute direct evidence of an unlawful agreement.[10] *See Citigroup, Inc.,* 709 F.3d at 136

(explaining that direct evidence "would consist, for example, of a recorded phone call in which

two competitors agreed to fix prices at a certain level"); *Starr,* 592 F.3d at 325 (noting that

"allegations in a Sherman Act § 1 complaint based on direct evidence of agreement would likely

require references to "specific time, place, or person involved in the alleged conspiracies")

(quoting *Twombly,* 550 U.S. at 565 n. 10). Put differently, Plaintiff alleges no facts to support

the inference that, in adhering to the FIFA directive, USSF actually entered an agreement with

FIFA to restrict output. *See Am. Tobacco,* 328 U.S. at 809-10 (an antitrust plaintiff must allege a

"unity of purpose or a common design and understanding, or a meeting of minds in an unlawful

arrangement"); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 147–48 (E.D.N.Y. 2010)

(dismissing plaintiffs' section 1 claim because the complaint failed to "allege any specific facts

providing any basis to infer an actual unlawful agreement," but rather relied on the "bald,

conclusory allegation that it 'appears that defendants and others decided to adopt the terms of

[the] [r]esolution'"). Plaintiff's repeated characterizations of Defendant's unilateral decision to

comply with the FIFA directive as an anticompetitive agreement, *see* Compl. ¶¶ 10, 24, 127, are

conclusory. *Twombly* 550 U.S. at 557 (holding that mere "conclusory allegation[s] of [an]

agreement at some unidentified point," are insufficient to allege plausibly a Sherman Act

---

[10]     Plaintiff claims that, because it plausibly alleged a conspiracy "through direct evidence—including USSF's
admissions and the rules and policies of FIFA and its affiliated members (including the FIFA Policy), it was not
required to plead parallel conduct and "plus factors" to infer such a conspiracy." Pl. Opp., Dkt. 35 at 28.

violation); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51-52 (2d Cir. 2007); *Cenedella,* 348 F. Supp. 3d at 358 (rejecting plaintiff's attempts to "summarily assert[] several times that there is an agreement" as "nothing more than conclusory allegations").

Although Defendant's adherence to the FIFA policy may be "*consistent*" with a vertical agreement, at the pleading stage, Plaintiff must plead facts "to suggest that an agreement *was made.*" *Anderson News,* 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556, 549, 557) (emphasis added); *Citigroup, Inc.,* 709 F. 3d at 136 ("A plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed."). Here, the complaint's reliance on USSF's unilateral compliance with FIFA's directive to support an inference that an unlawful agreement was made falls short.[11] *See id.; Monsanto,* 465 U.S. at 761 (holding that a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (explaining that it is not concerted action for a party to announce the terms under which it is willing to deal and to then act in accordance with that unilateral announcement, even if the practical effect may be to achieve conformity of behavior); *Tarrant Serv. Agency, Inc. v. Am. Standard Inc.*, 12 F.3d 609, 617-18 (6th Cir. 1993) (affirming the district court's grant of summary judgment on plaintiff's § 1 conspiracy claim on the grounds that plaintiff produced no evidence of a conspiracy and noting that the contested "broker policy was unilaterally implemented by [defendant]" and a third party's "mere adherence to the []

---

[11]     As noted, *infra,* Plaintiff may move for leave to amend its complaint. Because there are obvious rational reasons why USSF would comply with the FIFA Directive without being part of an agreement to do so (most notably its desire not to take action that could result in all U.S. men's soccer players and teams being deemed ineligible for World Cup play, *see* Compl. ¶¶ 32, 34), if Plaintiff chooses to amend its Complaint, it must plead facts, beyond Defendant's mere acquiescence to the FIFA Directive, from which the Court can infer that there is an unlawful agreement between USSF and FIFA.

policy [did] not illustrate the existence of a conspiracy.") (citing *Int'l Logistics Grp., Ltd. v.*

*Chrysler Corp.,* 884 F.2d 904, 907 (6th Cir. 1989)).

In sum, Plaintiff has failed to allege an unlawful vertical agreement between USSF and

FIFA sufficient to support an antitrust violation.[12]

---

[12]     Even if Plaintiff had adequately alleged an agreement between USSF and FIFA, Plaintiff's claim for injunctive relief would be dismissed for failure to join an indispensable party.  In deciding to dismiss a claim pursuant to Federal Rule of Civil Procedure 19, the Court must: (i) determine whether the absent party is "necessary" to the action under Rule 19(a) and (ii) assess whether joinder of the party is feasible, and if not, whether the party is indispensable under Rule 19(b).  *Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 724 (2d Cir. 2000).

FIFA is a necessary party under Rule 19(a)(1)(A); the Court cannot accord Plaintiff the relief it seeks, the ability to promote and host Official Games in the United States, in FIFA's absence.  *See Meyer v. Kalanick,* No. 15-CV-9796, 2016 WL 3509496, at *2 (S.D.N.Y. June 20, 2016).  At the heart of Plaintiff's claim is the FIFA directive that prohibits the staging of Official Games outside the participant leagues' home territory.  Plaintiff acknowledges that all FIFA-affiliated confederations, associations, leagues, clubs, and players "must comply with FIFA's rules" or face discipline.  Compl. ¶¶ 34, 59, 60.  Thus, even if the Court were to enjoin USSF from complying with the FIFA directive and order it to sanction Plaintiff's proposed matches, so long as the directive itself remains, Plaintiff will have difficulty obtaining the other approvals it needs to host a match.  *See* Def. Mem. of Law, Dkt. 33 at 21 n.25; *Kraebel v. N.Y.C. Dep't of Hous. Pres. & Dev.,* No. 90-CV-4391, 1994 WL 132239 (S.D.N.Y. Apr. 14, 1994).

Joinder of FIFA is infeasible for lack of personal jurisdiction.  The complaint fails to allege sufficient facts to establish FIFA's contacts with the Southern District of New York.  In the absence of such facts, the Court cannot exercise personal jurisdiction over FIFA pursuant to the Clayton Act or the New York long arm statute.  *See In re SSA Bonds Antitrust Litig.,* 420 F. Supp. 3d 219, 230 (S.D.N.Y. 2019); *Dennis v. JPMorgan Chase & Co.,* 343 F. Supp. 3d 122, 198–99 (S.D.N.Y. 2018).  Nor does the complaint allege sufficient "overt acts in furtherance of the conspiracy" taken by USSF *in New York* to impute to FIFA under the *Schwab* conspiracy theory.  *See Charles Schwab Corp. v. Bank of Am. Corp.,* 883 F.3d 68, 87 (2d Cir. 2018); *In re SSA Bonds Antitrust Litig.,* 420 F. Supp. at 239 (holding that plaintiffs did not meet "their burden of establishing conspiracy jurisdiction" because they "provide[d] no evidence as to any specific transactions that occurred in New York").  Finally, exercising personal jurisdiction over FIFA would violate due process.  Even adopting the national contacts approach, the complaint does not adequately allege that the FIFA directive was expressly aimed at the United States.  *Walden v. Fiore,* 571 U.S. 277, 289 (2014) (mere foreseeability of harm is insufficient to establish specific jurisdiction); *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.,* 916 F.3d 143, 151 (2d Cir. 2019) (explaining that it is insufficient "for a plaintiff to show simply that a defendant's actions caused an 'effect' in the forum state"; the plaintiff must show that the defendant has "expressly aimed its conduct at the forum.") (quoting *Licci ex rel. Licci v. Leb. Can. Bank, SAL,* 732 F.3d 161, 173 (2d Cir. 2013); *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG,* 277 F. Supp. 3d 521, 589-90 (S.D.N.Y. 2017) (explaining that the mere knowledge that a directive would be "disseminated worldwide, including into the United States, is not enough by itself to support specific personal jurisdiction because foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.") (internal quotation marks omitted).

Lastly, FIFA is an indispensable party under Rule 19(b) because a judgment rendered in its absence would be inadequate.  As long as the FIFA directive remains, Plaintiff will likely be unable to obtain the requisite approvals to promote an official game and players will remain under threat of discipline from FIFA if they participate in such games.  Plaintiff will likely be required to resort to "piecemeal litigation" to enjoin other confederations, associations, leagues, teams, players, and even FIFA itself from adhering to the directive, which is precisely what Rule 19 seeks to avoid.  *Kermanshah v. Kermanshah,* No. 08-CV-409, 2010 WL 1904135, at *4 (S.D.N.Y. May 11, 2010); *Freedom, N.Y. Inc. v. United States,* No. 86-CV-1363, 1986 WL 6163, at *3 (S.D.N.Y. May 27, 1986).

### C.  Plaintiff Fails to Allege a Horizontal Agreement Between USSF and "Others"

Plaintiff also alleges a conspiracy among the "horizontally competing FIFA-affiliated confederations, national associations, leagues, and teams" to adhere to and enforce the FIFA directive and to boycott leagues, clubs, and players that participate in unsanctioned games in the United States.  Compl. ¶¶ 127, 129.  Plaintiff argues that this "horizontal group boycott" constitutes a per se violation of § 1.  *Id.* ¶ 129; Pl. Opp., Dkt. 35 at 29.  At the outset, the Court is not convinced that USSF and the FIFA-affiliated regional confederations, national associations, leagues, and teams are, in fact, competitors; the complaint summarily states that "[e]ach Confederation and National Association is a separate economic actor with distinct economic interests," Compl. ¶ 29, but does not actually allege that they are competitors.[13]

More significantly, the complaint is devoid of factual allegations to support an inference that Defendant entered into an agreement with other confederations, national associations, leagues, or teams to do anything, including to comply with or to enforce the FIFA Policy.[14]  For example, the complaint makes no attempt to identify with which, if any, of the six regional confederations, over two hundred national associations, and countless leagues and teams Defendant allegedly conspired; instead, Plaintiff repeatedly refers simply to the alleged conspiracy among "USSF, FIFA, and others."  *See e.g.,* Compl. ¶¶ 1, 2, 5, 7, 9, 19, 24, 61, 64,

---

[13]    Although Plaintiff's opposition asserts that the "alleged co-conspirator Confederations, National Associations, leagues, and teams [] do compete with each other," it cites to no supporting factual allegations in the complaint.  Pl. Opp., Dkt. 35 at 30.  Moreover, it alleges that the relevant market "in which USSF's conduct has unreasonably restrained competition" is the "market for International Soccer Game Events" in the United States, Compl. ¶ 47, a market in which none of its alleged horizontal competitors appears to compete.

[14]    The Court also notes that Plaintiff's allegations of a horizontal agreement among USSF and "all of the FIFA-affiliated Confederations, National Associations, leagues, and teams," to comply with the FIFA Directive, Pl. Opp., Dkt. 35 at 29-30, flies in the face of its allegation that Plaintiff had obtained approval from Ecuador's Regional Confederation, Ecuador's National Association, and the participating teams' league in advance of its proposed May 5, 2019 game.  Compl. ¶ 96.

91, 101-02, 149.  Such conclusory statements are insufficient to allege the existence of a

horizontal agreement.  *Iqbal,* 556 U.S. at 681 ("the conclusory nature of respondent's allegations

... disentitles them to the presumption of truth" on a Rule 12(b)(6) motion to dismiss); *Cenedella,*

348 F. Supp. 3d at 358-59 (dismissing plaintiff's complaint as including "nothing more than

conclusory allegations … completely devoid of facts indicating who agreed with whom, to what,

and when," and noting that it merely referred to "other unnamed co-conspirators, whom the

plaintiff [made] little effort to describe").  Plaintiff's suggestion that the other confederations',

associations', leagues', and teams' admitted compliance with the FIFA Directive somehow

"culminates in the plausible allegation" that USSF, FIFA, and all of the confederations,

associations, leagues, and teams are engaged in "concerted action and agreements to restrict

entry into, and limit output of, the relevant market for international soccer game events in the

U.S.," Pl. Opp., Dkt. 35 at 29, is wholly unsupported and unavailing.[15]  *See Integrated Sys. &*

*Power, Inc. v. Honeywell Int'l, Inc.,* 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010) ("While Plaintiff

repeatedly asserts that Defendant's conduct constitutes a 'horizontal conspiracy,' and therefore is

a *per se* violation, this characterization is a legal conclusion that the Court does not accept as true

on a motion to dismiss.").

---

[15]    Plaintiff seemingly relies on FC Barcelona's statement regarding Plaintiff's proposed FC Barcelona-Girona game to support the existence of an agreement.  *See* Pl. Opp., Dkt. 35 at 29.  After the FIFA Directive was issued, FC Barcelona withdrew its commitment to participate in the game, explaining that it "was [] willing to play a La Liga match in Miami . . . but acknowledge[d] that while there is no agreement between all parties, this project will not succeed."  Compl. ¶ 93.  The Court is not entirely clear in what way Plaintiff is relying on this statement.  *See* Pl. Opp., Dkt. 35 at 29.  To the extent that Plaintiff is using this statement to demonstrate a vertical agreement between USSF and FIFA, it is insufficient.  This statement merely suggests that USSF declined to sanction a game that would have been in violation of the FIFA Directive, which, as noted *supra*, without additional factual allegations, does not suggest that USSF entered an unlawful agreement with FIFA.  To the extent that Plaintiff is using FC Barcelona's statement to support the allegation of a horizontal agreement between USSF and "numerous co-conspirator confederations, national associations, leagues, and teams," Pl. Opp., Dkt. 35 at 28-29, it similarly fails.  Although FC Barcelona's reference to "all parties" is admittedly vague, the statement seems to undermine Plaintiff's position by suggesting that there is, in fact, no "agreement" among the various confederations, national associations, leagues, and teams.

Moreover, even assuming that USSF does directly compete with the FIFA-affiliated regional confederations, national associations, leagues, and teams (which is far from intuitively obvious), and assuming that each of these organizations similarly withholds a sanction for proposed official international games in the United States in compliance with the FIFA directive, in the absence of any factual allegations supporting an inference of an actual agreement to restrict output, such conduct does not violate the Sherman Act. *See Apple,* 791 F. 3d at 318 ("[C]onduct resulting solely from competitors' independent business decisions—and not from any 'agreement'— is not unlawful under § 1 of the Sherman Act, even if it is anticompetitive."). Plaintiff's reliance on *United States v. Apple* is misplaced. In *Apple,* ample evidence existed to establish a horizontal conspiracy among the publisher defendants. *Apple,* 791 F. 3d at 318 ("That the Publisher Defendants were in constant communication regarding their negotiations with both Apple and Amazon can hardly be disputed. Indeed, Apple never seriously argues that the Publisher Defendants were not acting in concert."). Here, by contrast, Plaintiff's complaint alleges no facts to suggest that USSF "combined forces" with other regional confederations and national associations or that they had a "conscious commitment to a common scheme designed to achieve an unlawful objective."[16] *Id.; Monsanto Co.*, 465 U.S. at 764.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is GRANTED as to Plaintiff's tort claim; litigation regarding Count II is stayed in the meantime. The parties must provide joint quarterly updates on the status of the arbitration proceeding. The first such update

---

[16]   Plaintiff's failure to allege a horizontal agreement also dooms its hub-and-spoke conspiracy theory. Pl. Opp., Dkt. 35 at 30. A hub-and-spoke conspiracy requires: (1) a hub; (2) entities that enter into vertical agreements with the hub, known as the spokes; and (3) the connecting agreements among the horizontal competitors, known as the rim of the wheel. *Apple, Inc.*, 791 F. 3d at 314; *In re Elec. Books Antitrust Litig.,* 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012). As noted, *supra,* Plaintiff fails to allege a vertical agreement between FIFA and USSF and fails to allege anything approaching a rim to the asserted wheel.

is due by **November 1, 2020;** thereafter, reports are due every three (3) months on the first business day of the applicable month.  Defendant's motion to compel arbitration is DENIED as to Plaintiff's antitrust claim.

Defendant's motion to dismiss Plaintiff's antitrust claim is GRANTED.  Plaintiff's complaint is DISMISSED without prejudice.  Plaintiff may file a motion for leave to amend Count One of its complaint by **September 1, 2020.**  If Plaintiff chooses to move for leave to amend, Plaintiff must include a redlined version of its proposed amended complaint.  If Plaintiff chooses to pursue its claim for injunctive relief, its proposed amended complaint must allege facts sufficient to support the exercise of personal jurisdiction over FIFA.  Alternatively, Plaintiff may choose to join FIFA to this action.  If Plaintiff chooses not to move to amend, it must show cause by **September 1, 2020**, why this entire case should not be dismissed without prejudice for lack of subject matter jurisdiction.

The clerk of court is respectfully directed to close the open motion at docket entry 32.

**SO ORDERED.**

**Date:  July 20, 2020**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

19

SPA-20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

RELEVENT SPORTS, LLC,                         :
                                              :
                              Plaintiff,      :
                                              :
              -against-                       :        19-CV-8359 (VEC)
                                              :
FÉDÉRATION INTERNATIONALE DE                  :        OPINION AND ORDER
FOOTBALL ASSOCIATION and UNITED               :
STATES SOCCER FEDERATION, INC.,               :
                                              :
                              Defendants.     :

------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 7/20/2021

VALERIE CAPRONI, United States District Judge:

   This action stems from Plaintiff's desire to host official international soccer games

("Official Games") in the United States. Plaintiff alleges that its attempts to do so have been

thwarted by Defendants' refusal to sanction the games. Specifically, Plaintiff alleges that the

United States Soccer Federation ("USSF") violated Section 1 of the Sherman Act by conspiring

with the Fédération Internationale de Football Association ("FIFA") and all other FIFA-affiliated

regional confederations, National Associations, leagues, and teams to adopt and enforce a policy

that prohibits sanctioning Official Games in the United States and to boycott leagues, clubs, and

players that participate in unsanctioned Official Games. *See* Am. Compl., Dkt. 57. Defendants

moved to dismiss the Amended Complaint. Dkts. 65, 68. For the following reasons,

Defendants' motions are GRANTED.

## BACKGROUND[1]

   FIFA is the international federation and world governing body of soccer. Am. Compl. ¶¶

24-25. It administers soccer worldwide through its statutes, regulations, and directives. *Id.* ¶¶

---

[1] For purposes of this opinion, Plaintiff's well-pled factual allegations are taken as true. Conclusory
allegations unsupported by facts are not accepted as true.

26, 34. Beneath FIFA organizationally are six regional confederations that oversee soccer at the continental level and assist FIFA in carrying out its regulations. *Id.* ¶ 28. The Confederation of North, Central and Caribbean Association Football ("CONCACAF") is the regional confederation governing soccer in North America. *Id.* Beneath the six regional confederations are 211 National Associations ("National Associations"), each of which is authorized to represent FIFA as the governing body for soccer at the national level. *Id.* ¶¶ 25-28; Silvero Decl., Dkt. 70 ¶ 4. To compete in any FIFA-affiliated event, a soccer league and its team must be sanctioned by their corresponding National Association and by FIFA. Am. Compl. ¶ 29.

USSF is the FIFA-recognized National Association for administering and overseeing soccer in the United States. *Id.* ¶ 31. USSF is a member of CONCACAF. *Id.* ¶ 28. Pursuant to the authority granted to the United States Olympic Committee by the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501 *et seq.* (1998), USSF is also the recognized national governing body for soccer in the United States. *Id.* ¶ 68.

As FIFA's recognized National Association for soccer in the United States, USSF has the authority to sanction, on behalf of FIFA, Official Games and so-called "friendly games" that are played in the United States. *Id.* ¶¶ 29, 54, 70. Official Games are soccer matches that count towards the competing clubs' official league or tournament records. Am. Compl. ¶ 96; Pl. Opp., Dkt. 77 at 3. By contrast, so-called friendly games are not part of a regular season league schedule or an official tournament; friendly games can be between foreign countries' men's national teams, foreign professional men's soccer clubs, or foreign professional men's soccer clubs and U.S. professional men's soccer clubs. Am. Compl. ¶¶ 17-18, 96. Friendly games do

not count towards a club's official record.  *Id.* ¶ 96.  Plaintiff has promoted numerous friendly

games in the United States.[2]  *Id.* ¶¶ 17-18, 102-103.

It is a violation of FIFA statutes for a soccer club to play in the United States without

USSF's sanction.  *Id.* ¶ 98.  In addition to obtaining a sanction from USSF, third-party

promoters, such as Plaintiff, seeking to organize an international match must also obtain

approval from (i) each team's National Association(s); (ii) each team's regional confederation(s);

(iii) the host's National Association; and (iv) FIFA.  Boehning Decl., Dkt. 71, Ex. A, Arts. 71-

73; Ex. B, Arts. 6-8.  Any player who competes in an unsanctioned game risks being deemed

ineligible to participate in FIFA-sanctioned competitions, including the FIFA World Cup.  Am.

Compl. ¶ 100.

**The FIFA Policy**

In August 2018, Plaintiff announced that it intended to host an Official Game in Miami

between two La Liga teams, FC Barcelona and Girona FC.  Am. Compl. ¶ 111.  In response,

FIFA's President, Gianni Infantino, expressed doubt whether FIFA would permit an Official

Game to occur outside the teams' home territory and stated that he "would prefer to see a great

MLS game in the U.S. rather than La Liga being in the U.S."  *Id.* ¶ 113.  The Spanish National

Association ("RFEF"), CONCACAF, and USSF "referred the issue to the FIFA Council" to

address whether the game could occur in the United States, rather than in Spain.  *Id.* ¶ 114.  The

FIFA Council, which is comprised of 37 individuals from various National Associations, has the

authority to interpret the FIFA statutes adopted by the FIFA Congress and to adopt other rules

---

[2]      For example, Plaintiff promotes the annual International Champions Cup, a series of friendly international
soccer game events.  Am. Compl. ¶ 17.  Plaintiff also organized and promoted a friendly game between Real Madrid
and Manchester United in the United States in 2014.  *Id.* ¶ 18.

and policies.[3]  *Id.* ¶ 36.  In October 2018, the FIFA Council announced a "policy" that prohibits

staging Official Games outside the participants' home territory (the "FIFA Policy" or "Policy").[4]

*Id.* ¶¶ 37, 116-17.  The FIFA Policy appeared in a press release and does not appear in FIFA's

official statutes.  *Id.* ¶ 117.  Nevertheless, the Policy is consistent with several existing statutes

and regulations, which provide that international matches may only take place with the "prior

permission of FIFA, the confederations and/or the member associations," and that official

matches may only be played in another association's territory "under exceptional

circumstances."  Boehning Decl. Dkt. 71, Ex. 1, Arts. 71, 73.  Moreover, several FIFA statutes

confirm that "FIFA may take the final decision on the authorisation [sic] of any international

match or competition."  *Id.* at Art. 71.  In order to maintain their status in FIFA, all National

Associations, leagues, clubs, and players must comply with FIFA directives; failure to do so may

result in expulsion or discipline.  Am. Compl. ¶¶ 34, 98.  Following the announcement of the

FIFA Policy, FC Barcelona withdrew its commitment to participate in the match in Miami that

Plaintiff wanted to host.  *Id.* ¶ 121.

In March 2019, Plaintiff submitted another sanctioning application to USSF, this time

seeking approval to host an Official Game in Miami between two Ecuadorian clubs.  *Id.* ¶¶ 123-

25.  Prior to submitting the application to USSF, Plaintiff obtained approval from Ecuador's

regional confederation, the Ecuadorian National Association, and the participating teams' league.

---

[3]        The FIFA Council is elected by the members of each of the six regional confederations.  Am. Compl. ¶ 36.
Each National Association is entitled to suggest one person to its Confederation for possible election to the Council.
*Id.*  CONCACAF has five members on the FIFA Council.  *Id.*

          The FIFA Congress is FIFA's self-described "supreme and legislative body;" it is responsible for adopting
and amending the FIFA Statutes.  Am. Compl. ¶¶ 32-33.  Each National Association, including USSF, is provided
one vote in the FIFA Congress.  *Id.* ¶ 32

[4]        The FIFA Policy reads: "Consistent with the opinion expressed by the Football Stakeholders Committee,
the [FIFA] Council emphasised [sic] the sporting principle that official league matches must be played within the
territory of the respective member association."  Am. Compl. ¶ 117.

*Id.* ¶ 125.  In April 2019, USSF denied Plaintiff's application, explaining that sanctioning the match would violate the FIFA Policy that prohibits staging Official Games outside the league's home territory.  *Id.* ¶¶ 128-30.  USSF has similarly declined to sanction Official Games proposed by other promoters when doing so would violate the FIFA Policy.  *Id*. ¶¶ 131-34.

Plaintiff alleges that USSF's denial of its sanctioning applications reflects an anticompetitive market division agreement with FIFA to limit the output of Official Games in the United States.  *See id*. ¶¶ 160-78.  Specifically, Plaintiff alleges an unlawful vertical agreement between FIFA and all of the National Associations, including USSF, to facilitate and enforce the market division agreement against all leagues and teams.  *Id*. ¶¶ 6, 168.  Plaintiff also alleges an unlawful horizontal agreement "between and among MLS and the other top-tier men's professional soccer leagues and teams," as well as their "respective FIFA-affiliated 'National Associations,'" to adhere to the FIFA Policy and to boycott leagues, clubs, and players that participate in unsanctioned games in the United States.  *Id*. ¶¶ 4, 6, 167-68.

On July 20, 2020, this Court granted USSF's motion to dismiss Plaintiff's antitrust claim without prejudice and granted USSF's motion to compel to arbitration Plaintiff's tortious interference with business relationships claim against USSF.  Dkt. 47.  On September 14, 2020, Plaintiff filed an Amended Complaint, adding FIFA as a defendant and reasserting its antitrust claim against both USSF and FIFA.  Dkt. 57.  The Amended Complaint also reasserts the tort claim that was included in the original complaint.[5]  Am. Compl. ¶¶ 179-92.

USSF moves to dismiss Plaintiff's Amended Complaint for failure to state a claim and failure to join an indispensable party pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(7).  Dkt. 65.  USSF also renews its prior argument that Plaintiff's claim is barred by the

---

[5]       Plaintiff has not yet commenced arbitration proceedings.  Dkt. 83.  No later than July 30, 2021, Plaintiff must submit a letter indicating whether it intends to pursue its tort claim in arbitration.

parties' prior covenant not to sue. *Id.* FIFA moves to dismiss the Amended Complaint for lack of personal jurisdiction and failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). Dkt. 68. On June 15, 2021, the Court held oral argument on the motions to dismiss. *See* Tr., Dkt. 94.

## DISCUSSION[6]

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss, the Court may consider any "written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as materials "integral" to plaintiff's claims. *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

### A. Legal Framework

Section 1 of the Sherman Act prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1; *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015). In order to plead a violation of Section 1, a plaintiff must allege "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (emphasis omitted)). In other words, an antitrust plaintiff must allege an agreement; a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am.*

---

[6] Because the Court finds that Plaintiff has failed to state an antitrust claim, the Court will not consider Defendants' other grounds for dismissal.

*Tobacco Co. v. United States,* 328 U.S. 781, 809-10 (1946); *Starr v. Sony BMG Music Entm't,*
592 F.3d 314, 321 (2d Cir. 2010) (explaining that because Section 1 of the Sherman Act does not
prohibit all restraints of trade, but only *agreements* to restrain trade, the "crucial question in
a Section 1 case is [] whether the challenged conduct stem[s] from independent decision or from
an agreement, tacit or express.") (internal quotation marks omitted).  Independent action by one
party is not proscribed; there is a "basic distinction between concerted and independent action,"
and a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it
does so independently."  *Monsanto*, 465 U.S. at 760-61.

Because parallel conduct could simply be the result of "coincidence, independent
responses to common stimuli, or mere interdependence unaided by an advance understanding
among the parties," allegations of parallel conduct alone are insufficient to allege the existence
of a conspiracy.  *Twombly*, 550 U.S. at 556 n.4 (internal quotation marks omitted); *Apex Oil Co.
v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) (noting that while evidence of "[p]arallel conduct
can be probative . . . [of] an antitrust conspiracy," such evidence "alone will not suffice.").
Indeed, parallel conduct that "does not result from an agreement is not unlawful even if it is
anticompetitive."  *Apple*, 791 F.3d at 315.

In the absence of direct evidence of an agreement, such as a "recorded phone call in
which two competitors agreed to fix prices," a plaintiff must present circumstantial facts, known
as "plus factors," to support the inference that there was a conspiratorial agreement.  *Mayor &
City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).  These plus factors
may include, but are not limited to, "a common motive to conspire, evidence that shows that the
parallel acts were against the apparent individual economic self-interest of the alleged
conspirators, and evidence of a high level of interfirm communications."  *Id.* (citation omitted).

Regardless of whether the plaintiff presents direct or circumstantial evidence, at "the pleading stage, a complaint claiming conspiracy, to be plausible, must plead 'enough factual matter (taken as true) to suggest that an agreement was made,' *i.e.,* it must provide 'some factual context suggesting [that the parties reached an] agreement,' not facts that would be 'merely consistent' with an agreement." *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556, 549, 557) (alteration in original).  Mere "conclusory allegation[s] of [an] agreement at some unidentified point," are insufficient to allege a violation of Section 1 of the Sherman Act. *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (quoting *Twombly*, 550 U.S. at 557).  Finally, a complaint may be dismissed "where there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants." *Id.* (citing *Twombly*, 550 U.S. at 567; *Abbott Labs. v. Adelphia Supply USA*, No. 15-CV-5826, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10, 2017)).

If an antitrust plaintiff sufficiently alleges an agreement, it must next allege that the agreement "constituted an unreasonable restraint of trade either per se or under the rule of reason." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).  Few restraints of trade are unreasonable per se; conduct constituting a per se violation must be so "manifestly anticompetitive that it would almost invariably tend to restrict competition and decrease output." *Cenedella*, 348 F. Supp. 3d at 360 (citing *Hertz Corp. v. City of New York*, 1 F.3d 121, 130 (2d Cir. 1993)).  As a result, the per se rule is appropriate only "in the relatively narrow circumstance[s] where courts have sufficient experience with the [alleged wrongful] activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue." *Hertz*, 1 F.3d at 129; *Caruso Mgmt. Co. v. Int'l Council of Shopping Centers*, 403 F. Supp. 3d 191, 201 (S.D.N.Y. 2019).  Agreements among horizontal competitors to set prices are per se illegal, while vertical agreements, or agreements between parties at different levels of a

market structure, are not. *Apple*, 791 F.3d at 313–14; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882 (2007).

As a result of the "rigorous standard and [] presumption against applying the per se rule," courts apply the rule of reason in analyzing most alleged restraints of trade. *Caruso Mgmt. Co.*, 403 F. Supp. 3d at 201. At the motion to dismiss stage, the rule of reason inquiry requires the plaintiff to "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *Watkins v. Smith*, No. 12-CV-4635, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012), *aff'd*, 561 F. App'x 46 (2d Cir. 2014).

### B. Plaintiff Fails to Allege an Unlawful Vertical Agreement

Plaintiff alleges that USSF and "FIFA's other National Associations" entered into a vertical agreement with FIFA to apply the FIFA Policy against their member leagues and teams.[7] *See, e.g.,* Am. Compl. ¶¶ 6, 21, 71, 165, 166, 168. Plaintiff alleges that this "agreement to adhere to the FIFA market division policy has suppressed competition and reduced output in the relevant market." *Id.* ¶ 98. In support of the existence of this purported agreement, Plaintiff alleges that USSF admitted that it will not sanction Plaintiff's proposed games "because of its agreement to follow the FIFA geographic market division policy." *Id.* ¶ 129. Similarly, Plaintiff points to a letter USSF sent to Plaintiff denying a sanction for Plaintiff's proposed Official Game, in which USSF allegedly stated that it had "communicated with FIFA" regarding the proposed game and FIFA had "confirmed that the game was prohibited by the market division policy, which USSF had agreed to follow." *Id.* ¶ 130.

---

[7] At oral argument, Plaintiff's counsel indicated that Plaintiff was *not* alleging a separate vertical agreement. Tr., Dkt. 94 at 51-52. Nevertheless, because the Amended Complaint alleges an unlawful vertical agreement between FIFA and USSF, *see e.g.,* Am. Compl. ¶¶ 4, 6, 168, and Plaintiff's opposition brief argues that a vertical agreement exists, Pl. Opp., Dkt. 77 at 43-45, despite Plaintiff's apparent abandonment of the theory, for the sake of completeness, the Court will address the allegations of a vertical agreement between USSF and FIFA.

Plaintiff's allegations of a vertical agreement between FIFA and USSF fail to state a claim for the same reasons articulated in this Court's prior Opinion. Dkt. 47 at 12-15. Plaintiff continues to rely on USSF's admitted compliance with the FIFA Policy as evidence of an unlawful agreement between USSF and FIFA. This Court has already held, however, that USSF's compliance with the Policy, without additional factual allegations, is insufficient to constitute direct evidence of an unlawful agreement. Dkt. 47 at 13 (citing *Citigroup, Inc.*, 709 F.3d at 136 (explaining that direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level"); *Starr*, 592 F.3d at 325 (noting that allegations in a Sherman Act § 1 complaint based on direct evidence of agreement would likely require references to "specific time, place, or person involved in the alleged conspiracies") (quoting *Twombly*, 550 U.S. at 565 n.10)). Plaintiff's Amended Complaint still alleges no facts to support the inference that, in complying with the FIFA Policy, USSF actually entered an agreement with FIFA to restrict output. *See Am. Tobacco*, 328 U.S. at 809-10 (an antitrust plaintiff must allege a "unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement"); *Monsanto,* 465 U.S. at 761 (holding that a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."). Plaintiff's repeated characterizations of USSF's decision to comply with the FIFA directive as an unlawful agreement, *see, e.g.,* Am. Compl. ¶¶ 4, 6, 21, 26, 34, 35, 71, 98, 129, 130, 131, 162, 164, 165, 166, 174, are conclusory.[8] *Twombly* 550 U.S. at 557 (holding that mere "conclusory allegation[s] of [an] agreement at some unidentified point," are insufficient to

---

[8]     Moreover, the Court notes that certain of Plaintiff's allegations are simply inaccurate. *See* Am. Compl. ¶¶ 34, 35, 98, 117. For example, Plaintiff alleges that "under the agreed-upon FIFA Statutes, each National Association is required to *agree* to 'comply fully with the Statutes, regulations, directives and decisions of FIFA bodies at any time.'" *Id.* ¶ 34 (emphasis added) (quoting FIFA Stat. Art. II.14(1)(a)). As evidenced by the portion of the FIFA statute that Plaintiff quotes directly, the statute merely requires individual National Associations to comply with its statutes, regulations, and directives; it does not require or encourage any *agreement* among National Associations or with FIFA to do so.

allege plausibly a Sherman Act violation); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51-52 (2d

Cir. 2007); *Cenedella*, 348 F. Supp. 3d at 358 (rejecting plaintiff's attempts to "summarily

assert[] several times that there is an agreement" as "nothing more than conclusory

allegations.").

As this Court noted in its prior opinion, although USSF's adherence to the FIFA Policy

may be "*consistent*" with a vertical agreement, Plaintiff must plead facts "to suggest that an

agreement *was made.*"  *Anderson News*, 680 F.3d at 184 (quoting *Twombly*, 550 U.S. at 556,

549, 557) (emphasis added); *Citigroup, Inc.*, 709 F. 3d at 136 ("A plaintiff's job at the pleading

stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference

that a conspiracy actually existed.").  USSF's admitted compliance with the FIFA Policy is

insufficient to support an inference that USSF and FIFA shared a "unity of purpose or a common

design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco*,

328 U.S. at 809-10; *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (explaining that it

is not concerted action for a party to announce the terms under which it is willing to deal and to

then act in accordance with that unilateral announcement, even if the practical effect may be to

achieve conformity of behavior); *Tarrant Serv. Agency, Inc. v. Am. Standard Inc.*, 12 F.3d 609,

617-18 (6th Cir. 1993) (affirming the district court's grant of summary judgment on plaintiff's §

1 conspiracy claim on the grounds that plaintiff produced no evidence of a conspiracy and noting

that the contested "broker policy was unilaterally implemented by [defendant]" and a third

party's "mere adherence to the [] policy [did] not illustrate the existence of a conspiracy.").  As

the Court previously noted, there are obvious rational reasons why USSF would comply with the

FIFA Policy without being part of an unlawful agreement to do so, such as its desire not to take

action that could result in all U.S. men's soccer players and teams being deemed ineligible for

World Cup play.[9]  Am. Compl. ¶ 100; *Cenedella*, 348 F. Supp. 3d at 358 (noting that a complaint may be dismissed "where there is an obvious alternative explanation to the facts underlying the alleged conspiracy among the defendants.").

In sum, Plaintiff has failed to allege adequately that there was an unlawful agreement between USSF and FIFA; without an adequate allegation of an agreement, Plaintiff has not stated a claim for a violation of Section 1 of the Sherman Act.[10]

### C.  Plaintiff Fails to Allege an Unlawful Horizontal Agreement

Plaintiff alleges a horizontal agreement among the "FIFA-affiliated top-tier men's professional soccer leagues and their teams" to "geographically allocate the markets in which they are permitted to stage official season games, including in the U.S. market."  Am. Compl. ¶ 4, *see also* ¶¶ 26, 117, 167.   Plaintiff alleges that "these leagues and teams have agreed, along with their respective FIFA-affiliated National Associations," including USSF, to "adhere to the FIFA rules and policies establishing and enforcing the horizontal market division agreement." *Id.* ¶ 4; Pl. Opp., Dkt. 77 at 27.  At the outset, the Amended Complaint nowhere specifies with

---

[9]     Plaintiff added allegations regarding the relationship among USSF, MLS, and SUM, the marketing and promotion arm of MLS, to the Amended Complaint.  *See* Am. Compl. ¶¶ 91, 105-110.  Specifically, Plaintiff alleges that USSF's alleged economic dependence on SUM "incentivizes USSF to promote, participate in and adhere to the FIFA market division agreement," because the agreement purportedly shields MLS from competition.  *Id.* ¶ 107.  Even assuming the truth of those allegations, Plaintiff's allegations do not give rise to the inference that USSF entered an agreement with FIFA to restrict output.  Instead, the fact that the FIFA Policy has beneficial economic consequences for USSF provides yet another rational reason why USSF would unilaterally comply with the Policy.  If complying with the Policy were contrary to USSF's economic interests, *that* would be circumstantial evidence of an unlawful agreement.

[10]     Plaintiff also appears to allege that an identical vertical agreement to comply with the FIFA Policy exists among FIFA and *all* of the 211 National Associations.  *See e.g.*, Am. Compl. ¶¶ 166, 168.  But Plaintiff alleges no facts to support the inference that the remaining 210 National Associations also entered an agreement with FIFA to restrict output.  To the contrary, Plaintiff alleges that Ecuador's National Association agreed to allow two Ecuadorian teams to participate in Plaintiff's proposed Official Game in 2019, notwithstanding the FIFA Policy. Am. Compl. ¶ 125; Pl. Opp., Dkt. 77 at 30.  Moreover, as noted *supra*, a National Association's unilateral compliance with the FIFA Policy, without more, is insufficient evidence from which the Court can infer the existence of an unlawful agreement.  *See Monsanto,* 465 U.S. at 761 (holding that a party "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *Apple*, 791 F. 3d at 318 ("[C]onduct resulting solely from competitors' independent business decisions—and not from any 'agreement'— is not unlawful under § 1 of the Sherman Act, even if it is anticompetitive.").

which of the leagues, teams, and National Associations USSF purportedly conspired, a deficiency this Court also identified in its prior opinion.  Dkt. 47 at 16-17 (citing *Cenedella*, 348 F. Supp. 3d at 358-59 (dismissing plaintiff's complaint as including "nothing more than conclusory allegations . . . completely devoid of facts indicating who agreed with whom, to what, and when," and noting that the complaint merely referred to "other unnamed co-conspirators, whom the plaintiff [made] little effort to describe")).  In its opposition brief, Plaintiff argues that "*all* the top-tier men's professional soccer leagues and teams" have "agreed, through their National Associations, to adhere to all FIFA rules and policies, including the geographic market division policy."  Pl. Opp., Dkt. 77 at 28-29 (emphasis added).[11] Accordingly, the Court will assume that the alleged horizontal agreement is among *all* 211 National Associations and *all* leagues and teams.

### 1. The FIFA Policy Itself is Not Direct Evidence of a Horizontal Conspiracy

Plaintiff argues that the FIFA Policy itself constitutes direct evidence of "Defendants' and their alleged conspirators' conscious commitment to [a] common scheme."  Pl. Opp., Dkt. 77 at 32.  The Court disagrees.  Although actions of organizations comprised of horizontal competitors are certainly subject to scrutiny as potentially unlawful conspiracies, "[o]rganizational decisions do not inherently constitute § 1 concerted action."  *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2018) ("*NASL*")[12]; *see*

---

[11]    Plaintiff confirmed at oral argument that its theory is that there is a worldwide conspiracy comprised of 211 National Associations and all top tier soccer leagues and teams.  *See* Tr., Dkt. 94 at 52.

[12]    Plaintiff makes much of the Second Circuit's comment in *NASL* that if the plaintiff "were challenging the Standards themselves—in totality—as violative of the antitrust laws, then the USSF Board's promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking."  883 F.3d at 41.  At the outset, that statement is dicta; the Circuit affirmed the District Court's holding that Section 1 would require an underlying "agreement to agree" among members of the USSF Board to adopt the standards in order for the standards to constitute direct evidence of an unlawful agreement.  *Id.* at 39-40.  Moreover, Plaintiff in this case is *not* challenging FIFA's standards as a whole, but merely the impact of a single FIFA Policy.  Finally, as noted *supra*, because

also *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999)

(holding that "every action by a trade association is not concerted action by [its] members.");

*LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) (noting that

"membership and participation in a trade association alone does not give rise to a plausible

inference of illegal agreement.").  In order for an organizational decision or policy to constitute

concerted action and, therefore, to serve as direct evidence of an unlawful agreement, Plaintiff

must plausibly allege an antecedent "agreement [among horizontal competitors] to agree to vote

a particular way" to adopt such a policy.[13]  *NASL*, 883 F.3d at 39; *see also AD/SAT*, 181 F.3d at

234 ("an antitrust plaintiff must present evidence tending to show that association members, *in

their individual capacities*, consciously committed themselves to a common scheme designed to

achieve an unlawful objective.") (emphasis added); *LaFlamme*, 702 F. Supp. 2d at 147-48

(dismissing plaintiffs' § 1 claim because the complaint failed to "allege any specific facts

providing any basis to infer an actual unlawful agreement," but rather relied on the "bald,

---

Plaintiff has not alleged an underlying "agreement to agree" to adopt the Policy, the Policy does not constitute direct evidence of a conspiracy.

[13]     Plaintiff relies on cases such as *Nat'l Collegiate Athletic Ass'n v. Alston et al.*, 141 S.Ct. 2141 (2021), *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 99 (1984), and *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492 (1988), to argue that the FIFA Policy itself constitutes direct evidence of a conspiracy. Those cases are readily distinguishable.  In *Alston*, the Supreme Court specifically noted that there was no dispute that NCAA and its members, which are undisputed horizontal competitors, "agreed to compensation limits on student-athletes."  141 S.Ct. at 2151.  In other words, the Court in *Alston* began its analysis from the premise of "admitted horizontal price fixing."  *Id.* at 2154.  Similarly, in *Board of Regents*, the challenged policy was indisputably agreed upon by a vote among horizontal competitors.  468 U.S. at 99.  Finally, in *Allied Tube*, the defendant "conceded that it had conspired with the other steel interests to exclude respondent's [proposal]" by, *inter alia,* strategizing with other steel workers, "packing" the meeting with new members "whose only function would be to vote against" plaintiff's proposal, and instructing the voters "where to sit and how and when to vote by group leaders who used walkie-talkies and hand signals to facilitate communication."  486 U.S. at 496-97.  Put differently, Plaintiff relies on cases in which the existence of an underlying agreement was not disputed.  Here, Plaintiff's Amended Complaint fails precisely because it does not include any well-pled facts from which the Court could infer that there was an unlawful agreement among Defendants and their horizontal competitors to adopt or enforce the Policy.

14

conclusory allegation that 'it appears that defendants and others decided to adopt the terms of [the] [r]esolution'").

Plaintiff's Amended Complaint lacks any non-conclusory factual allegations from which the Court can reasonably infer that the 37 members of the FIFA Council unlawfully agreed to adopt the Policy, or even that USSF and some of the members of the FIFA Council unlawfully agreed to adopt the Policy.[14]  Plaintiff fails entirely to allege any facts suggesting that there was an "agreement to agree," *NASL*, 883 F.32 at 39, a "unity of purpose," *Am. Tobacco*, 328 U.S. at 810, or a "meeting of the minds," *Twombly*, 550 U.S. at 557, among USSF and any other member of the FIFA Council to adopt the Policy.  Plaintiff's allegations that the FIFA Council adopted the rule "at the behest of USSF and MLS" and that unnamed "USSF and MLS allies [] push[ed] the policy through in the FIFA Council" are conclusory.[15]  Am. Compl. ¶¶ 114, 117; *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 437 (4th Cir. 2015) (dismissing allegations that "a collective decision was made," and that the defendants "agreed to vote as a

---

[14]    The Court also notes that it is not at all clear whether the members of the FIFA Council, who represent various National Associations and regional confederations, are horizontal competitors.  The Amended Complaint alleges that the FIFA-affiliated leagues and teams are "competitors," *see e.g.*, Am. Compl. ¶ 4, 88, but it does not allege that the six regional confederations and 211 National Associations are horizontal competitors.  Instead, the Amended Complaint merely alleges that each National Association is a "separate economic actor."  *Id.* ¶ 161.

[15]    The Amended Complaint identifies four other individuals who sat on the FIFA Council on behalf of the National Associations of England, Portugal, Canada, and Japan.  Am. Compl. ¶ 41.  Plaintiff does not, however, allege that any of those four individuals agreed with USSF to vote to adopt the FIFA Policy.  Plaintiff also fails to identify the remaining members of the FIFA Council, let alone include allegations that those unidentified people agreed with USSF (or with anyone else) to vote in favor of the Policy.

    At oral argument, the Court pressed Plaintiff on the facts that support its assertion that FIFA adopted the Policy at the behest of USSF.  Tr., Dkt. 94 at 38, 54, 57-62.  The resulting exchange leads the Court to suspect that Relevant does not fully understand the pleading standard announced over a decade ago in *Ashcroft v. Iqbal* and *Bell Atlantic v. Twombly*.  Although Plaintiff's counsel assured the Court that he had "source information" and "other things" to back up the Amended Complaint's conclusory allegations regarding U.S. Soccer's role in the announcement of the FIFA Policy, when pressed on where those facts appear in the Amended Complaint, counsel could only assure the Court that the "allegations [in the Amended Complaint] are not made up out of whole cloth," and he had "a reasonable basis" for the allegations.  Tr., Dkt. 94 at 59.  If Plaintiff had sources who provided information that supported its conclusory allegations regarding USSF's role in pressing others on the FIFA Council to adopt the Policy (allegations that might have started to look like there was "an agreement to agree"), it should have included that information in the Amended Complaint, together with the sources' asserted basis for knowledge.  That is the clear teaching of *Iqbal* and *Twombly*.

bloc" as conclusory, non-specific, and insufficient to support an inference of an unlawful

agreement); *cf. Allied Tube*, 486 U.S. at 496-97 (noting specific factual allegations that defendant

had "pack[ed]" the meeting with new members "whose only function would be to vote against"

plaintiff's proposal, and instructed voters "where to sit and how and when to vote by group

leaders who used walkie-talkies and hand signals to facilitate communication.").  Similarly,

Plaintiff's allegation that former USSF President, Sunil Gulati, participated in the FIFA

Council's adoption of the Policy "with the goal of shielding USSF's sole Division I league,

MLS, from official season games competition from foreign leagues," Am. Compl. ¶ 39, is

wholly unsupported and conclusory.  The Court cannot plausibly infer, merely from Mr. Gulati's

presence on the FIFA Council, that USSF facilitated or participated in an unlawful agreement to

adopt the Policy.  *See SD3, LLC,* 801 F.3d at 436 (rejecting plaintiff's argument that the court

should "infer malfeasance because some of the defendants' representative[s] served on the

relevant standard-setting panel"); *All Star Carts & Vehicles, Inc. v. BFI Can. Income Fund*, 596

F. Supp. 2d 630, 640 (E.D.N.Y. 2009) (allegations that Defendants participated in meetings,

conversations and communications, and "reached agreement during these meetings as to their

anticompetitive practices" were insufficient allegations of the existence of an agreement to

survive a motion to dismiss).  In sum, Plaintiff fails to allege any facts from which the Court can

reasonably infer that the members of the FIFA Council, "in their individual capacities,

consciously committed themselves to a common scheme designed to achieve an unlawful

objective." *AD/SAT, Div. of Skylight, Inc.*, 181 F.3d at 234; *SD3, LLC,* 801 F.3d at 437

(dismissing certain allegations of an unlawful agreement because the complaint identified "no

fact other than consistent votes against [plaintiff's] proposal . . . to establish the alleged illegal

agreements.").  Without such well-pled facts, the FIFA Policy is not direct evidence of an

unlawful agreement.

Plaintiff similarly fails to allege circumstantial evidence of an agreement among the members of the FIFA Council to adopt the Policy.[16]  Although Plaintiff makes much of the fact that Don Garber, MLS Commissioner and a Board Member of USSF, and Carlos Cordeiro, a former-USSF President, were on the FIFA Stakeholders Committee,[17] Am. Compl. ¶¶ 44-45, Mr. Garber and others' participation on the Stakeholders Committee is not circumstantial evidence of an agreement among the members of the FIFA Council.  At the outset, Plaintiff's allegations that Mr. Garber and Mr. Cordeiro "advocate[d] for a new geographic market division policy" and that the Stakeholders Committee "has taken a number of actions to support the adoption, implementation, enforcement—and, most recently, the strengthening—of the geographic market division agreement," *id.* ¶¶ 46, 114, are factually unsupported and conclusory.  The Court cannot reasonably infer merely from Mr. Garber's presence on the Stakeholders Committee in 2018 that he "advocate[d]" for the Policy or took any action to "support the adoption, implementation, [or] enforcement" of the Policy.  Moreover, and most significantly, the FIFA Policy was announced by the FIFA Council, *not* by the FIFA Stakeholders Committee, which has no rule-making authority.  *Id.* ¶ 117.  Accordingly, even accepting that members of the FIFA Stakeholders' Committee did in fact advocate for the adoption of the FIFA Policy (a conclusory allegation totally devoid of factual support), Plaintiff alleges no facts to support the

---

[16]    As noted *supra* at note 7, at oral argument, Plaintiff's counsel strayed considerably from the allegations and arguments in his papers.  For example, when pressed about the implications of Plaintiff's allegations regarding the role of the FIFA Stakeholders Committee, Plaintiff's counsel stated that its allegations that the FIFA Council adopted the Policy at the urging or "at the behest of U.S. Soccer and Major League Soccer" are "irrelevant to whether there is an agreement."  Tr., Dkt. 94 at 35.  Plaintiff's Amended Complaint and opposition, however, argue that the actions and statements of the members of the Stakeholders Committee are circumstantial evidence of an unlawful agreement.  Am. Compl. ¶¶ 46, 51 114, 117; Pl. Opp., Dkt. 77 at 34.  Accordingly, Plaintiff's theory of the role and impact of the FIFA Stakeholders Committee vis-à-vis the alleged unlawful agreements among the members of the FIFA Council to adopt the Policy or among the National Associations, leagues, and teams to adhere to the Policy, is entirely unclear.  Nevertheless, the Court assumes that Plaintiff is relying on allegations concerning the Stakeholders Committee as circumstantial evidence of an unlawful agreement and will analyze them as such.

[17]    The FIFA Stakeholders Committee is a standing committee tasked with "advising and assisting" the FIFA Council.  Am. Compl. ¶ 42.

SPA-37

inference that such a recommendation had any bearing on whether the members of the FIFA

Council formed a "conscious commitment to a common scheme designed to achieve an unlawful

objective." *Monsanto*, 465 U.S. at 768.  Although the Court notes that the terms of the FIFA

Policy indicate that it is "consistent with the opinion expressed by the Football Stakeholders

Committee," Plaintiff alleges no facts to support an inference that (i) the FIFA Council adopted

the Policy "at the urging," Am. Compl. ¶ 41, of the Stakeholders Committee; (ii) the Policy

reflects any "unity of purpose or a common design and understanding" among the members of

the Stakeholders Committee and the FIFA Council; or (iii) the Stakeholders Committee's

recommendation precipitated any unlawful underlying agreement among the members of the

FIFA Council to adopt the Policy.

Finally, even assuming that all 37 members of the FIFA Council did vote to adopt the

Policy,[18] which is not alleged in the Amended Complaint, "consistent votes," absent additional

evidence is best viewed as "parallel conduct . . .  equally consistent with legal behavior."

*SD3, LLC*, 801 F.3d at 437; *Twombly*, 550 U.S. at 556-57 ("[W]hen allegations of parallel

conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a

suggestion of a preceding agreement, not merely parallel conduct that could just as well be

independent action.").  The Court cannot reasonably infer, merely from the fact that the members

of the FIFA Council met and subsequently announced a Policy, that there was a "unity of

purpose or a common design and understanding, or a meeting of minds in an unlawful

arrangement" to adopt that Policy.  *Am. Tobacco Co.*, 328 U.S. at 809-10.

---

[18]    The Amended Complaint does not allege how many votes on the FIFA Council are required to adopt a policy nor how many members voted in favor of the Policy at issue here.

2.   **Unilateral Adherence to the FIFA Policy is Not Evidence of a Horizontal Conspiracy**

The National Associations, leagues, and teams' adherence to the announced FIFA Policy, without additional factual allegations, is similarly insufficient to allege adequately the existence of a horizontal conspiracy.  Plaintiff's repeated conclusory allegations that all of the National Associations, leagues, and teams have agreed to adhere to the FIFA Policy, *see, e.g.,* Am. Compl. ¶¶ 4, 35, 70, 98, 117, 162, 166, 167, 170-174, are just that – conclusory allegations that are not entitled to the presumption of truth.  *Iqbal*, 556 U.S. at 681; *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010) ("While Plaintiff repeatedly asserts that Defendant's conduct constitutes a 'horizontal conspiracy,' . . . this characterization is a legal conclusion that the Court does not accept as true on a motion to dismiss.").  Moreover, as noted *supra,* Plaintiff's allegation that FIFA "require[s]" the National Associations "*to agree* to 'comply fully with FIFA's Statutes'" is belied by the language of the cited FIFA statute.  Am. Compl. ¶ 34 (emphasis added); *see also* ¶¶ 35, 98, 117.  The relevant FIFA statute requires the National Associations to adhere to FIFA policies; it does not require them unlawfully to agree to adhere to them.  *Id.* ¶ 34.  In short, Plaintiff's Amended Complaint is devoid of any factual allegations to support the inference that the Defendants in this case agreed with anyone, let alone with all 210 other National Associations and countless leagues and teams, to do anything, including to adhere to the Policy.  *See Jessup v. Am. Kennel Club*, 862 F. Supp. 1122, 1129 (S.D.N.Y. 1994) (observing the weakness of antitrust claims where the plaintiff failed to "identify or refer to specific acts or activities suggesting any illegal agreement or concerted action by Defendants").

Plaintiff similarly fails plausibly to allege circumstantial evidence of an agreement among the National Associations, leagues, and teams to adhere to the Policy.  Plaintiff relies on a

statement made by Mr. Garber that "the respective leagues don't believe it's in their best interest" to permit Official Games to be held outside of their home markets and that while there may be "one or two" leagues that feel differently, MLS was not one of them. Am. Compl. ¶ 51. Plaintiff alleges that Mr. Garber's statement constitutes an "admission" of "his intention to use the FIFA market division agreement to shield MLS from official games competition in the U.S." *Id.* At the outset, Mr. Garber made this statement in 2020, two years after the FIFA Policy was announced. *Id.* Accordingly, Plaintiff's argument that Mr. Garber's statement is circumstantial evidence of an agreement to adhere to a policy that was announced two years earlier is tenuous at best. Moreover, Mr. Garber's expression of MLS or USSF's opinion regarding the benefits of the Policy does not necessarily signify an underlying conspiracy among all National Associations, leagues, and teams to enforce the Policy. *See Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1195 (D.N.M. 2011) (noting that defendant's statement that it opposed changing a standard-setting organization's proposed standard did not suggest an unlawful agreement but merely "unilateral conduct."). To the contrary, Mr. Garber's statement that there are leagues who do *not* support the FIFA Policy undermines Plaintiff's argument by suggesting that there is, in fact, no "agreement" among *all* of the National Associations, leagues, and teams to adhere to the Policy.

Finally*,* even assuming that all National Associations, leagues, and teams do comply with the FIFA Policy, in the absence of any factual allegations supporting an inference of an actual agreement to restrict output, such conduct does not violate the Sherman Act. *See Apple*, 791 F. 3d at 318 ("[C]onduct resulting solely from competitors' independent business decisions—and not from any 'agreement'— is not unlawful under § 1 of the Sherman Act, even if it is anticompetitive."); *Anderson News*, 680 F.3d at 174 (noting that "unilateral parallel conduct" does not itself "create an inference of collusion"); *Abraham v. Intermountain Health Care*

20

*Inc.*, 461 F.3d 1249, 1256 (10th Cir. 2006) ("unilateral conduct, regardless of its anti-competitive effects, is not prohibited by § 1 of the Sherman Act.") (internal quotation marks omitted).

In sum, Plaintiff has failed to allege an unlawful horizontal agreement.[19]  As such, Plaintiff has not stated a claim for a violation of Section 1 of the Sherman Act.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss Plaintiff's antitrust claim are GRANTED.

No later than **July 30, 2021**, Plaintiff must submit a letter indicating whether it intends to pursue its tort claim.  If Plaintiff intends to pursue the tort claim in arbitration, this case will be stayed pending arbitration.

The Clerk of Court is respectfully directed to close the open motions at docket entries 65 and 68.

**SO ORDERED.**

**Date:  July 20, 2021
         New York, New York**

**VALERIE CAPRONI
United States District Judge**

---

[19]     Plaintiff makes much of a letter written by the Department of Justice to FIFA and USSF on March 16, 2020.  Am. Compl., Ex. 1.  The letter, which is attached to Plaintiff's Amended Complaint, concerned a proposed rule that FIFA never adopted.  The letter does not concern the FIFA Policy adopted in 2018 and does not contain any additional facts to support the existence of an unlawful vertical or horizontal agreement among FIFA, USSF, the regional confederations, National Associations, leagues, and teams to adhere to the Policy.

SPA-41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/23/2021

-------------------------------------------------------------X
RELEVENT SPORTS, LLC,                           :
                                                :
                                    Plaintiff,  :
                                                :
                    -against-                   :          19-CV-8359 (VEC)
                                                :
                                                :          ORDER
FÉDÉRATION INTERNATIONALE DE                    :
FOOTBALL ASSOCIATION and UNITED                 :
STATES SOCCER FEDERATION, INC.,                 :
                                                :
                                    Defendants. :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      WHEREAS on July 20, 2021, the Court granted Defendants' motions to dismiss

Plaintiff's antitrust claim and directed Plaintiff to submit a letter indicating whether it intends to

pursue its remaining tort claim (Dkt. 96);

      WHEREAS on July 23, 2021, Plaintiff informed the Court that it does not intend to

pursue its tort claim in arbitration (Dkt. 97);

      IT IS HEREBY ORDERED THAT:  This case is DISMISSED.


**SO ORDERED.**

**Date:  July 23, 2021**
**      New York, New York**

                                        **VALERIE CAPRONI**
                                   **United States District Judge**

SPA-42

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
RELEVENT SPORTS, LLC,

                                    Plaintiff,

            -against-

FÉDÉRATION INTERNATIONALE DE
FOOTBALL ASSOCIATION and UNITED
STATES SOCCER FEDERATION, INC.,

                                    Defendants.
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/28/2021

19 **CIVIL** 8359 (VEC)

## JUDGMENT

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated July 20, 2021, and the Court's Order dated July 23,

2021, Defendants' motions to dismiss Plaintiff's antitrust claim are GRANTED; accordingly, the

case is closed.

**Dated:**  New York, New York

        July 28, 2021

                                        **RUBY J. KRAJICK**

                                        **Clerk of Court**

            **BY:**

                                        **Deputy Clerk**