# No. 21-2088

IN THE
## United States Court of Appeals for the Second Circuit

RELEVENT SPORTS, LLC,
*Plaintiff-Appellant*,

v.

UNITED STATES SOCCER FEDERATION, INC.,
and FÉDÉRATION INTERNATIONALE DE FOOTBALL ASSOCIATION,
*Defendants-Appellees*.

On Appeal from the
United States District Court for the Southern District of New York
District Court No. 1:19-cv-08359 (Hon. Valerie E. Caproni)

## BRIEF FOR THE UNITED STATES OF AMERICA
## AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

RICHARD A. POWERS
  *Acting Assistant Attorney General*

KATHLEEN S. O'NEILL
  *Senior Director of Investigations
  and Litigation*

DANIEL E. HAAR
NICKOLAI G. LEVIN
ADAM D. CHANDLER
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 353-6638
adam.chandler@usdoj.gov

*Counsel for the United States of America*

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF THE UNITED STATES OF AMERICA ......................................... 1

STATEMENT OF THE ISSUE ...................................................................................... 2

BACKGROUND ................................................................................................................. 2

SUMMARY OF ARGUMENT ....................................................................................... 5

ARGUMENT ....................................................................................................................... 6

An Association Rule Governing How Members' Separate Businesses
Compete Is Direct Evidence of Concerted Action Subject to Section 1
of the Sherman Act. ................................................................................................. 7

    A.  Courts Have Long Treated Association Rules Governing Members'
Separate Businesses as Concerted Action Under Section 1. ....................... 9

    B.  Because an Association Rule Governing Members' Separate
Businesses Is Itself Direct Evidence of an Agreement, No
Additional Allegations of Concerted Action Are Necessary To
Challenge the Rule. .............................................................................................. 14

    C.  The District Court Misapplied This Court's Decision in *North
American Soccer League* and Other Precedents. .......................................... 16

    D.  The District Court's Standard Could Shield Significant
Anticompetitive Conduct from Section 1 Scrutiny and Waste
Resources ................................................................................................................. 21

CONCLUSION ................................................................................................................... 23

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*AD/SAT, A Division of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) ................................................................. 18, 20

*All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund*,
596 F. Supp. 2d 630 (E.D.N.Y. 2009) ...................................................... 21

*American Needle, Inc. v. National Football League*,
560 U.S. 183 (2010) ...................................................................... *passim*

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
456 U.S. 556 (1982) ................................................................................ 14

*Anderson v. Shipowners' Ass'n of Pacific Coast*,
272 U.S. 359 (1926) ................................................................................ 11

*Arizona v. Maricopa County Medical Society*,
457 U.S. 332 (1982) .................................................................................. 9

*Associated Press v. United States*,
326 U.S. 1 (1945)........................................................................ 9, 11, 17, 19

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................ 14

*Board of Trade v. United States*,
246 U.S. 231 (1918) ................................................................................ 10

*California Dental Ass'n v. FTC*,
526 U.S. 756 (1999) .................................................................................. 9

*Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.*,
996 F.2d 537 (2d Cir. 1993) ...................................................................... 8

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) ................................................................................ 13

*Fashion Originators' Guild of America v. FTC*,
312 U.S. 457 (1941) ............................................................................. 9, 18

*FTC v. Indiana Federation of Dentists*,
  476 U.S. 447 (1986) ..................................................................9, 18

*FTC v. Pacific States Paper Trade Ass'n*,
  273 U.S. 52 (1927) ......................................................................... 9

*Goldfarb v. Virginia State Bar*,
  421 U.S. 773 (1975) ...................................................................9, 13

*LaFlamme v. Société Air France*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) ......................................... 21

*MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*,
  62 F.3d 967 (7th Cir. 1995) .......................................................... 11

*National Society of Professional Engineers v. United States*,
  435 U.S. 679 (1978) ...................................................................9, 10

*North American Soccer League, LLC v. United States Soccer
  Federation, Inc.*, 883 F.3d 32 (2d Cir. 2018).........................*passim*

*North Carolina State Board of Dental Examiners v. FTC*,
  717 F.3d 359 (4th Cir. 2013)........................................................ 13

*NCAA v. Alston*,
  141 S. Ct. 2141 (2021) .................................................................. 11

*NCAA v. Board of Regents of the University of Oklahoma*,
  468 U.S. 85 (1984) ..............................................................9, 10, 11

*Robertson v. Sea Pines Real Estate Cos.*,
  679 F.3d 278 (4th Cir. 2012).......................................................2, 15

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
  801 F.3d 412 (4th Cir. 2015)........................................................ 20

*Silver v. New York Stock Exchange*,
  373 U.S. 341 (1963) ....................................................................... 9

## TABLE OF AUTHORITIES—Continued

Page(s)

*Sugar Institute, Inc. v. United States*,
   297 U.S. 553 (1936) ....................................................................... 9

*Sulitzer v. Tippins*,
   No. 20-55735 (9th Cir.) ................................................................. 2

*Systemcare, Inc. v. Wang Laboratories Corp.*,
   117 F.3d 1137 (10th Cir. 1997) ................................................. 15

*United States v. Consolidated Multiple Listing Service, Inc.*,
   No. 3:08-cv-01786-SB (D.S.C. filed May 2, 2008) ...................... 1

*United States v. Multiple Listing Service of Hilton Head Island*,
   No. 9:07-cv-3435-SB (D.S.C. filed Oct. 16, 2007) ...................... 1

*United States v. National Ass'n of Real Estate Boards*,
   339 U.S. 485 (1950) ....................................................................... 9

*United States v. National Ass'n of Realtors*,
   No. 1:05-cv-05140 (N.D. Ill. filed Sept. 8, 2005) ....................... 1

*United States v. Paramount Pictures, Inc.*,
   334 U.S. 131 (1948) ..................................................................... 11

*United States v. Sealy, Inc.*,
   388 U.S. 350 (1967) .................................................................. 9, 14

*United States v. Topco Associates, Inc.*,
   405 U.S. 596 (1972) .................................................................. 9, 18

*Visa Inc. v. Osborn*,
   137 S. Ct. 289 (2016) ..................................................................... 1


STATUTE:

15 U.S.C. § 1................................................................................ 1, 7, 15

**TABLE OF AUTHORITIES—Continued**

Page(s)

**RULE:**

Fed. R. App. P. 29 ........................................................................................................... 2

**OTHER AUTHORITIES:**

Phillip E. Areeda & Herbert Hovenkamp,
 *Antitrust Law* (4th & 5th ed. May 2021) ............................................................ 10, 12

FIFA*, FIFA Council Makes Key Decisions for the Future of Football
 Development* (Oct. 26, 2018) ................................................................................... 3

## INTEREST OF THE UNITED STATES OF AMERICA

The United States enforces the federal antitrust laws and has a strong interest in their correct interpretation. The government takes no position on the merits of plaintiff's antitrust claim but urges this Court to reject the district court's holding that a plaintiff challenging an association's rule governing its members' separate businesses must plausibly allege an antecedent "agreement to agree" to that rule in order to plead concerted action under Section 1 of the Sherman Act, 15 U.S.C. § 1. That holding is legally incorrect and could improperly shield many anticompetitive association rules from Section 1 scrutiny in both public and private antitrust enforcement actions.[1]

The government has previously filed amicus briefs explaining the proper legal framework for identifying concerted action under Section 1, including in challenges to association rules.[2] As in those cases, we file this

---

[1] For examples of government enforcement actions challenging association rules, see *United States v. Consolidated Multiple Listing Service, Inc.*, No. 3:08-cv-01786-SB (D.S.C. filed May 2, 2008); *United States v. Multiple Listing Service of Hilton Head Island*, No. 9:07-cv-3435-SB (D.S.C. filed Oct. 16, 2007); and *United States v. National Ass'n of Realtors*, No. 1:05-cv-05140 (N.D. Ill. filed Sept. 8, 2005).

[2] *See, e.g.*, Brief for the United States as Amicus Curiae Supporting Respondents, *Visa Inc. v. Osborn*, 137 S. Ct. 289 (2016) (Nos. 15-961, 15-962) (dismissed as improvidently granted), https://www.justice.gov/atr/case-document/file/905436/download; Brief of the United States of America as

brief, pursuant to Fed. R. App. P. 29(a)(2), to promote sound Section 1 analysis.[3]

## STATEMENT OF THE ISSUE

Whether the district court erred in holding that, to plead concerted action subject to antitrust scrutiny under Section 1 of the Sherman Act, a plaintiff challenging an association rule governing association members' separate businesses not only must identify the challenged rule but also must plead facts showing that the rule resulted from a separate, additional agreement among the members to vote for or otherwise adopt the rule—that is, an "agreement to agree," SPA32 n.12; SPA33; SPA34 & n.15.

## BACKGROUND

A soccer promoter—Relevent Sports, LLC ("Relevent" or "plaintiff")— sued the Fédération Internationale de Football Association ("FIFA") and the

---

Amicus Curiae in Support of Neither Party, *Sulitzer v. Tippins*, No. 20-55735 (9th Cir. Dec. 2, 2020), https://www.justice.gov/atr/case-document/file/1342616/download; Brief for the United States as Amicus Curiae in Support of Plaintiffs-Appellees, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012) (Nos. 11-1538, 11-1539, 11-1540, 11-1541), https://www.justice.gov/atr/case-document/brief-united-states-amicus-curiae-support-plaintiffs-appellees.

[3] On March 16, 2020, the U.S. Department of Justice's Antitrust Division sent defendants a competition-advocacy letter, which plaintiff attached to its amended complaint.  A548-49.  That letter has no bearing on the arguments in this brief, which are based on the government's longstanding interest in the correct interpretation of Section 1's concerted-action requirement.

United States Soccer Federation, Inc. ("USSF") (collectively, "defendants"), alleging that they violated Section 1 of the Sherman Act by adopting and enforcing a market-division policy that prohibits staging official season soccer matches off home soil.  A493-549.  Relevent's complaint quoted an October 2018 public statement by FIFA, which "emphasised the sporting principle that official league matches must be played within the territory of the respective member association."  A523 ¶ 117 (quoting FIFA, *FIFA Council Makes Key Decisions for the Future of Football Development* (Oct. 26, 2018), https://www.fifa.com/tournaments/mens/futsalworldcup/lithuania2021/ media-releases/fifa-council-makes-key-decisions-for-the-future-of-football-development (reproduced at A598-601)).  Relevent further alleged that this policy binds soccer leagues and teams because they "agree[d] to comply with FIFA's Statutes, regulations, directives and decisions" on penalty of "suspension or expulsion from FIFA."  A501 ¶ 34.

The defendants moved to dismiss Relevent's complaint.  D. Ct. Dkt. Nos. 65, 68.  Among other things, they argued that "[a]llegations that a constituency-based organization's governance processes constitute concerted action are not sufficient to plead an antitrust conspiracy."  D. Ct. Dkt. No. 66 (USSF), at 17; *accord* D. Ct. Dkt. No. 69 (FIFA), at 17.  Rather, they argued that Relevent must also allege an antecedent "agreement [between the members of

the organization] *to agree* to vote a particular way on a rule or policy" in order

to plead concerted action.  D. Ct. Dkt. No. 78 (USSF), at 3 (emphasis and

alteration in original) (internal quotation marks omitted); *accord* D. Ct. Dkt.

No. 79 (FIFA), at 2; D. Ct. Dkt. No. 94 (Tr.), at 7 (USSF: "[W]hat you need is that

agreement to agree . . . , that antecedent agreement that we are all going to

vote a particular way.").

On July 20, 2021, the district court granted defendants' motions,

rejecting Relevent's contention "that the FIFA Policy itself constitutes direct

evidence" of concerted action.  SPA32.  The district court acknowledged that

"actions of organizations comprised of horizontal competitors are certainly

subject to scrutiny as potentially unlawful conspiracies," *id.*, but it insisted that

such an action could serve as direct evidence of an unlawful agreement only

when a plaintiff has also "plausibly allege[d] an antecedent 'agreement to

agree to vote'" to take that action, SPA33 (alteration omitted) (quoting *N. Am.*

*Soccer League, LLC v. USSF*, 883 F.3d 32, 39 (2d Cir. 2018)).  Because the court

saw no allegations "suggesting that there was an 'agreement to agree' . . . to

adopt the [FIFA] Policy," SPA34, it concluded that "the FIFA Policy is not direct

evidence of an unlawful agreement," SPA35.

This appeal followed.

## SUMMARY OF ARGUMENT

More than a century of U.S. Supreme Court precedent has treated association rules that govern the conduct of members' separate businesses as agreements subject to Section 1 of the Sherman Act. The district court's opinion flouted this well-established principle by holding that any Section 1 plaintiff challenging an association rule that binds association members as discrete enterprises must not only identify the rule, but also allege that association members separately agreed beforehand to adopt the rule.

That is not the law, and it sets too high a bar for pleading concerted action. When a Section 1 plaintiff challenges an association rule governing members' conduct in their separate businesses, there is no uncertainty about the existence of concerted action. Such cases do not rely on inferences of an agreement from parallel business conduct or from other circumstantial evidence. Rather, the rule itself embodies the agreement, and it is direct evidence of concerted action under Section 1.

The district court reached its contrary conclusion by misconstruing *North American Soccer League, LLC v. USSF*, 883 F.3d 32 (2d Cir. 2018). That case did not involve a direct challenge to an association rule, but rather concerned a broader conspiracy to manipulate the application of an

association rule.  Indeed, the case expressly recognized that a direct challenge to an association rule would be treated differently.  *Id.* at 40-41.

The district court's erroneous standard could improperly shield many anticompetitive association rules from Section 1 scrutiny by forcing plaintiffs to plead and prove an extraneous (and possibly nonexistent) "antecedent" agreement just to state a claim.  Moreover, such a standard would incentivize associations to restructure their decisionmaking so as to avoid liability for their anticompetitive restraints.  And courts and litigants could end up wasting substantial time and resources in unnecessary discovery over the existence of separate "agreements to agree."

## ARGUMENT

Relevent's complaint identifies a public statement by FIFA regarding where "official league matches must be played," A523 ¶ 117, and alleges that this "policy" is binding on the national associations that are FIFA's members and, in turn, on the leagues and teams that are the national associations' members, A499 ¶ 26; A501 ¶ 34; A502 ¶ 37.  Defendants dispute that such a policy exists.  FIFA has taken the position that the statement was mere "guidance," D. Ct. Dkt. No. 69, at 3, 4 n.2, while USSF has characterized it as an "organizational directive" adhered to by "some FIFA members," D. Ct. Dkt. No. 78, at 5.

The district court seemed to accept Relevent's characterization of the statement as a "policy," at least for this stage of the litigation, and that "the National Associations [must] adhere to FIFA policies" under FIFA statutes. SPA23; SPA38. The court nonetheless held that, as an allegation of concerted action under Section 1 of the Sherman Act, simply pointing to the existence of the policy is insufficient as a matter of law. The court concluded that, to survive a motion to dismiss, the complaint needed to include plausible allegations of a side agreement among FIFA members to agree to vote for the policy. SPA33. That holding violates well-established precedent and would unduly circumscribe the scope of Section 1, potentially allowing serious anticompetitive conduct to evade antitrust scrutiny.[4]

**An Association Rule Governing How Members' Separate Businesses Compete Is Direct Evidence of Concerted Action Subject to Section 1 of the Sherman Act.**

Section 1 of the Sherman Act prohibits every "contract, combination . . . or conspiracy" (*i.e.*, concerted action) that unreasonably restrains trade (*i.e.*, is anticompetitive). 15 U.S.C. § 1. Courts assess separately whether (i)

---

[4] This amicus brief takes no position on how the challenged conduct should be characterized as a matter of fact or, more generally, on whether the complaint sets forth a viable Section 1 claim. Rather, it is directed solely at the erroneous legal framework applied by the district court.

concerted action exists and (ii) the concerted action is anticompetitive. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010).

To prove a Section 1 contract, combination, or conspiracy, a plaintiff must show that there is an agreement between two or more entities capable of engaging in concerted action. *See id.* at 189-90. Action is "concerted" for purposes of Section 1 when it joins together "'separate economic actors pursuing separate economic interests,' such that the agreement 'deprives the marketplace of independent centers of decisionmaking,' and therefore of 'diversity of entrepreneurial interests,' and thus of actual or potential competition." *Id.* at 195 (citations omitted).

The concerted-action requirement plays an important gatekeeping role. "In § 1 Congress 'treated concerted behavior more strictly than unilateral behavior' . . . because unlike independent action, '[c]oncerted activity inherently is fraught with anticompetitive risk.'" *Id.* at 190 (citation omitted). Analytically, "[t]he question whether an arrangement is a contract, combination, or conspiracy"—that is, whether it constitutes concerted action—"is different from and antecedent to the question whether it unreasonably restrains trade." *Id.* at 186; *accord Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). This

appeal presents only the first question with respect to FIFA's alleged

"geographic market division policy."  A523 ¶ 117.

### A. Courts Have Long Treated Association Rules Governing Members' Separate Businesses as Concerted Action Under Section 1.

For more than a century, the U.S. Supreme Court has treated association

rules imposing "duties and restrictions in the conduct of [the members']

separate businesses" as agreements subject to Section 1.  *Associated Press v.*

*United States*, 326 U.S. 1, 8 (1945).[5]  It has not demanded details about the

---

[5] *See, e.g.*, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 759-60 (1999) (dental-association rule restricting members' advertising); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 451 (1986) (dental-association rule forbidding members from submitting x-rays to insurers); *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 99 (1984) (NCAA plan restricting members' licensing of television rights); *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 357 (1982) (medical society's schedule of maximum prices); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 681 (1978) (engineering society's ethical canon barring competitive bidding); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-83 (1975) (bar associations' fee schedules); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 602-03 (1972) (joint-venture bylaws setting exclusive territories for members); *United States v. Sealy, Inc.*, 388 U.S. 350, 352-54 (1967) (same); *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 347-48 (1963) (exchange rules prohibiting wire connections with nonmembers); *United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485, 488 (1950) (real-estate board's code of ethics requiring adherence to standard rates); *Associated Press*, 326 U.S. at 4 (Associated Press bylaws prohibiting members from selling news to nonmembers); *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 461-63 (1941) (guild rules prohibiting sales to certain retailers); *Sugar Inst., Inc. v. United States*, 297 U.S. 553, 579 (1936) (industry association's ethical rule governing price-setting); *FTC v. Pac. States Paper Trade Ass'n*, 273 U.S. 52, 58-59 (1927) (price lists set by associations of paper

manner in which such rules were adopted or which members supported them. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692 (considering a Society rule to be an agreement among the Society's engineering members).  Instead, it has treated the rules themselves as concerted decisions by the members, "within the reach of §1 of the Sherman Act."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1477 (4th & 5th ed. May 2021); *see also id.* ("The court [in *Professional Engineers*] never asked whether the society as an entity had conspired with anyone[, as i]t seemed obvious to the parties that the rule was a contract, combination, or conspiracy among the members.").

The principle applies equally to all association members adhering to the rule, regardless of whether they voted for the rule, actively supported the rule, merely agreed to follow the rule, or even opposed the rule.[6]  *See, e.g.*, *NCAA*, 468 U.S. at 91, 95, 99 (finding that the NCAA's television plan was a horizontal agreement among the "NCAA member institutions" even though it had been negotiated by an NCAA committee, had not been submitted to the membership for prior approval, and had been actively resisted by many

_____

dealers); *Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (commodities-exchange rule governing members' off-exchange transactions).

[6] Whether concerted action exists is a distinct issue from whether a particular association member may be liable for it.  Because the district court found insufficient allegations of concerted action, the court did not reach the issue of membership liability, and we express no position on it here.

members); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2154 (2021) ("NCAA-issued-and-enforced limits on what compensation [member schools] can offer [constitute] admitted horizontal price fixing in a market where the defendants exercise monopoly control."). *But cf.* SPA34 n.15 (attempting, unnecessarily, to identify who "agreed with USSF to vote to adopt the FIFA Policy"). After all, "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948); *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 973-74 (7th Cir. 1995) (collecting cases).

An association member engages in concerted action when it "surrender[s its] freedom of action" in an aspect of its separate business and "agree[s] to abide by the will of the association[]." *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 364-65 (1926); *see also NCAA*, 468 U.S. at 99 ("By participating in an association which prevents member institutions from competing against each other on the basis of price or . . . television rights . . . , the NCAA member institutions have created a horizontal restraint."). By "surrender[ing] . . . to the control of the association," an association member agrees to abide by the association's rules, including those promulgated after the member joins. *Associated Press*, 326 U.S. at 19 (quoting *Anderson*, 272 U.S. at 362). Because the member has already agreed to abide by all association

rules, there would be no need for the member to agree to any particular rule to be bound by it. *Cf.* A501 ¶ 34 (alleging that FIFA members are "required to agree to comply fully with the Statutes, regulations, directives and decisions of FIFA bodies at any time" (internal quotation marks removed)); Tr. 55 (Relevent: "[W]hen [FIFA's] rules and policies are amended, [members] are still agreeing to follow them.").

USSF argued below that, under this view of the law, "every membership organization would be a serial antitrust violator." D. Ct. Dkt. No. 66, at 18. That argument is misplaced. The existence of concerted action is just one element of a Section 1 claim. *See supra* pp. 7-8. Many actions are "concerted" for Section 1 purposes, even though they are reasonable and thus lawful. *Cf. Am. Needle*, 560 U.S. at 202-03 ("The fact that NFL teams share an interest in making the entire league successful and profitable . . . provides a perfectly sensible justification for making a host of collective decisions [that would qualify as] concerted activity under the Sherman Act.").[7] In addition, some association rules might not implicate Section 1 because they do not affect any aspect of the market activity of the members. Areeda & Hovenkamp, *supra*,

---

[7] At various points in its opinion, the district court appears to merge the two inquiries, discussing "unlawful" agreements within its concerted-action analysis. *See* SPA34; SPA38.

¶ 1477.  For example, an American Bar Association by-law setting the size of its diversity committee is a rule that governs only the association's internal affairs and imposes nothing on members in their independent enterprises. Lacking any effect on members' separate businesses, such rules do not "deprive[] the marketplace of the independent centers of decisionmaking that competition assumes and demands."  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984); *see also Am. Needle*, 560 U.S. at 190-91.

Defendants, however, did not argue below that restricting the locations of official season soccer matches has no effect on their members' separate businesses.  Rather, they took the position that no FIFA rule constitutes concerted action unless it results from an antecedent agreement among the members to agree to it, *see* D. Ct. Dkt. No. 78 (USSF), at 3; D. Ct. Dkt. No. 79 (FIFA), at 2, which is a misstatement of law.[8]

---

[8] Concerted action is not limited to an association's formal, binding rules.  An advisory rule can also constitute concerted action.  *See Goldfarb*, 421 U.S. at 781-82 (holding that "a naked agreement was clearly shown" by the defendant bar association's fee schedule even though it was facially "advisory").  Concerted action also encompasses association conduct that does not take the form of a rule but that similarly eliminates independent centers of decisionmaking.  For instance, the Fourth Circuit held that a state dental board engaged in concerted action by agreeing to send cease-and-desist letters to non-dentist competitors.  *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 372 (4th Cir. 2013), *aff'd on other grounds*, 574 U.S. 494 (2015).  In other instances, concerted action might come in the form of an association's delegation of authority to an agent.  *See Am. Needle*, 560 U.S. at 204 (holding

### B. Because an Association Rule Governing Members' Separate Businesses Is Itself Direct Evidence of an Agreement, No Additional Allegations of Concerted Action Are Necessary To Challenge the Rule.

Under *Bell Atlantic Corp. v. Twombly*, a plaintiff asserting a Section 1 claim must plead "enough factual matter (taken as true) to suggest that an agreement was made." 550 U.S. 544, 556 (2007). The form that such "factual matter" takes depends on whether a Section 1 plaintiff seeks to allege and prove the existence of an agreement directly or indirectly.

In many Section 1 cases, including *Twombly* itself, the plaintiff seeks to prove the existence of an agreement indirectly through "parallel conduct" by the defendants, such as charging the same price or staying out of each other's territories, or through other circumstantial evidence. *Id.* at 551, 556-57. In such cases, the plaintiff must plead sufficient facts regarding the context of that parallel conduct (or other circumstantial evidence) to render "plausible" the inference of a "preceding agreement" in light of the competing inference of independent actions. *Id.* at 556-57.

---

that "decisions by [a joint licensing agent] regarding the teams' separately owned intellectual property constitute concerted action" by the teams); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 577-78 (1982). In still other instances, a corporation or other type of entity could function as an "instrumentality" of an association or of its members. *See Am. Needle,* 560 U.S. at 201; *Sealy*, 388 U.S. at 352-56.

That is different from cases involving direct evidence of an agreement. For example, a Section 1 plaintiff challenging a contract between two separate businesses need only identify the contract, because Section 1 expressly reaches "contract[s]" as a form of concerted action. 15 U.S.C. § 1. A plaintiff is not required to allege any additional facts showing that the contract resulted from a separate, additional agreement or was part of a broader conspiracy.[9]

Likewise, a plaintiff challenging an association rule governing members' separate businesses need only identify the rule, because the rule itself is "direct evidence" of agreement. *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012) (Wilkinson, J.). Such a case "do[es] not rest on evidence of parallel business conduct," so circumstantial facts of the sort required in *Twombly* are "superfluous." *Id.* "[C]oncerted conduct is not a matter of inference or dispute" when "the very passage of [the rule] establishes that the defendants convened and came to an agreement." *Id.* at 289-90.

---

[9] If a contract were not direct evidence of concerted action—such that an additional "agreement to agree" were required—then the word "contract" would be effectively excised from the text of Section 1. *Cf. Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1143 (10th Cir. 1997) (en banc) ("To hold otherwise would be to read the words 'contract' and 'combination' out of section 1.").

### C. The District Court Misapplied This Court's Decision in *North American Soccer League* and Other Precedents.

The district court diverged from the settled treatment of association rules under Section 1 of the Sherman Act by overreading this Court's recent decision in *North American Soccer League, LLC v. USSF* (*NASL*), 883 F.3d 32 (2d Cir. 2018). The district court mistook *NASL* to require Section 1 plaintiffs to allege an additional "antecedent agreement [among horizontal competitors] to agree to" take a particular action as members of an association "[i]n order for [the resulting restraint] to constitute concerted action and, therefore, to serve as direct evidence of an unlawful agreement"—even when the challenged restraint is a binding association rule. SPA33 (first alteration in original) (internal quotation marks omitted). Properly read, however, *NASL* does not support the district court's erroneous legal rule.

*NASL* was not a straightforward challenge to an association rule but rather involved a broader alleged conspiratorial agreement, including entities outside the association, to apply an association rule (USSF's standards for designating soccer leagues as Division I, II, or III) in an anticompetitive manner. *NASL*, 883 F.3d at 35. USSF denied the plaintiff (NASL) Division I status but generally granted it waivers to operate as a Division II league, even though it did not meet Division II requirements, either. *Id.* at 36. When USSF

declined to grant a waiver for the 2018 season, NASL sued. *Id.* It alleged a Section 1 conspiracy among USSF, a Division I league, a Division III league, and an outside marketing company to suppress competition at the Division I level by "revising" and "manipulating" the standards and by "selectively granting and denying waivers." *Id.* at 36, 38-39.

Because NASL challenged a broader conspiracy to apply USSF standards anticompetitively—*i.e.*, it involved other conduct by other actors and was not simply a challenge to the standards themselves—USSF's "promulgation of the Standards was not direct evidence of concerted action among" the conspirators. *Id.* at 39. The alleged anticompetitive conduct encompassed more than just the standards, and the alleged "overarching conspiracy" (*id.* at 41) encompassed more than just USSF. *Cf.* Tr. 25 (Relevent: "[W]e are focused on . . . the policy announced by the FIFA [C]oun[ci]l.").

In demanding more allegations than just the existence of the USSF standards, *NASL* expressly distinguished cases in which "there is direct evidence of an alleged conspiracy via an association's express regulation of its members' market." 883 F.3d at 40. It recognized that "'by-laws of [an association] are in effect agreements between the members.'" *Id.* (quoting *Associated Press*, 326 U.S. at 11 n.6). It cited Supreme Court cases on associational policies, rules, and by-laws going back eight decades. *Id.* at 40-

41 (citing *Ind. Fed'n of Dentists*, 476 U.S. at 457-58; *Topco Assocs., Inc.*, 405 U.S. at 601-02; *Fashion Originators' Guild*, 312 U.S. at 462-64). And it explicitly clarified that, "[i]f NASL were challenging the Standards themselves—in totality—as violative of the antitrust laws, then the USSF Board's promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking." *Id.* at 41.

The district court, however, improperly disregarded that portion of the *NASL* decision, declaring it dicta, SPA32 n.12, even though it restated decades of controlling precedent. Moreover, the district court distinguished Relevent's suit based on two words—"in totality"—noting: Relevent "is *not* challenging FIFA's standards as a whole, but merely the impact of a single FIFA Policy." *Id.* That may be true, but *NASL* cannot reasonably be read to mean that a plaintiff would need to challenge an association's entire collection of by-laws to supply direct evidence of concerted action. That would be contrary to numerous decisions of the U.S. Supreme Court and this Court, and the cases that *NASL* cited were not challenges of that sort. *See Ind. Fed'n of Dentists*, 476 U.S. at 451 (specific rule about submitting x-rays to insurers); *Topco Assocs., Inc.*, 405 U.S. at 601-03 (specific subset of by-laws); *Fashion Originators' Guild*, 312 U.S. at 461-63 (specific rules prohibiting certain sales); *see also AD/SAT, A Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 233 (2d Cir. 1999) (per curiam)

("The issue decided by the [Supreme] Court in *Associated Press* [*v. United States*, 326 U.S. 1 (1945)] was whether two particular bylaws of the AP constituted a conspiratorial agreement in violation of the antitrust laws. . . . *Associated Press* did not determine that AP members are engaged in a conspiratorial agreement with respect to all actions of the AP."). Even in *NASL*, the Divisional "Standards" at issue were not the sum total of USSF governance rules.[10]

*NASL*'s qualifier "in totality" can be interpreted more logically (and more in keeping with precedent) as "and nothing more" or "and nothing else," as in: "If NASL were challenging the Standards themselves—and nothing else—as violative of the antitrust laws . . . ." That interpretation, in which the word "totality" limits instead of expands, makes sense in the context of the case. NASL's challenge was not to the Standards alone, but to something more: an "overarching conspiracy" beyond USSF to influence and manipulate the application of the Standards and the waiver process. The *NASL* Court was

---

[10] The district court's reading of "in totality" would also needlessly induce plaintiffs to challenge an association's entire rulebook when only one rule affects them. Courts then would have to evaluate rules that operate separately and that govern unrelated subjects as a collective whole. That approach could allow anticompetitive rules to persist simply because an association's rules, taken together, are net procompetitive. It would also encourage associations to package naked restraints on competition within a collection of other rules.

drawing a line between simpler cases, in which the total challenge is to the rules themselves, and more expansive cases involving broader allegations of conspiracy, like *NASL*. *See NASL*, 883 F.3d at 41 n.11 (marking a distinction between "the Standards" and "their role in the larger alleged conspiracy").

In support of its holding, the district court also relied on an earlier precedent from this Court, *AD/SAT, A Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216 (2d Cir. 1999) (per curiam), but *AD/SAT* is distinguishable because it did not involve an association rule. The plaintiff in *AD/SAT* claimed that members of the Associated Press engaged in a group boycott of its satellite-based advertising service after the AP decided to offer a competing service. 181 F.3d at 221, 235. Because the alleged boycott was secret, no AP rule was claimed to effectuate it. That context is crucial to the requisite pleading requirements, because the plaintiff was relying on indirect allegations of agreement, not direct evidence in the form of a rule. *See supra* pp. 14-15.

The same is true for the other cases on which the district court relied. *SD3, LLC v. Black & Decker (U.S.) Inc.* (cited at SPA34; SPA35; SPA37) was not a challenge to an adopted rule but rather involved allegations of parallel conduct and other circumstantial evidence from which the plaintiff sought to infer the existence of an agreement. 801 F.3d 412, 427 (4th Cir. 2015).

*LaFlamme v. Société Air France* (cited at SPA33) weighed whether "meetings and discussions," not a rule, could "constitute direct evidence of a price-fixing agreement." 702 F. Supp. 2d 136, 147 (E.D.N.Y. 2010). Similarly, *All Star Carts & Vehicles, Inc. v. BFI Canada Income Fund* (cited at SPA35) involved allegations of "meetings, conversations and communications"—not a rule. 596 F. Supp. 2d 630, 640 (E.D.N.Y. 2009). In none of these cases was an association rule alleged to violate Section 1. The district court's opinion appears to broaden the holdings of all of these cases into contexts in which they do not apply.

### D. The District Court's Standard Could Shield Significant Anticompetitive Conduct from Section 1 Scrutiny and Waste Resources.

By raising the pleading and proof standards in association cases beyond what the statutory text and relevant precedent require, the district court's holding could have several adverse consequences. First, it could shield many anticompetitive rules from scrutiny. It is far simpler for a potential plaintiff to learn about and detail in a complaint the existence of an (often public) association rule than to uncover and sufficiently allege a secret side conspiracy to adopt such a rule. Moreover, it is possible that an anticompetitive rule could be promulgated without a prior side agreement or even that an association could restructure its governance to eliminate the

possibility of a separate agreement to agree to the rule.  For instance, an association could empower its chairperson to promulgate binding rules on her own so that there is no membership or board vote to influence.  Alternatively, an association might delegate rulemaking to a single, centralized entity, similarly eliminating any votes by members or board members.  *See generally Am. Needle*, 560 U.S. at 201 ("[C]ompetitors cannot simply get around antitrust liability by acting through a third-party intermediary or joint venture." (internal quotation marks omitted)).

Furthermore, the district court's erroneous holding could entangle parties and the courts in unnecessary discovery (and discovery disputes) as plaintiffs hunt down extraneous information, like board meeting minutes, to prove an antecedent agreement the law does not require.[11]  Where the existence of concerted action is clear from the rule itself, requiring more would waste the resources of litigants and courts.

---

[11] Such evidence could potentially be relevant for other purposes.  For instance, plaintiffs might seek some of this information to establish anticompetitive intent.

## CONCLUSION

This Court should hold that the district court employed an incorrect legal framework in analyzing whether Relevent adequately pleaded concerted action under Section 1 of the Sherman Act.

Respectfully submitted.

 /s/ Adam D. Chandler 

RICHARD A. POWERS
  *Acting Assistant Attorney General*

KATHLEEN S. O'NEILL
  *Senior Director of Investigations
  and Litigation*

DANIEL E. HAAR
NICKOLAI G. LEVIN
ADAM D. CHANDLER
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 353-6638
adam.chandler@usdoj.gov

October 14, 2021     *Counsel for the United States of America*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 29(a)(4)(G) and Fed. R. App. P. 32(g)(1), I certify that this brief complies with the type-volume limitation of 2d Cir. R. 29.1(c) and 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts exempted by Fed. R. App. P. 32(f), this brief contains 5163 words.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in Microsoft Office Word Professional Plus 2019 using 14-point New Century Schoolbook font.

October 14, 2021        _/s/ Adam D. Chandler_____
                                     *Counsel for the United States of America*