**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2021

(Argued: April 7, 2022      Decided: March 7, 2023)

Docket No. 21-2088-cv

————————————————————

RELEVENT SPORTS, LLC,

*Plaintiff-Appellant,*

v.

UNITED STATES SOCCER FEDERATION, INC.,
FÉDÉRATION INTERNATIONALE DE FOOTBALL ASSOCIATION,

*Defendants-Appellees.*

————————————————————

Before:

LIVINGSTON, *Chief Judge,* LYNCH, and LOHIER, *Circuit Judges.*

Relevent Sports, LLC, a U.S.-based soccer promoter, alleges that the Fédération Internationale de Football Association (popularly known as FIFA) and the United States Soccer Federation, Inc. adopted and enforced a geographic market division policy in 2018 that unlawfully prohibits soccer leagues and teams from playing official season games outside of their home territory. Relevent claims that the 2018 policy represents an agreement among direct competitors to restrict competition in violation of federal antitrust laws. The United States District Court for the Southern District of New York (Caproni, <u>J.</u>) concluded that Relevent failed to allege that the

challenged anticompetitive conduct stemmed from a prior agreement to enter
into the 2018 policy.  But a plaintiff challenging an association policy or rule
that governs the conduct of the members' separate businesses need not allege
an antecedent "agreement to agree."  Because Relevent challenges the
allegedly monopolistic 2018 Policy directly, it has adequately alleged
concerted action.  The Sherman Antitrust Act and the Clayton Antitrust Act
require no further allegations of an agreement to engage in concerted action
for Relevent's complaint to survive a motion to dismiss.  VACATED and
REMANDED.

JEFFREY L. KESSLER (Linda T. Coberly, *on the brief*),
Winston & Strawn LLP, Chicago, IL, and New York,
NY, *for Plaintiff-Appellant* Relevent Sports, LLC.

KANNON K. SHANMUGAM (Williams T. Marks, H.
Christopher Boehning, Andrew C. Finch, *on the
brief*), Paul, Weiss, Rifkind, Wharton & Garrison
LLP, New York, NY and Washington, DC, *for
Defendant-Appellee* Fédération Internationale de
Football Association.

GREGORY G. GARRE (Lawrence E. Buterman, Samir
Deger-Sen, Christopher S. Yates, Aaron T. Chiu,
Elizabeth H. Yandell, *on the brief*), Latham & Watkins
LLP, Washington, DC, San Francisco, CA, and New
York, NY, *for Defendant-Appellee* United States Soccer
Federation, Inc.

PETER M. BOZZO, Attorney (Adam D. Chandler,
Daniel E. Haar, Nickolai G. Levin, Attorneys,
Kathleen S. O'Neill, Senior Director of Investigations
and Litigation, *on the brief*), *for* Richard A. Powers,
Acting Assistant Attorney General, Antitrust
Division, United States Department of Justice,
Washington, DC, *for Amicus Curiae* United States of
America, *in support of Neither Party*.

Randy M. Stutz, American Antitrust Institute,
Washington, DC, *for Amicus Curiae* American
Antitrust Institute, *in support of Plaintiff-Appellant*.

Steffen N. Johnson, Jonathan M. Jacobson, Wilson
Sonsini Goodrich & Rosati, P.C., Washington, DC,

and New York, NY, *for Amici Curiae* 14 Antitrust, Sports Law, and Economics Professors, *in support of Plaintiff-Appellant.*

LOHIER, *Circuit Judge*:

Soccer, also known as "the beautiful game," unites the world in shared competition. This case, by contrast, concerns an allegedly anticompetitive policy that restricts access to the game by prohibiting soccer leagues and teams from playing official season games outside of their home territory. Relevent Sports, LLC ("Relevent"), a U.S.-based soccer promoter, alleges that the Fédération Internationale de Football Association ("FIFA") and the United States Soccer Federation, Inc. ("USSF") adopted and enforced this geographic market division policy ("2018 Policy") in violation of Section 1 of the Sherman Antitrust Act and Sections 4 and 16 of the Clayton Antitrust Act.

The United States District Court for the Southern District of New York (Caproni, <u>J.</u>) determined that Section 1 required Relevent to present either direct or circumstantial evidence of an "antecedent 'agreement [among horizontal competitors] to agree to vote a particular way' to adopt such a policy." Special App'x 33 (alteration in original). After concluding that Relevent failed to allege that the 2018 Policy itself stemmed from or

3

1   constituted direct evidence of such a prior agreement among the Defendants,

2   the District Court dismissed Relevent's complaint for failure to state a claim.

3       We disagree with the District Court's conclusion.  Relevent plausibly

4   alleges that the 2018 Policy reflects a contractual commitment of head-to-head

5   competitors to restrict competition.  Because Relevent's complaint challenges

6   the 2018 Policy itself "as violative of the antitrust laws," the "promulgation of

7   [the policy] . . . constitute[s] direct evidence of § 1 concerted action."  N. Am.

8   Soccer League v. U.S. Soccer Fed'n, 883 F.3d 32, 41 (2d Cir. 2018) ("NASL");

9   see Associated Press v. United States, 326 U.S. 1, 12 (1945).  No further

10  allegation of an agreement is necessary.  In holding that no inference of

11  concerted activity can be drawn from the "promulgation" of the 2018 Policy,

12  the District Court's decision conflicts directly with this core principle.  The

13  judgment of the District Court is thus **VACATED** and the matter is

14  **REMANDED** for further proceedings consistent with this opinion.

**BACKGROUND**[1]

2         We start with an overview of the governance structure of international

3    soccer.  FIFA, a private membership-based association comprised of over 200

4    national associations, is the well-known international governing body for

5    soccer.  Each national association is itself membership-based and comprised

6    of professional soccer leagues and teams.  FIFA's legislative body, the FIFA

7    Congress, includes representatives from every national association in the

8    world and adopts and amends the FIFA Statutes, which contain many of

9    FIFA's rules and policies.  A smaller entity within FIFA, the FIFA Council,

10   "has authority to interpret the FIFA Statutes and to adopt rules and policies

11   not specifically addressed in the FIFA Statutes."  App'x 502.

12        National associations represent their members in FIFA decision-making

13   and agree to "comply fully with the Statutes, regulations, directives and

14   decisions of FIFA bodies at any time."  App'x 500–01.  In turn, the national

15   associations require their members to agree to comply with these same rules

16   and policies.  USSF is the FIFA-authorized national association for the United

---

[1] These facts are drawn from the amended complaint and assumed to be true for purposes of our de novo review of the District Court's judgment dismissing the complaint for failure to state a claim upon which relief can be granted.  See Schlosser v. Kwak, 16 F.4th 1078, 1080 (2d Cir. 2021).

States. "[USSF] and its members are, to the extent permitted by governing law, obliged to respect the statutes, regulations, directives and decisions of FIFA . . . and to ensure that these are likewise respected by their members." App'x 502 n.12 (alterations in original) (quoting BYLAWS OF THE UNITED STATES SOCCER FEDERATION, INC., Bylaw 103 § 1). Leagues and players that fail to comply with FIFA rules and policies are subject to discipline and sanction, including exclusion from the FIFA World Cup.

Relevent organizes, promotes, and hosts soccer matches in the United States and globally. Because it is a violation of the FIFA Statutes for a soccer club affiliated with a FIFA-sanctioned league to play in the United States without USSF's approval, Relevent had to obtain approval from USSF to organize a match in the United States between teams from other countries. And third-party promoters such as Relevent must also obtain approval from each team's national association, each team's regional confederation, and, of course, FIFA.

In the past, Relevent has tried to host official season games for international professional soccer leagues in the United States—including for La Liga (Spain), Liga MX (Mexico) and LigaPro Serie A (Ecuador)—without

1    success.  Its efforts to host have been foiled by the FIFA Council each time.[2]

2    In 2018, for example, Relevent and La Liga, the Spanish professional soccer

3    league, agreed to host an official season game in Miami.  Given La Liga's

4    worldwide popularity, the game would undoubtedly have drawn a large

5    audience.  In response, the FIFA Council "issued a policy prohibiting FIFA's

6    National Association members, including USSF, from sanctioning any official

7    season games held outside of the participants' home territory."  App'x 523.  A

8    FIFA press release memorializing this policy stated:

9        Following a request for guidance . . . the FIFA Council discussed
10       La Liga's proposal to host an official 2018/19 regular season league
11       match outside Spain (in Miami).
12
13       Consistent with the opinion expressed by the Football
14       Stakeholders Committee, the Council emphasized the sporting
15       principle that official league matches must be played within the
16       territory of the respective member association.
17
18   App'x 601 (2018 Policy).  "[B]ecause this was a formal policy announced by a

19   FIFA decision-making body, any leagues and teams who did not comply with

20   it would run the risk of FIFA penalties and all such leagues and teams were

---

[2] As fans know, there is a difference between "friendly" (or exhibition) games, which Relevent has organized, promoted, and hosted in the United States, and official season games.  Official season games affect the standing of teams in their respective leagues or tournaments.

1 required to agree to adhere to this policy."  App'x 523.  As a result, the game

2 in Miami never took place.

3      Relevent filed this action against USSF in 2019.  The District Court

4 dismissed Relevent's first complaint without prejudice for failing to allege an

5 unlawful vertical agreement between USSF and FIFA or an unlawful

6 horizontal agreement between USSF and other national associations, leagues,

7 and teams sufficient to support an antitrust violation.  The court added that

8 even if Relevent "had adequately alleged an agreement between USSF and

9 FIFA," its "claim for injunctive relief would be dismissed for failure to join"

10 FIFA as "an indispensable party."  Special App'x 15 n.12.  Relevent then filed

11 an amended complaint adding FIFA as a defendant.  In the amended

12 complaint, Relevent claimed that the Defendants violated Section 1 of the

13 Sherman Act and Sections 4 and 16 of the Clayton Act, and were liable under

14 New York law for tortious interference with business relationships.[3]  Relevent

15 principally alleged that "FIFA and USSF, in combination with numerous

16 FIFA-affiliated men's top-tier professional soccer leagues and teams,

17 including Major League Soccer ("MLS")[4] and its teams, have entered into an

---

[3] On appeal, Relevent pursues only its antitrust claims.
[4] MLS is the top-tier FIFA-affiliated professional soccer league in the United States.

1     agreement to divide geographic markets, including the United States market,

2     which stifles competition in the U.S."  App'x 493.

3            The District Court granted the Defendants' motion to dismiss

4     Relevent's amended complaint for failure to state a claim.  It again held that

5     Relevent failed to allege that USSF and other national associations in FIFA

6     entered into an unlawful vertical agreement with FIFA to apply the 2018

7     Policy against their member leagues and teams.  The District Court likewise

8     again held that Relevent failed to allege a horizontal conspiracy between

9     USSF and FIFA's other top-tier men's professional soccer leagues and their

10     teams outside the United States.  The 2018 Policy, the District Court

11     explained, did not constitute direct evidence of a horizontal conspiracy

12     because there was neither an antecedent "agreement to agree" among the

13     Defendants to adopt the policy, Special App'x 32 n.12, nor any circumstantial

14     evidence of an agreement among the members of the FIFA Council to adopt

15     the 2018 Policy.  Finally, the District Court determined that universal

16     adherence to the 2018 Policy was insufficient to support a claim that the

17     Defendants engaged in a horizontal conspiracy.

18            This appeal followed.

## DISCUSSION

### I.  Personal Jurisdiction

To start, the Defendants argue that FIFA is not subject to personal jurisdiction in New York.  They contend that this action must therefore be dismissed because, in their view, FIFA is a necessary and indispensable party to the action.  We conclude that FIFA is subject to personal jurisdiction in this case.

"A plaintiff must have a state-law statutory basis for jurisdiction and demonstrate that the exercise of personal jurisdiction comports with due process."  Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82 (2d Cir. 2018).  "New York's long-arm statute provides in relevant part that 'a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state,'" as to any cause of action arising from such a transaction or contract.  Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013) (alterations in original) (quoting N.Y. C.P.L.R 302(a)(1)).

On the record before us, FIFA is subject to personal jurisdiction in New

York under New York's long-arm statute.  According to Relevent's amended

complaint, FIFA "authorizes USSF . . . to act on its behalf to sanction

professional soccer leagues in the U.S. and this District."  App'x 513.  USSF,

which is incorporated as a New York not-for-profit, is FIFA's agent and

transacts substantial business on behalf of FIFA in New York.  For example,

FIFA authorized USSF's "refusal to sanction the official season games sought

to be promoted by Relevent from its headquarters in [New York]."  App'x

513–14; see also App'x 506–07 ("As FIFA's National Association in the U.S.,

USSF is vested with the exclusive authority to sanction, on behalf of FIFA, all

men's professional soccer leagues and games played in this country.").  These

allegations establish, at the pleading stage, that USSF "acted in New York for

the benefit of, with the knowledge and consent of, and under some control

by" FIFA.  Charles Schwab, 883 F.3d at 85.  No party disputes that USSF's

actions subject it to personal jurisdiction in New York on Relevent's claims.

That USSF undertook those actions as FIFA's agent is thus sufficient to subject

FIFA to personal jurisdiction in New York as well.  See id. at 85–86 ("[A]n

agency relationship between a parent corporation and a subsidiary that sells

securities on the parent's behalf could establish personal jurisdiction over the

parent in a state in which the parent 'indirectly' sells the securities.").

FIFA also has the minimum contacts with New York necessary to

satisfy constitutional due process principles.

> Although the long-arm statute and the Due Process Clause are
> not technically coextensive, the New York requirements (benefit,
> knowledge, some control) are consonant with the due process
> principle that a defendant must have purposefully availed itself
> of the privilege of doing business in the forum.  And where we
> have found personal jurisdiction based on an agent's contacts, we
> have never suggested that due process requires something more
> than New York law.

Id. at 85 (cleaned up).  Here, the same alleged contacts that subject FIFA to

New York's long-arm statute—including vesting USSF with the exclusive

authority to sanction all men's professional soccer leagues and games played

in the United States—satisfy the Constitution's due process requirement of

minimum contacts with New York such that the suit "does not offend

traditional notions of fair play and substantial justice."  Ford Motor Co. v.

Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) (quoting Int'l Shoe Co.

v. Washington, 326 U.S. 310, 316 (1945)).

1       II.    **Antitrust Liability**

2              A. **Legal Standard**

3       Section 1 of the Sherman Act prohibits "[e]very contract, combination

4       . . . or conspiracy[] in restraint of trade or commerce."  15 U.S.C. § 1.  The first

5       question is "whether the challenged conduct stems from independent

6       decision or from an agreement, tacit or express."  United States v. Apple, Inc.,

7       791 F.3d 290, 314–15 (2d Cir. 2015) (cleaned up).  Distinguishing between

8       concerted action and independent individual behavior is important because

9       "concerted activity inherently is fraught with anticompetitive risk insofar as it

10      deprives the marketplace of independent centers of decisionmaking that

11      competition assumes and demands."  Am. Needle, Inc. v. NFL, 560 U.S. 183,

12      190 (2010) (cleaned up).  If the challenged conduct reflects concerted action,

13      then we consider whether that action unreasonably restrains trade.  Id. at

14      186.[5]

---

[5] The antecedent question of whether the inference of concerted action could be drawn from the 2018 Policy itself is distinct from the subsequent question of whether any concerted action was "unlawful."  Cf. Special App'x 34 (Dist. Ct. Op.) ("Plaintiff's Amended Complaint lacks any non-conclusory factual allegations [that] . . . the FIFA Council unlawfully agreed to adopt the Policy." (emphasis added)). We express no view on the latter question.  See Am. Needle, 560 U.S. at 202–03 ("The fact that NFL teams share an interest in making the entire league successful and

1    At the pleading stage, a plaintiff need only allege "enough factual

2    matter (taken as true) to suggest that an agreement was made."  Bell Atl.

3    Corp. v. Twombly, 550 U.S. 544, 556 (2007).  In other words, a plaintiff must

4    allege facts that "reasonably tend[] to prove that the defendant and others

5    had a conscious commitment to a common scheme designed to achieve an

6    unlawful objective."  Apple, 791 F.3d at 315 (cleaned up).  Those facts can

7    constitute either "direct evidence that the defendants entered into an

8    agreement" or "circumstantial facts supporting the inference that a

9    conspiracy existed."  Id. (quotation marks omitted).

10    Competitors do not avoid antitrust liability by hiding behind or acting

11    through third-party intermediaries.  See Amici Br. of Antitrust, Sports Law,

12    and Economics Professors at 3–4.  Business, professional, trade, and sports

13    organizations and associations, for instance, are all subject to federal antitrust

14    laws if their members demonstrate "a conscious commitment to a common

15    scheme designed to achieve an unlawful objective." Apple, 791 F.3d at 315

16    (quotation marks omitted); see also Am. Needle, 560 U.S. at 190.  When an

_____

profitable . . . provides a perfectly sensible justification for making a host of
collective decisions" that qualify as "concerted activity under the Sherman Act that
is subject to § 1 analysis.").

1  association member "surrender[s] himself completely to the control of the

2  association" in a "contractual restraint of interstate trade, designed in the

3  interest of preventing competition," then a rule that imposes "duties and

4  restrictions in the conduct of [the members'] separate businesses"

5  demonstrates an agreement for purposes of Section 1 of the Sherman Act.

6  Associated Press, 326 U.S. at 8, 19 (quotation marks omitted).

7       It follows from this precedent that the adoption of a binding association

8  rule designed to prevent competition is direct evidence of concerted action.

9  No further proof is necessary.  See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd.

10 of Regents of Univ. of Oklahoma, 468 U.S. 85, 99 (1984) ("[T]he policies of the

11 NCAA with respect to television rights" give rise to "a horizontal restraint—

12 an agreement among competitors on the way in which they will compete with

13 one another."); Nat'l Collegiate Athletic Ass'n v. Alston, 141 S. Ct. 2141, 2154

14 (2021) ("[T]he NCAA [does not] dispute that its member schools . . . remain

15 subject to NCAA-issued-and-enforced limits on what compensation they can

16 offer. . . . [Accordingly,] this suit involves admitted horizontal price fixing in a

17 market where the defendants exercise monopoly control."); Nat'l Soc'y of Pro.

18 Eng'rs v. United States, 435 U.S. 679, 683 (1978) (finding "[e]vidence of" an

unlawful "agreement" in an engineering society's "Code of Ethics"); <u>Allied</u>

<u>Tube & Conduit Corp. v. Indian Head, Inc.</u>, 486 U.S. 492, 500 (1988)

("Agreement on a product standard is, after all, implicitly an agreement not

to manufacture, distribute, or purchase certain types of products.").  Contrary

to the District Court's conclusion, there is no need for Relevent to allege a

prior "agreement to agree" or conspiracy to adopt the policy; the adoption of

the policy, combined with the member leagues' prior agreement, by joining

FIFA, to adhere to its policies, constitutes an agreement on the part of all—

whether they voted in favor of the policy or not—to adhere to the announced

restriction on competition.

Of course, not every decision by an association violates federal antitrust

laws.  As we have said, although a "trade association by its nature involves

collective action by competitors, a trade association is not by its nature a

walking conspiracy."  <u>NASL</u>, 883 F.3d at 40 (cleaned up).  Take sports

associations, for example.  "Without some agreement among rivals—on

things like how many players may be on the field or the time allotted for

play—the very competitions that consumers value would not be possible."

<u>Alston</u>, 141 S. Ct. at 2156.  For this reason, "we focus on those improprieties

1  reducing competition among the members or with their competitors," not the

2  "day-to-day operations of the organization" including "buying, selling,

3  hiring, renting, or investing decisions."  AD/SAT, Div. of Skylight, Inc. v.

4  Associated Press, 181 F.3d 216, 234 (2d Cir. 1999) (quoting 7 Phillip E. Areeda

5  et al., Antitrust Law ¶ 1477, at 347 (1999)).

6       We recently applied these principles in NASL, where the NASL (a

7  second-tier soccer league in the United States)[6] brought an antitrust challenge

8  to USSF's application of its Professional League Standards, which establish

9  requirements for sanctioning professional soccer leagues in the United States.

10  See NASL, 883 F.3d at 35–36.  We recognized that "[i]f NASL were

11  challenging the [Professional League] Standards themselves—in totality—as

12  violative of the antitrust laws, then the USSF Board's promulgation of them

13  would constitute direct evidence of § 1 concerted action in that undertaking."

14  Id. at 41.  But the NASL, we explained, had opted to allege an "overarching

15  conspiracy to restrain competition in markets for top- and second-tier men's

_____

[6] As we observed in NASL, "[t]he three most prominent men's professional soccer leagues have historically occupied their respective divisions in isolation.  [MLS] has been the only Division I men's soccer league since MLS's start in 1995.  NASL has existed since 2009 and has operated as a Division II league since 2011.  The United Soccer Leagues, LLC . . . ordinarily has filled the Division III slot."  NASL, 883 F.3d at 35.

professional soccer leagues in North America," so that "the promulgation of

the Standards" constituted only "circumstantial evidence of that conspiracy,"

not direct evidence.  Id.  So how the plaintiff frames a challenge affects how

we analyze the adequacy of its pleadings.  If the plaintiff alleges that a policy

or rule is in service of a plan to restrain competition, then it must allege

enough additional facts to show that agreement to such a plan exists.  If, on

the other hand, the plaintiff adequately alleges that the policy or rule is the

agreement itself, then it need not allege any further agreement.

In dismissing Relevent's complaint, the District Court misapplied the

lesson of NASL.

B. **Application**

Relevent attacks the 2018 Policy directly as anticompetitive.  It alleges

that "this anticompetitive agreement was expressly formulated in 2018,"

App'x 494, and more specifically that "[o]n October 26, 2018, the FIFA

Council adopted a policy embodying the anticompetitive market division

agreement at issue in this case," App'x 502, and "issued a policy prohibiting

FIFA's National Association members, including USSF, from sanctioning any

official season games held outside of the participants' home territory," App'x

523.  "The FIFA geographic market division policy was, and is," Relevent

alleges, "a horizontal division of geographic markets agreement."  App'x 523;

see App'x 503 (alleging that the USSF president "participated in the FIFA

Council's consideration and adoption of the geographic market division

agreement in October 2018").

These allegations provide "enough factual matter (taken as true) to

suggest that an agreement was made," Twombly, 550 U.S. at 556, and the

District Court erred in concluding that the 2018 Policy was not itself direct

evidence of an agreement under Section 1.  The District Court held that "[i]n

order for an organizational decision or policy to constitute concerted action

and, therefore, to serve as direct evidence of an unlawful agreement, Plaintiff

must plausibly allege an antecedent 'agreement [among horizontal

competitors] to agree to vote a particular way' to adopt such a policy."

Special App'x 33 (alteration in original); see also id. at 34 n.15 ("Plaintiff also

fails to . . . include allegations that those unidentified [remaining members of

the FIFA Council] agreed with USSF (or with anyone else) to vote in favor of

the Policy.").  Applying this mistaken premise, the District Court concluded

1     that Relevent "fails entirely to allege any facts suggesting that there was an

2     'agreement to agree.'"  Special App'x 34.

3           A plaintiff challenging an association rule that governs the conduct of

4     members' separate businesses need not allege an antecedent agreement to

5     agree.  The promulgation of the rule, in conjunction with the members'

6     "surrender[] . . . to the control of the association," sufficiently demonstrates

7     concerted action.  <u>Associated Press</u>, 326 U.S. at 19; <u>see</u> <u>also</u> <u>Anderson v.</u>

8     <u>Shipowners' Ass'n of Pac. Coast</u>, 272 U.S. 359, 363 (1926) ("The absence of an

9     allegation that such was the specific intent is not important, since that is the

10    necessary and direct consequence of the combination and the acts of the

11    associations under it . . . .").  Here, Relevent alleges that the national

12    associations, leagues, and teams have "surrendered [their] freedom of action

13    . . . and agreed to abide by the will of the association[]."  <u>Anderson</u>, 272 U.S. at

14    364–65.  That is enough.  <u>See</u> <u>Board of Regents</u>, 468 U.S. at 99 ("By

15    participating in an association which prevents member institutions from

16    competing against each other . . . the NCAA member institutions have created

17    a horizontal restraint . . . ."); Amicus Br. of the United States at 11–12

18    ("Because the member has already agreed to abide by all association rules,

1   there would be no need for the member to agree to any particular rule to be

2   bound by it.").

3       This conclusion comports with our decisions in <u>NASL</u> and <u>AD/SAT</u>.  In

4   <u>NASL</u>, plaintiffs alleged an "overarching conspiracy" instead of challenging

5   "the Standards themselves."  883 F.3d at 41.  And in <u>AD/SAT</u>, plaintiffs

6   challenged an inferred policy as opposed to any specific written or

7   promulgated policy.  <u>See</u> 181 F.3d at 233.  Here, by contrast, Relevent

8   challenges a specific policy—the "policy embodying the anticompetitive

9   market division agreement" adopted by "the FIFA Council" on "October 26,

10  2018."  App'x 502.  In this circumstance, the "promulgation of [the policy]

11  constitute[s] direct evidence of § 1 concerted action."  <u>NASL</u>, 883 F.3d at 41.[7]

12      FIFA and USSF defend the District Court's decision against Relevent's

13  attacks by urging that the 2018 Policy is not direct evidence of concerted

14  action.  First, they contend that Relevent forfeited or waived its direct

---

[7] The District Court also observed that "Plaintiff in this case is <u>not</u> challenging
FIFA's standards as a whole, but merely the impact of a single FIFA Policy."  Special
App'x 32 n.12.  That distinction, presumably based on the words "in totality" in
<u>NASL</u>, is immaterial.  Neither <u>NASL</u> nor any other precedent of which we are aware
requires a plaintiff to challenge an association's entire set of by-laws.  <u>Cf.</u>, <u>e.g.</u>,
<u>Associated Press</u>, 326 U.S. at 9 (determining whether particular by-laws of the AP
violated antitrust laws).

evidence theory by raising it for the first time on appeal.  Not so.  The

amended complaint alleges that "[t]he FIFA geographic market division

policy was, and is, a horizontal division of geographic markets agreement."

App'x 523.  Relevent also advanced this argument in response to the

Defendants' motion to dismiss.  <u>See</u> Relevent Sports, LLC's Mem. of Law in

Opp'n to Mots. to Dismiss 34 n.9, Dist. Ct. ECF No. 77 ("Relevent . . . alleges,

among numerous other specific allegations, that the market division policy

itself is direct evidence of such an unlawful conspiracy."); Tr. of Oral Arg. on

Mots. to Dismiss 35, Dist. Ct. ECF No. 94 ("[The] main factual allegation" "is

that FIFA has a rule that says you can't play out of your own geographic

territory.").  And the District Court also specifically considered and rejected

this argument.  <u>See</u> Special App'x 32 ("Plaintiff argues that the FIFA Policy

itself constitutes direct evidence of . . . [a] common scheme.  The Court

disagrees." (alteration in original) (quotation marks omitted)); <u>Jacques v.

DiMarzio, Inc.</u>, 386 F.3d 192, 201 (2d Cir. 2004) (holding that where "the

district court was made fully aware of [a] position . . . and the trial judge

discussed and explicitly rejected [the] position in its written opinion on the

motion," "the issue is not waived on appeal").

1    Next, the Defendants argue that leagues and teams are not members of

2    FIFA, and that the national associations that are members of FIFA are not

3    competitors.  But this argument runs headlong into Relevent's allegations,

4    which we must accept as true, that the FIFA Council's decisions bind the

5    various national associations, which in turn bind their respective leagues and

6    teams; that those leagues and teams would otherwise compete with each

7    other for fans and sponsors but dodge competition because FIFA and the

8    national associations enforce the 2018 Policy;[8] and that, as a result, "[t]he FIFA

9    geographic market division policy has created a barrier to entry which has

10   prevented leagues and teams that do not want to adhere to this policy from

11   competing in the relevant market," App'x 516.  Taken together, these

12   allegations clearly depict a rule governing how an association's separate

13   members' separate businesses compete.  As Relevent puts it, "[e]ffectively, the

14   National Associations and their respective leagues agreed to stay home, so

15   that each league will be free from competition within its own territory."

16   Relevent Br. 2.

---

[8] See App'x 498 (Alleging that "an official season game between La Liga teams in the U.S. would directly compete for fans and sponsors with the official season games of USSF-member MLS, which currently benefits from a monopoly position in the U.S. market").

1     Finally, the Defendants argue that the 2018 Policy was merely a non-

2     binding "sporting principle."  Once again, we consider the allegations in the

3     amended complaint.  According to Relevent, "the FIFA Council—one of

4     FIFA's decision-making bodies with authority to issue policies that each

5     National Association and their member leagues and teams have agreed to

6     follow—adopted a geographic market division policy."  App'x 523; <u>see also</u>

7     App'x 502 ("On October 26, 2018, the FIFA Council adopted a policy

8     embodying the anticompetitive market division agreement at issue in this

9     case . . . .").  And "because this was a formal policy announced by a FIFA

10    decision-making body, any leagues and teams who did not comply with it

11    would run the risk of FIFA penalties and all such leagues and teams were

12    required to agree to adhere to this policy."  App'x 523.  These allegations,

13    corroborated by the fact that the 2018 Policy does not on its face relate to

14    "things like how many players may be on the field or the time allotted for

15    play," *Alston*, 141 S. Ct. at 2156, but rather relates to a geographic limitation

16    on where various leagues can compete for ticket sales, plausibly allege that in

17    adopting the 2018 Policy, FIFA and its member associations adopted an

18    anticompetitive geographic market division.

1                                    * * *

2          The District Court correctly observed that "the FIFA Council

3   announced a 'policy' that prohibits staging Official Games outside the

4   participants' home territory," and that "all National Associations, leagues,

5   clubs, and players must comply with FIFA directives."  Special App'x 23.

6   Relevent directly challenges the 2018 Policy as anticompetitive.  Under these

7   circumstances, the very promulgation of the 2018 Policy is direct evidence of

8   an agreement for purposes of Section 1 of the Sherman Act.

9                                **CONCLUSION**

10         For the foregoing reasons, we **VACATE** the judgment of the District

11  Court and **REMAND** for further proceedings consistent with this opinion.