# 21-2088-cv

## In the United States Court of Appeals for the Second Circuit

RELEVENT SPORTS, LLC,
PLAINTIFF-APPELLANT

*v.*

UNITED STATES SOCCER FEDERATION, INC.;
FÉDÉRATION INTERNATIONALE DE FOOTBALL ASSOCIATION,
DEFENDANTS-APPELLEES

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 19-8359)
(THE HONORABLE VALERIE CAPRONI, J.)*

**PETITION FOR PANEL REHEARING
BY APPELLEE FÉDÉRATION INTERNATIONALE
DE FOOTBALL ASSOCIATION**

H. CHRISTOPHER BOEHNING
ANDREW C. FINCH
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
YISHAI SCHWARTZ
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

Statement of the case ................................................................1

Reasons for granting panel rehearing ........................................8

    A.    The panel's decision misapplied the legal standards for
asserting personal jurisdiction over foreign corporations ............8

        1.    The location of the plaintiff is insufficient to establish
personal jurisdiction under New York law ..........................9

        2.    The panel failed to consider whether Relevent's claims
arose from U.S. Soccer's New York transactions...............10

        3.    The panel misaplied the test for personal jurisdiction
based on on agency ................................................13

    B.    The panel should clarify its decision to ensure the
appropriate analysis in further proceedings on remand ..............38

Conclusion....................................................................18

# TABLE OF AUTHORITIES

## CASES

*Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239 (2d Cir. 2007).......................9, 13

*Bloomgarden* v. *Lanza*, 40 N.Y.S.3d 142 (App. Div. 2016) ...............................10

*Bluewaters Commc'ns Holdings, LLC* v. *Ecclestone*,
    996 N.Y.S.2d 232 (App. Div. 2014) ....................................................15

*Charles Schwab Corp.* v. *Bank of America Corp.*,
    883 F.3d 68 (2d Cir. 2018) ....................................................14, 15, 16

*Coast to Coast Energy, Inc.* v. *Gasarch*,
    53 N.Y.S.3d 16 (App. Div. 2017) ....................................................14

*Daimler AG* v. *Bauman*, 571 U.S. 117 (2014) .......................................11, 14, 16

Page

Cases—continued:

*Fantis Foods, Inc.* v. *Standard Importing Co.*,
  49 N.Y.2d 317 (1980) ................................................................9

*Hollingsworth* v. *Perry*, 570 U.S. 693 (2013) ....................................15

*Kreutter* v. *McFadden Oil Corp.*, 522 N.E.2d 40 (N.Y. 1988) ...........14

*Lawati* v. *Montague Morgan Slade Ltd.*,
  961 N.Y.S.2d 5 (App. Div. 2013) ..............................................14

*Paterno* v. *Laser Spine Institute*, 24 N.Y.3d 370 (2014) ..................13

*Pincione* v. *D'Alfonso*, 506 Fed. Appx. 22 (2d Cir. 2012).................16

*Polansky* v. *Gelrod*, 798 N.Y.S.2d 762 (App. Div. 2005)....................14

*Sole Resort, S.A. de C.V.* v. *Allure Resorts Management, LLC*,
  450 F.3d 100 (2d Cir. 2006) ....................................................13

*Waldman* v. *Palestine Liberation Organization*,
  835 F.3d 317 (2d Cir. 2016) ......................................................8

*Williams* v. *Enterprise Rent-A-Car of Boston, Inc.*,
  826 N.Y.S.2d 59 (App. Div. 2006) ............................................10

## RULE

Fed. R. of App. P. 28(i) ............................................................17

## MISCELLANEOUS

Jeff Carlisle, *MLS's Don Garber Against Staging League Games
  in Other Countries*, ESPN (Feb. 26, 2020)
  <tinyurls.com/espngarber> ..................................................13

N.Y. C.P.L.R. § 302(a)(1) ..........................................................9

Restatement (Third) of Agency (2005)........................................15

ii

In this case, the panel addressed an issue that the district court had not reached, erroneously exposing a foreign association to personal jurisdiction in New York despite the absence of any factual allegations indicating that the claims arose out of the association's New York-based conduct. In so doing, the panel incorrectly focused on the residence of an injured party to establish jurisdiction, violating settled principles of state law. The panel also incorrectly assumed the parties' agreement on an essential question concerning the existence of New York-based conduct by the foreign association's alleged agent; as a result, the panel failed independently to analyze the question. And the panel incorrectly applied federal and state standards for subjecting a foreign entity to personal jurisdiction based on agency analysis. If the panel's decision stands as written, crucial limitations on personal jurisdiction will be eroded. Rehearing by the panel is therefore warranted.

## STATEMENT OF THE CASE

1.    This case involves allegations of an unlawful geographic market division in the international organization of official soccer matches. Plaintiff-appellant Relevent Sports, LLC, a Delaware corporation headquartered in New York, promotes international sporting competitions. A. 498. In 2018, Relevent proposed to host a regular-season soccer match between two of Spain's top-division men's soccer teams in Miami. A. 525. The proposal to

move a previously scheduled Spanish regular-season match outside Spain attracted significant criticism, including from the Spanish players' union and season-ticket holders.  A. 604.  When Relevent sought approval of the match, the Spanish football association delayed approval and requested additional documentation.  A. 464-465.  In the face of the criticism and delays, one team withdrew and the match did not occur.  A. 525.

FIFA is the international governing body for amateur and professional soccer.  A. 499, 590.  A non-profit association (or verein) organized under Swiss law, FIFA is composed of over 200 national soccer association members, each of which serves as the national governing body for football in its respective country.  A. 499; *see also* FIFA Stat. art. 11(1).  Each national association supervises its country's national team; a country's professional leagues and clubs are not members of FIFA.  A. 500; *see also* FIFA Stat. art. 18.  U.S. Soccer, a New York corporation headquartered in Chicago, is the FIFA member association for the United States.  A. 509.

In the midst of the controversy over the proposed Miami match, a FIFA executive body, the FIFA Council, issued a press release addressing several issues raised at its October 2018 meeting in Kigali, Rwanda.  A. 598-601.  The last sentence of the press release addressed the issues underlying the Miami controversy.  It stated: "Consistent with the opinion expressed by the Football Stakeholders Committee, the Council emphasised the sporting principle that

official league matches must be played within the territory of the respective member association." A. 523, 601.

Relevent subsequently attempted to host two additional official soccer matches in Miami—one between two Argentinian clubs and another between two Ecuadorian clubs. A. 524-525. Relevent approached U.S. Soccer to discuss promoting the match between the two Argentinian clubs, but U.S. Soccer allegedly "refused to engage." A. 524. Ultimately, the Argentinian league decided to hold the match elsewhere. A. 358. U.S. Soccer also declined to approve the Ecuadorian match, noting the 2018 FIFA Council press release concerning the sporting principle that official season games should generally not be held outside of a league's home territory. A. 528; *see* A. 526-527.

2.     In 2019, Relevent filed an Article 78 proceeding in New York state court challenging U.S. Soccer's failure to approve the Miami matches. In a sworn pleading, Relevent alleged that U.S. Soccer had violated its own rules in declining to approve the matches. A. 358. Relevent conceded that no FIFA rule forbade the Miami matches; it argued that U.S. Soccer had "denied Relevent's application based o[n] the purported viewpoint of a FIFA advisory committee"—the FIFA Council—instead of based on an "existing FIFA rule or policy" or even the views of a "FIFA decision-making body." A. 371. Relevent did not name FIFA as a defendant.

3.    In September 2019, Relevent dropped the New York state lawsuit and filed this action in the Southern District of New York.  As with the Article 78 proceeding, the initial complaint was filed only against U.S. Soccer and did not name FIFA as a defendant.  Relevent alleged that U.S. Soccer had engaged in an unlawful agreement to "boycott professional clubs and players" that played in matches not approved by FIFA and that U.S. Soccer had engaged in an "anticompetitive scheme with FIFA to create barriers to entry." A. 13, 49-51.

The district court dismissed Relevent's antitrust claims, holding that Relevent had not pleaded that there was an agreement between U.S. Soccer and FIFA, but instead merely that U.S. Soccer had followed FIFA rules.  S.A. 12-15.  The court also determined that FIFA was a necessary party that could not be joined for lack of personal jurisdiction.  S.A. 15 n.12.

4.    In response to the district court's ruling, Relevent filed an amended complaint, this time adding FIFA as a defendant.  The amended complaint alleges a horizontal agreement "among the FIFA-affiliated top-tier men's professional football leagues and their teams, who are actual and potential competitors with one another, to geographically allocate the markets in which they are permitted to stage official season games."  A. 494.  The amended complaint also refers in passing to an alleged vertical conspiracy that included FIFA and U.S. Soccer.  *See* A. 538.

In its amended complaint, Relevent does not allege that FIFA or U.S. Soccer officials ever met in New York State to agree to the alleged geographic division. Nor does the amended complaint allege that FIFA and U.S. Soccer specifically sought to control matches that might occur in New York State. Instead, to establish personal jurisdiction over FIFA, Relevent alleges that two individuals affiliated with FIFA or U.S. Soccer supported the challenged policy while they were residents of, or generally worked, in New York. A. 502-506. In particular, Relevent alleges that U.S. Soccer President Sunil Gulati was a New York resident and that he "participated in the FIFA Council's consideration and adoption of the geographic market division agreement in October 2018." A. 503. Relevent similarly alleges that U.S. Soccer board member Don Garber "engaged in preparation" from New York for a FIFA Football Stakeholders Committee meeting and that he "spoke publicly" from New York "about his intention to support efforts" to recommend that FIFA adopt the allegedly anticompetitive policy. A. 506.

5. Both FIFA and U.S. Soccer moved to dismiss the amended complaint. FIFA argued that Relevent had failed adequately to allege the conspiracy among countless "soccer leagues and teams" pleaded in the complaint. FIFA further argued that, even if Relevent had adequately alleged a conspiracy, it had not adequately pleaded a rule-of-reason claim. In addition, FIFA argued that the district court lacked personal jurisdiction over it.

5

The district court dismissed Relevent's claims on the merits. As to Relevent's claim of a horizontal conspiracy, the court concluded that Relevent had not adequately alleged a conspiracy among professional football leagues and teams worldwide. *See* S.A. 31-40. The court also concluded that Relevent had abandoned and failed to adequately allege a vertical conspiracy between FIFA and U.S. Soccer. S.A. 28-31 & n.7. In light of its merits holdings, the district court did not reach FIFA's arguments on personal jurisdiction.

6. On appeal, Relevent argued that the district court had misunderstood the nature of the alleged conspiracy because it was challenging the 2018 FIFA Council statement directly as a violation of the antitrust laws. Br. 33-35. Of relevance here, Relevent argued that FIFA was subject to personal jurisdiction in New York because the alleged conspiracy was "intended to, among other things, block foreign men's top-tier professional soccer leagues from playing official games in the United States, including in New York." Br. 9. Relevent further argued that FIFA was subject to personal jurisdiction based on the conduct of U.S. Soccer, on the theory that U.S. Soccer was FIFA's agent and coconspirator. *Id.*

In response, FIFA explained that Relevent's new characterization of the alleged conspiracy was inconsistent with its arguments in the district court; FIFA also argued that Relevent's new theory was incorrect because the challenged FIFA Council statement was non-binding and because Relevent failed

6

to allege a rule-of-reason claim.  Of relevance here, FIFA explained that the district court lacked personal jurisdiction because FIFA did not "transact[] business" in New York for purposes of New York's long-arm statute, nor did it have the "minimum contacts" necessary to satisfy due process.

7.    The panel reversed.  On the merits, the panel largely accepted Relevent's characterization of the alleged conspiracy as focused on the existence of a "binding association rule" itself.  Op. 15, 24.  But the panel also reached the issue of personal jurisdiction and, after a brief analysis, held that FIFA was not entitled to dismissal on that ground at the motion-to-dismiss stage.  Op. 10-12.  The panel concluded that in light of Relevent's allegations FIFA was subject to personal jurisdiction in New York under New York's long-arm statute based on agency analysis.  Op. 11.  In particular, the panel noted Relevent's allegations that FIFA had authorized U.S. Soccer to "act on its behalf to sanction professional soccer leagues in the [United States] and this District" and that FIFA had "authorized [U.S. Soccer's] refusal to sanction the official season games sought to be promoted by Relevent from its headquarters in [New York]."  Op. 11.  The panel further asserted that "[n]o party disputes that [U.S. Soccer's] actions subject it to personal jurisdiction in New York on Relevent's claims."  *Id.*  The panel concluded that those allegations sufficed to subject FIFA to New York's long-arm statute and also to satisfy constitutional due process.  Op. 11-12.

7

## REASONS FOR GRANTING PANEL REHEARING

**A. The Panel's Decision Misapplied The Legal Standards For Asserting Personal Jurisdiction Over Foreign Corporations**

For a court to exercise personal jurisdiction, "there must be a statutory basis" for jurisdiction, and the exercise of jurisdiction "must comport with constitutional due process principles." *Waldman* v. *Palestine Liberation Organization*, 835 F.3d 317, 327 (2d Cir. 2016) (citation omitted). Here, the panel relied on an agency theory to conclude that FIFA was subject to New York's long-arm statute and possessed the minimum contacts necessary for constitutional due process. The panel's flawed analysis does not comport with state or federal law, and it cannot support personal jurisdiction here.

*First*, the panel impermissibly relied on the location of the corporate headquarters of the plaintiff to determine the location of the relevant conduct for purposes of the New York long-arm statute, deviating sharply from binding state-court authority. *Second*, the panel misstated the agreed-upon basis for personal jurisdiction over U.S. Soccer, and thus failed to recognize the absence of allegations of New York-based conduct. *Third*, the panel adopted a capacious view of agency principles that threatens to render important limitations on corporate personal jurisdiction a dead letter. Rehearing by the panel is therefore warranted.

8

**1.** ***The Location Of The Plaintiff Is Insufficient To Establish Personal Jurisdiction Under New York Law***

New York's long-arm statute, C.P.L.R. § 302(a)(1), requires, first, that a defendant have "transact[ed] any business within the state or contract[ed] anywhere to supply goods or services in the state," and second, that the cause of action "aris[e] from" that transaction. To satisfy the first part of that test, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities" within New York. *Best Van Lines, Inc.* v. *Walker*, 490 F.3d 239, 247 (2d Cir. 2007) (citation omitted). To satisfy the second, there must be some "articulable nexus, or a substantial relationship," between the claim and the alleged contacts, not a "merely coincidental" connection. *Id.* at 246, 249.

In holding that Relevent's allegations regarding FIFA met that test at the motion-to-dismiss stage, the panel focused on the allegation that FIFA had authorized U.S. Soccer's "refusal to sanction the official season games sought to be promoted by Relevent from its headquarters in [New York]." Op. 11 (quoting A. 513-514). The panel thus suggested that, because *Relevent* was headquartered in New York, Chicago-headquartered U.S. Soccer's refusal to sanction events promoted by Relevent took place "within" New York for purposes of establishing personal jurisdiction. That is incorrect. New York courts have long held that "the residence or domicile of the injured party within a State is not a sufficient predicate for jurisdiction." *Fantis Foods, Inc.* v.

9

*Standard Importing Co.*, 49 N.Y.2d 317, 326 (1980); *see also, e.g., Bloom-garden* v. *Lanza*, 40 N.Y.S.3d 142, 144-145 (App. Div. 2016); *Williams* v. *Enterprise Rent-A-Car of Boston, Inc.*, 826 N.Y.S.2d 59, 60 (App. Div. 2006).

Nor can the panel's holding be justified based on communications between U.S. Soccer and New-York based Relevent. Section 302(a)(1) does not provide for jurisdiction where an out-of-state defendant "communicates with plaintiffs in New York via mail, telephone, and email" simply "because the plaintiffs [a]re New York domiciliaries," where the defendants are not also "actively participating in transactions in New York." *Lanza*, 40 N.Y.S.3d at 144-145. On the contrary, New York courts have rejected assertions of personal jurisdiction based merely on communications where a defendant's "communications with the plaintiffs in New York all concerned" commercial activities occurring outside New York. *Id.* That is precisely the situation here. As alleged, U.S. Soccer may have communicated with New York-based Relevent from its Chicago headquarters, but those communications concerned potential soccer matches *in Miami*. The panel's reliance on the location of Relevent's corporate headquarters to establish jurisdiction in New York was thus erroneous.

## 2. *The Panel Failed To Consider Whether Relevent's Claims Arose From U.S. Soccer's New York Transactions*

In addition to improperly focusing on the location of Relevent's corporate headquarters, the panel reasoned that, assuming the existence of an

agency relationship between FIFA and U.S. Soccer, U.S. Soccer's alleged New York conduct sufficed to establish jurisdiction because "[n]o party disputes that [U.S. Soccer's] actions subject it to personal jurisdiction in New York on Relevent's claims." Op. 11. That is true as far as it goes, but it cannot suffice to establish personal jurisdiction over FIFA, even at the motion-to-dismiss stage. To be sure, U.S. Soccer is subject to personal jurisdiction in New York State. But that is because U.S. Soccer is incorporated in New York and is thus subject to *general* personal jurisdiction in the State. A. 509; *see Daimler AG* v. *Bauman*, 571 U.S. 117, 137 (2014). On an agency theory, however, Relevent must allege, and eventually must demonstrate, that U.S. Soccer's actions would be sufficient to establish *specific* personal jurisdiction over U.S. Soccer in New York. In its briefing, FIFA argued that Relevent failed sufficiently to allege that U.S. Soccer had "engaged in conduct in New York" in furtherance of the alleged conspiracy. Br. 59.

Because the panel erroneously assumed the parties' agreement concerning U.S. Soccer's New York conduct, the panel never analyzed Relevent's factual allegations to determine whether Relevent had adequately pleaded suit-related conduct in New York. If the panel had considered those allegations, it could not have found them sufficient to establish jurisdiction, whether under the New York long-arm statute or the Due Process Clause.

Relevent relies almost exclusively on the alleged conduct of two U.S. Soccer-affiliated individuals. *First*, Relevent points to U.S. Soccer President Gulati, a resident of New York who allegedly "participated in the FIFA's Council's consideration and adoption" of the 2018 statement and who "regularly conducted business in his role on the FIFA council" from New York. A. 503. But the FIFA Council meeting was held in Rwanda, with all members attending in person. *See* A. 591. And Relevent does not allege any specific act that Gulati took to bring about the 2018 statement (or the alleged policy it represents), much less that such an act occurred in New York.

Gulati's status as a New York resident does not alter the analysis. A person's residence in New York does not transform every act he takes *outside* New York into New York-based conduct. If that were the rule, every corporation would automatically be subject to specific personal jurisdiction wherever their leadership happens to live, regardless of the location of suit-related conduct.

*Second*, Relevent points to comments that U.S. Soccer board member Garber made to the media in February 2020 regarding what Relevent characterizes as "efforts to have the geographic market division agreement made a formal part of the FIFA Statutes." A. 506. In his comments, which were delivered two years *after* when Relevent claims the agreement came into existence, Garber explained that "[t]he decision on whether regular season games

12

are played outside their home countries, it's not a decision that I have any role in making," but that "[m]y opinion on it is I don't think it's the best thing for the sport." Jeff Carlisle, *MLS's Don Garber Against Staging League Games in Other Countries*, ESPN (Feb. 26, 2020) <tinyurl.com/espngarber>. Those comments, which expressly disclaim a role in the challenged policy, are clearly inadequate to establish personal jurisdiction under the New York long-arm statute. They are not statements "in furtherance" of the alleged conspiracy, but the expression of opinion; at most, they are comments *about* the alleged conspiracy. Those comments, "which merely impart information without permitting a business transaction," do not amount to "transact[ing]" business, let alone business in New York from which Relevent's injuries arose. *Paterno* v. *Laser Spine Institute*, 24 N.Y.3d 370, 377 (2014) (citations omitted); *see also Walker*, 490 F.3d at 247. Garber's comments thus have "at best[] a tangential relationship" to the injury asserted by Relevent. *Sole Resort, S.A. de C.V.* v. *Allure Resorts Management, LLC*, 450 F.3d 100, 104 (2d Cir. 2006).

### 3. *The Panel Misapplied The Test For Personal Jurisdiction Based On Agency*

Even if the panel were correct that Relevent's allegations concerning U.S. Soccer's conduct would suffice to establish specific personal jurisdiction in New York *over U.S. Soccer*, the panel still erred by holding that such alleged conduct was sufficient to establish personal jurisdiction *over FIFA*.

To establish an agency relationship for purposes of the long-arm statute, Relevent is required to allege and then show that U.S. Soccer engaged in actions in New York "for the benefit of and with the knowledge and consent" of FIFA *and* that FIFA "exercised some control" over U.S. Soccer. *Coast to Coast Energy, Inc.* v. *Gasarch*, 53 N.Y.S.3d 16, 19 (App. Div. 2017) (quoting *Kreutter* v. *McFadden Oil Corp.*, 522 N.E.2d 40, 44 (N.Y. 1988)). Similarly, to the extent Relevent relies on a theory of "conspiracy jurisdiction"—a species of agency for purposes of the long-arm statute—it must allege "sufficient dominion and control to attribute [U.S. Soccer's] actions in New York to [FIFA]," *Polansky* v. *Gelrod*, 798 N.Y.S.2d 762, 764 (App. Div. 2005), and that U.S. Soccer acted "to the benefit of" FIFA, *Lawati* v. *Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 7 (App. Div. 2013). For purposes of due process, Relevent must allege facts that indicate FIFA "purposefully avail[ed] itself of" New York's courts and laws by "directing its agents or distributors to take action there." *Charles Schwab Corp.* v. *Bank of America Corp.*, 883 F.3d 68, 84 (2d Cir. 2018) (quoting *Daimler*, 571 U.S. at 135 n.13).

The panel simply did not analyze whether Relevent's allegations met these standards. Instead, the panel pointed to a single allegation—that "FIFA authorized [U.S. Soccer's] 'refusal to sanction the official season games sought to be promoted by Relevent.'" Op. 11 (quoting A. 506-507)—and concluded

14

that allegation was sufficient to establish agency. That conclusion was plainly incorrect.

As an initial matter, that allegation at most established that FIFA empowered U.S. Soccer—not that it subjected it to control. "Agency requires more than mere authorization to assert a particular interest." *Hollingsworth* v. *Perry*, 570 U.S. 693, 713 (2013) (citing 1 Restatement (Third) of Agency § 1.01, Comment *f* (2005)). Granting discretionary authority to another entity—in this case, on the question whether to sanction Relevent's and similar events—is the opposite of an "exercise of control" or "dominion."

To the extent that the panel understood the amended complaint as alleging a "binding" policy that compelled U.S. Soccer to decline to sanction Relevent's events, that also does not suffice to establish an "exercise of control" in the relevant sense. If it did, FIFA might be amenable to suit anywhere any of its 211 members happens to act. But the hallmark of an agency relationship is not following another's passive rules; it is acting for the benefit of the principal and in a manner the principal actively controls. *See Charles Schwab*, 883 F.3d at 85-86; *Bluewaters Commc'ns Holdings, LLC* v. *Ecclestone*, 996 N.Y.S.2d 232, 233-234 (App. Div. 2014). Were it otherwise, football players would be "agents" of the referee; lawyers would be "agents" of the judge in the courtroom; and all citizens would be "agents" of Congress. More-

15

over, nothing in the complaint suggests that U.S. Soccer enforced the supposed policy for FIFA's benefit and in a manner FIFA controlled; to the contrary, the complaint alleges that U.S. Soccer did so for its own reasons.  A. 522.

Finally, even if FIFA's relationship with U.S. Soccer were an agency relationship, it would still not suffice to establish personal jurisdiction here. When relying on an agency relationship to establish personal jurisdiction, both New York law and due process require the principal to have exercised its control over its agent to "direct[] [the agent] to take action [in New York]." *Charles Schwab*, 883 F.3d at 84; *see also Daimler*, 571 U.S. at 135 n.13; *Pincione* v. *D'Alfonso*, 506 Fed. Appx. 22, 25 (2d Cir. 2012).  The amended complaint contains no such allegation.  FIFA's "authorization" of U.S. Soccer to sanction (or decline to sanction) events applied throughout the United States and was in no way directed at New York.  To the contrary, insofar as the 2018 statement responded to specific events, those events were set to occur not in New York, but in Miami.  Relevent's allegations are thus insufficient at the motion-to-dismiss stage to establish "purposeful availment" of a New York forum even under an agency theory.  *Charles Schwab*, 883 F.3d at 87.

## B.  The Panel Should Clarify Its Decision to Ensure The Appropriate Analysis In Further Proceedings On Remand

If the panel does not reverse its holding on personal jurisdiction outright, it should amend its opinion to ensure an appropriate analysis on remand and also to prevent misinterpretation in subsequent cases.  The panel could do

so by removing the portion of its opinion discussing personal jurisdiction (Op. 10-12), an alternative basis for affirmance that the district court did not address and that the panel did not need to reach. In any event, the panel should make clear that the location of a plaintiff, and particularly its corporate headquarters, is not determinative of specific personal jurisdiction under the New York long-arm statute. The panel should also make clear that, on remand, Relevent will have to substantiate its conclusory allegations of (1) New York-based conduct by U.S. Soccer giving rise to the claims at issue, and (2) the existence of a sufficiently close agency relationship between FIFA and U.S. Soccer, in which the former exerts control over and specifically directs conduct of the latter into New York. Those allegations should not have been sufficient at the motion-to-dismiss stage; unless substantiated further, summary judgment on personal jurisdiction will be appropriate.[*]

---

[*] Pursuant to Federal Rule of Appellate Procedure 28(i), FIFA adopts the arguments presented in U.S. Soccer's petition for rehearing en banc.

17

## CONCLUSION

The petition for panel rehearing should be granted.

Respectfully submitted,

/s/ Kannon K. Shanmugam

H. CHRISTOPHER BOEHNING     KANNON K. SHANMUGAM
ANDREW C. FINCH     WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,     YISHAI SCHWARTZ
  WHARTON & GARRISON LLP     PAUL, WEISS, RIFKIND,
  *1285 Avenue of the Americas*       WHARTON & GARRISON LLP
  *New York, NY 10019*       *2001 K Street, N.W.*
      *Washington, DC 20006*
      *(202) 223-7300*
      *kshanmugam@paulweiss.com*

APRIL 4, 2023

18

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellee Fédération Internatio-
nale de Football Association and a member of the Bar of this Court, certify,
pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 40(b)(1), that
the attached Petition for Panel Rehearing is proportionately spaced, has a
typeface of 14 points or more, and contains 3,900 words.

APRIL 4, 2023                         /s/ Kannon K. Shanmugam

                                             KANNON K. SHANMUGAM

## CERTIFICATE OF SERVICE

I, Kannon K. Shanmugam, counsel for appellee Fédération Internatio-nale de Football Association and a member of the Bar of this Court, certify that, on April 4, 2023, a copy of the attached Petition for Panel Rehearing By Defendant-Appellee Fédération Internationale de Football Association was filed through the Court's electronic filing system. I further certify that all participants in the case are registered users with the electronic filing system and that service will be accomplished by that system.

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM

1
2
3          **UNITED STATES COURT OF APPEALS**
4              **FOR THE SECOND CIRCUIT**
5
6                  August Term, 2021
7
8      (Argued: April 7, 2022        Decided: March 7, 2023)
9
10                 Docket No. 21-2088-cv
11     _____
12
13               RELEVENT SPORTS, LLC,
14
15                  *Plaintiff-Appellant*,
16
17                         v.
18
19      UNITED STATES SOCCER FEDERATION, INC.,
20   FÉDÉRATION INTERNATIONALE DE FOOTBALL ASSOCIATION,
21
22                *Defendants-Appellees*.
23     _____
24
25   Before:
26
27        LIVINGSTON, *Chief Judge*, LYNCH, and LOHIER, *Circuit Judges*.
28
29        Relevent Sports, LLC, a U.S.-based soccer promoter, alleges that the
30   Fédération Internationale de Football Association (popularly known as FIFA)
31   and the United States Soccer Federation, Inc. adopted and enforced a
32   geographic market division policy in 2018 that unlawfully prohibits soccer
33   leagues and teams from playing official season games outside of their home
34   territory.  Relevent claims that the 2018 policy represents an agreement
35   among direct competitors to restrict competition in violation of federal
36   antitrust laws.  The United States District Court for the Southern District of
37   New York (Caproni, <u>L</u>) concluded that Relevent failed to allege that the

1    challenged anticompetitive conduct stemmed from a prior agreement to enter
2    into the 2018 policy.  But a plaintiff challenging an association policy or rule
3    that governs the conduct of the members' separate businesses need not allege
4    an antecedent "agreement to agree."  Because Relevent challenges the
5    allegedly monopolistic 2018 Policy directly, it has adequately alleged
6    concerted action.  The Sherman Antitrust Act and the Clayton Antitrust Act
7    require no further allegations of an agreement to engage in concerted action
8    for Relevent's complaint to survive a motion to dismiss.  VACATED and
9    REMANDED.
10
11                        JEFFREY L. KESSLER (Linda T. Coberly, *on the brief*),
12                        Winston & Strawn LLP, Chicago, IL, and New York,
13                        NY, *for Plaintiff-Appellant* Relevent Sports, LLC.
14
15                        KANNON K. SHANMUGAM (Williams T. Marks, H.
16                        Christopher Boehning, Andrew C. Finch, *on the*
17                        *brief*), Paul, Weiss, Rifkind, Wharton & Garrison
18                        LLP, New York, NY and Washington, DC, *for*
19                        *Defendant-Appellee* Fédération Internationale de
20                        Football Association.
21
22                        GREGORY G. GARRE (Lawrence E. Buterman, Samir
23                        Deger-Sen, Christopher S. Yates, Aaron T. Chiu,
24                        Elizabeth H. Yandell, *on the brief*), Latham & Watkins
25                        LLP, Washington, DC, San Francisco, CA, and New
26                        York, NY, *for Defendant-Appellee* United States Soccer
27                        Federation, Inc.
28
29                        PETER M. BOZZO, Attorney (Adam D. Chandler,
30                        Daniel E. Haar, Nickolai G. Levin, Attorneys,
31                        Kathleen S. O'Neill, Senior Director of Investigations
32                        and Litigation, *on the brief*), *for* Richard A. Powers,
33                        Acting Assistant Attorney General, Antitrust
34                        Division, United States Department of Justice,
35                        Washington, DC, *for Amicus Curiae* United States of
36                        America, *in support of Neither Party*.
37
38                        Randy M. Stutz, American Antitrust Institute,
39                        Washington, DC, *for Amicus Curiae* American
40                        Antitrust Institute, *in support of Plaintiff-Appellant*.
41
42                        Steffen N. Johnson, Jonathan M. Jacobson, Wilson
43                        Sonsini Goodrich & Rosati, P.C., Washington, DC,

1    and New York, NY, *for Amici Curiae* 14 Antitrust,
2    Sports Law, and Economics Professors, *in support of*
3    *Plaintiff-Appellant.*
4
5    LOHIER, *Circuit Judge*:

6    Soccer, also known as "the beautiful game," unites the world in shared

7    competition.  This case, by contrast, concerns an allegedly anticompetitive

8    policy that restricts access to the game by prohibiting soccer leagues and

9    teams from playing official season games outside of their home territory.

10   Relevent Sports, LLC ("Relevent"), a U.S.-based soccer promoter, alleges that

11   the Fédération Internationale de Football Association ("FIFA") and the United

12   States Soccer Federation, Inc. ("USSF") adopted and enforced this geographic

13   market division policy ("2018 Policy") in violation of Section 1 of the Sherman

14   Antitrust Act and Sections 4 and 16 of the Clayton Antitrust Act.

15   The United States District Court for the Southern District of New York

16   (Caproni, <u>J.</u>) determined that Section 1 required Relevent to present either

17   direct or circumstantial evidence of an "antecedent 'agreement [among

18   horizontal competitors] to agree to vote a particular way' to adopt such a

19   policy."  Special App'x 33 (alteration in original).  After concluding that

20   Relevent failed to allege that the 2018 Policy itself stemmed from or

Op. 3

1    constituted direct evidence of such a prior agreement among the Defendants,

2    the District Court dismissed Relevent's complaint for failure to state a claim.

3         We disagree with the District Court's conclusion.  Relevent plausibly

4    alleges that the 2018 Policy reflects a contractual commitment of head-to-head

5    competitors to restrict competition.  Because Relevent's complaint challenges

6    the 2018 Policy itself "as violative of the antitrust laws," the "promulgation of

7    [the policy] . . . constitute[s] direct evidence of § 1 concerted action."  N. Am.

8    Soccer League v. U.S. Soccer Fed'n, 883 F.3d 32, 41 (2d Cir. 2018) ("NASL");

9    see Associated Press v. United States, 326 U.S. 1, 12 (1945).  No further

10   allegation of an agreement is necessary.  In holding that no inference of

11   concerted activity can be drawn from the "promulgation" of the 2018 Policy,

12   the District Court's decision conflicts directly with this core principle.  The

13   judgment of the District Court is thus **VACATED** and the matter is

14   **REMANDED** for further proceedings consistent with this opinion.

1      **BACKGROUND**[1]

2      We start with an overview of the governance structure of international

3  soccer.  FIFA, a private membership-based association comprised of over 200

4  national associations, is the well-known international governing body for

5  soccer.  Each national association is itself membership-based and comprised

6  of professional soccer leagues and teams.  FIFA's legislative body, the FIFA

7  Congress, includes representatives from every national association in the

8  world and adopts and amends the FIFA Statutes, which contain many of

9  FIFA's rules and policies.  A smaller entity within FIFA, the FIFA Council,

10  "has authority to interpret the FIFA Statutes and to adopt rules and policies

11  not specifically addressed in the FIFA Statutes."  App'x 502.

12      National associations represent their members in FIFA decision-making

13  and agree to "comply fully with the Statutes, regulations, directives and

14  decisions of FIFA bodies at any time."  App'x 500–01.  In turn, the national

15  associations require their members to agree to comply with these same rules

16  and policies.  USSF is the FIFA-authorized national association for the United

---

[1] These facts are drawn from the amended complaint and assumed to be true for purposes of our de novo review of the District Court's judgment dismissing the complaint for failure to state a claim upon which relief can be granted.  See Schlosser v. Kwak, 16 F.4th 1078, 1080 (2d Cir. 2021).

1  States. "[USSF] and its members are, to the extent permitted by governing

2  law, obliged to respect the statutes, regulations, directives and decisions of

3  FIFA . . . and to ensure that these are likewise respected by their members."

4  App'x 502 n.12 (alterations in original) (quoting BYLAWS OF THE UNITED

5  STATES SOCCER FEDERATION, INC., Bylaw 103 § 1). Leagues and players that

6  fail to comply with FIFA rules and policies are subject to discipline and

7  sanction, including exclusion from the FIFA World Cup.

8      Relevent organizes, promotes, and hosts soccer matches in the United

9  States and globally. Because it is a violation of the FIFA Statutes for a soccer

10  club affiliated with a FIFA-sanctioned league to play in the United States

11  without USSF's approval, Relevent had to obtain approval from USSF to

12  organize a match in the United States between teams from other countries.

13  And third-party promoters such as Relevent must also obtain approval from

14  each team's national association, each team's regional confederation, and, of

15  course, FIFA.

16      In the past, Relevent has tried to host official season games for

17  international professional soccer leagues in the United States—including for

18  La Liga (Spain), Liga MX (Mexico) and LigaPro Serie A (Ecuador)—without

1    success.  Its efforts to host have been foiled by the FIFA Council each time.[2]

2    In 2018, for example, Relevent and La Liga, the Spanish professional soccer

3    league, agreed to host an official season game in Miami.  Given La Liga's

4    worldwide popularity, the game would undoubtedly have drawn a large

5    audience.  In response, the FIFA Council "issued a policy prohibiting FIFA's

6    National Association members, including USSF, from sanctioning any official

7    season games held outside of the participants' home territory."  App'x 523.  A

8    FIFA press release memorializing this policy stated:

9        Following a request for guidance . . . the FIFA Council discussed
10       La Liga's proposal to host an official 2018/19 regular season league
11       match outside Spain (in Miami).
12
13       Consistent with the opinion expressed by the Football
14       Stakeholders Committee, the Council emphasized the sporting
15       principle that official league matches must be played within the
16       territory of the respective member association.
17
18   App'x 601 (2018 Policy).  "[B]ecause this was a formal policy announced by a

19   FIFA decision-making body, any leagues and teams who did not comply with

20   it would run the risk of FIFA penalties and all such leagues and teams were

---

[2] As fans know, there is a difference between "friendly" (or exhibition) games, which
Relevent has organized, promoted, and hosted in the United States, and official
season games.  Official season games affect the standing of teams in their respective
leagues or tournaments.

1    required to agree to adhere to this policy."  App'x 523.  As a result, the game

2    in Miami never took place.

3          Relevent filed this action against USSF in 2019.  The District Court

4    dismissed Relevent's first complaint without prejudice for failing to allege an

5    unlawful vertical agreement between USSF and FIFA or an unlawful

6    horizontal agreement between USSF and other national associations, leagues,

7    and teams sufficient to support an antitrust violation.  The court added that

8    even if Relevent "had adequately alleged an agreement between USSF and

9    FIFA," its "claim for injunctive relief would be dismissed for failure to join"

10   FIFA as "an indispensable party."  Special App'x 15 n.12.  Relevent then filed

11   an amended complaint adding FIFA as a defendant.  In the amended

12   complaint, Relevent claimed that the Defendants violated Section 1 of the

13   Sherman Act and Sections 4 and 16 of the Clayton Act, and were liable under

14   New York law for tortious interference with business relationships.[3]  Relevent

15   principally alleged that "FIFA and USSF, in combination with numerous

16   FIFA-affiliated men's top-tier professional soccer leagues and teams,

17   including Major League Soccer ("MLS")[4] and its teams, have entered into an

---

[3] On appeal, Relevent pursues only its antitrust claims.
[4] MLS is the top-tier FIFA-affiliated professional soccer league in the United States.

1    agreement to divide geographic markets, including the United States market,

2    which stifles competition in the U.S."  App'x 493.

3          The District Court granted the Defendants' motion to dismiss

4    Relevent's amended complaint for failure to state a claim.  It again held that

5    Relevent failed to allege that USSF and other national associations in FIFA

6    entered into an unlawful vertical agreement with FIFA to apply the 2018

7    Policy against their member leagues and teams.  The District Court likewise

8    again held that Relevent failed to allege a horizontal conspiracy between

9    USSF and FIFA's other top-tier men's professional soccer leagues and their

10   teams outside the United States.  The 2018 Policy, the District Court

11   explained, did not constitute direct evidence of a horizontal conspiracy

12   because there was neither an antecedent "agreement to agree" among the

13   Defendants to adopt the policy, Special App'x 32 n.12, nor any circumstantial

14   evidence of an agreement among the members of the FIFA Council to adopt

15   the 2018 Policy.  Finally, the District Court determined that universal

16   adherence to the 2018 Policy was insufficient to support a claim that the

17   Defendants engaged in a horizontal conspiracy.

18         This appeal followed.

# DISCUSSION

## I.   **Personal Jurisdiction**

To start, the Defendants argue that FIFA is not subject to personal

jurisdiction in New York.  They contend that this action must therefore be

dismissed because, in their view, FIFA is a necessary and indispensable party

to the action.  We conclude that FIFA is subject to personal jurisdiction in this

case.

"A plaintiff must have a state-law statutory basis for jurisdiction and

demonstrate that the exercise of personal jurisdiction comports with due

process."  Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82 (2d Cir.

2018).  "New York's long-arm statute provides in relevant part that 'a court

may exercise personal jurisdiction over any non-domiciliary . . . who in

person or through an agent . . . transacts any business within the state or

contracts anywhere to supply goods or services in the state,'" as to any cause

of action arising from such a transaction or contract.  Licci ex rel. Licci v.

Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013) (alterations in

original) (quoting N.Y. C.P.L.R 302(a)(1)).

1    On the record before us, FIFA is subject to personal jurisdiction in New

2    York under New York's long-arm statute.  According to Relevent's amended

3    complaint, FIFA "authorizes USSF . . . to act on its behalf to sanction

4    professional soccer leagues in the U.S. and this District."  App'x 513.  USSF,

5    which is incorporated as a New York not-for-profit, is FIFA's agent and

6    transacts substantial business on behalf of FIFA in New York.  For example,

7    FIFA authorized USSF's "refusal to sanction the official season games sought

8    to be promoted by Relevent from its headquarters in [New York]."  App'x

9    513–14; see also App'x 506–07 ("As FIFA's National Association in the U.S.,

10   USSF is vested with the exclusive authority to sanction, on behalf of FIFA, all

11   men's professional soccer leagues and games played in this country.").  These

12   allegations establish, at the pleading stage, that USSF "acted in New York for

13   the benefit of, with the knowledge and consent of, and under some control

14   by" FIFA.  Charles Schwab, 883 F.3d at 85.  No party disputes that USSF's

15   actions subject it to personal jurisdiction in New York on Relevent's claims.

16   That USSF undertook those actions as FIFA's agent is thus sufficient to subject

17   FIFA to personal jurisdiction in New York as well.  See id. at 85–86 ("[A]n

18   agency relationship between a parent corporation and a subsidiary that sells

1    securities on the parent's behalf could establish personal jurisdiction over the

2    parent in a state in which the parent 'indirectly' sells the securities.").

3            FIFA also has the minimum contacts with New York necessary to

4    satisfy constitutional due process principles.

5            Although the long-arm statute and the Due Process Clause are
6            not technically coextensive, the New York requirements (benefit,
7            knowledge, some control) are consonant with the due process
8            principle that a defendant must have purposefully availed itself
9            of the privilege of doing business in the forum.  And where we
10           have found personal jurisdiction based on an agent's contacts, we
11           have never suggested that due process requires something more
12           than New York law.
13
14   Id. at 85 (cleaned up).  Here, the same alleged contacts that subject FIFA to

15   New York's long-arm statute—including vesting USSF with the exclusive

16   authority to sanction all men's professional soccer leagues and games played

17   in the United States—satisfy the Constitution's due process requirement of

18   minimum contacts with New York such that the suit "does not offend

19   traditional notions of fair play and substantial justice."  Ford Motor Co. v.

20   Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) (quoting Int'l Shoe Co.

21   v. Washington, 326 U.S. 310, 316 (1945)).

1       II.   **Antitrust Liability**

2         A. **Legal Standard**

3       Section 1 of the Sherman Act prohibits "[e]very contract, combination

4   . . . or conspiracy[] in restraint of trade or commerce."  15 U.S.C. § 1.  The first

5   question is "whether the challenged conduct stems from independent

6   decision or from an agreement, tacit or express."  <u>United States v. Apple, Inc.</u>,

7   791 F.3d 290, 314–15 (2d Cir. 2015) (cleaned up).  Distinguishing between

8   concerted action and independent individual behavior is important because

9   "concerted activity inherently is fraught with anticompetitive risk insofar as it

10   deprives the marketplace of independent centers of decisionmaking that

11   competition assumes and demands."  <u>Am. Needle, Inc. v. NFL</u>, 560 U.S. 183,

12   190 (2010) (cleaned up).  If the challenged conduct reflects concerted action,

13   then we consider whether that action unreasonably restrains trade.  <u>Id.</u> at

14   186.[5]

---

[5] The antecedent question of whether the inference of concerted action could be drawn from the 2018 Policy itself is distinct from the subsequent question of whether any concerted action was "unlawful."  <u>Cf.</u> Special App'x 34 (Dist. Ct. Op.) ("Plaintiff's Amended Complaint lacks any non-conclusory factual allegations [that] . . . the FIFA Council <u>unlawfully</u> agreed to adopt the Policy." (emphasis added)). We express no view on the latter question.  <u>See</u> <u>Am. Needle</u>, 560 U.S. at 202–03 ("The fact that NFL teams share an interest in making the entire league successful and

1       At the pleading stage, a plaintiff need only allege "enough factual

2    matter (taken as true) to suggest that an agreement was made." Bell Atl.

3    Corp. v. Twombly, 550 U.S. 544, 556 (2007). In other words, a plaintiff must

4    allege facts that "reasonably tend[] to prove that the defendant and others

5    had a conscious commitment to a common scheme designed to achieve an

6    unlawful objective." Apple, 791 F.3d at 315 (cleaned up). Those facts can

7    constitute either "direct evidence that the defendants entered into an

8    agreement" or "circumstantial facts supporting the inference that a

9    conspiracy existed." Id. (quotation marks omitted).

10       Competitors do not avoid antitrust liability by hiding behind or acting

11    through third-party intermediaries. See Amici Br. of Antitrust, Sports Law,

12    and Economics Professors at 3–4. Business, professional, trade, and sports

13    organizations and associations, for instance, are all subject to federal antitrust

14    laws if their members demonstrate "a conscious commitment to a common

15    scheme designed to achieve an unlawful objective." Apple, 791 F.3d at 315

16    (quotation marks omitted); see also Am. Needle, 560 U.S. at 190. When an

profitable . . . provides a perfectly sensible justification for making a host of
collective decisions" that qualify as "concerted activity under the Sherman Act that
is subject to § 1 analysis.").

1    association member "surrender[s] himself completely to the control of the

2    association" in a "contractual restraint of interstate trade, designed in the

3    interest of preventing competition," then a rule that imposes "duties and

4    restrictions in the conduct of [the members'] separate businesses"

5    demonstrates an agreement for purposes of Section 1 of the Sherman Act.

6    Associated Press, 326 U.S. at 8, 19 (quotation marks omitted).

7         It follows from this precedent that the adoption of a binding association

8    rule designed to prevent competition is direct evidence of concerted action.

9    No further proof is necessary.  See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd.

10   of Regents of Univ. of Oklahoma, 468 U.S. 85, 99 (1984) ("[T]he policies of the

11   NCAA with respect to television rights" give rise to "a horizontal restraint—

12   an agreement among competitors on the way in which they will compete with

13   one another."); Nat'l Collegiate Athletic Ass'n v. Alston, 141 S. Ct. 2141, 2154

14   (2021) ("[T]he NCAA [does not] dispute that its member schools . . . remain

15   subject to NCAA-issued-and-enforced limits on what compensation they can

16   offer. . . . [Accordingly,] this suit involves admitted horizontal price fixing in a

17   market where the defendants exercise monopoly control."); Nat'l Soc'y of Pro.

18   Eng'rs v. United States, 435 U.S. 679, 683 (1978) (finding "[e]vidence of" an

1   unlawful "agreement" in an engineering society's "Code of Ethics"); <u>Allied</u>

2   <u>Tube & Conduit Corp. v. Indian Head, Inc.</u>, 486 U.S. 492, 500 (1988)

3   ("Agreement on a product standard is, after all, implicitly an agreement not

4   to manufacture, distribute, or purchase certain types of products.").  Contrary

5   to the District Court's conclusion, there is no need for Relevent to allege a

6   prior "agreement to agree" or conspiracy to adopt the policy; the adoption of

7   the policy, combined with the member leagues' prior agreement, by joining

8   FIFA, to adhere to its policies, constitutes an agreement on the part of all—

9   whether they voted in favor of the policy or not—to adhere to the announced

10  restriction on competition.

11       Of course, not every decision by an association violates federal antitrust

12  laws.  As we have said, although a "trade association by its nature involves

13  collective action by competitors, a trade association is not by its nature a

14  walking conspiracy."  <u>NASL</u>, 883 F.3d at 40 (cleaned up).  Take sports

15  associations, for example.  "Without some agreement among rivals—on

16  things like how many players may be on the field or the time allotted for

17  play—the very competitions that consumers value would not be possible."

18  <u>Alston</u>, 141 S. Ct. at 2156.  For this reason, "we focus on those improprieties

1    reducing competition among the members or with their competitors," not the

2    "day-to-day operations of the organization" including "buying, selling,

3    hiring, renting, or investing decisions." AD/SAT, Div. of Skylight, Inc. v.

4    Associated Press, 181 F.3d 216, 234 (2d Cir. 1999) (quoting 7 Phillip E. Areeda

5    et al., Antitrust Law ¶ 1477, at 347 (1999)).

6         We recently applied these principles in NASL, where the NASL (a

7    second-tier soccer league in the United States)[6] brought an antitrust challenge

8    to USSF's application of its Professional League Standards, which establish

9    requirements for sanctioning professional soccer leagues in the United States.

10   See NASL, 883 F.3d at 35–36.  We recognized that "[i]f NASL were

11   challenging the [Professional League] Standards themselves—in totality—as

12   violative of the antitrust laws, then the USSF Board's promulgation of them

13   would constitute direct evidence of § 1 concerted action in that undertaking."

14   Id. at 41.  But the NASL, we explained, had opted to allege an "overarching

15   conspiracy to restrain competition in markets for top- and second-tier men's

---

[6] As we observed in NASL, "[t]he three most prominent men's professional soccer leagues have historically occupied their respective divisions in isolation. [MLS] has been the only Division I men's soccer league since MLS's start in 1995. NASL has existed since 2009 and has operated as a Division II league since 2011. The United Soccer Leagues, LLC . . . ordinarily has filled the Division III slot." NASL, 883 F.3d at 35.

1    professional soccer leagues in North America," so that "the promulgation of

2    the Standards" constituted only "circumstantial evidence of that conspiracy,"

3    not direct evidence.  Id.  So how the plaintiff frames a challenge affects how

4    we analyze the adequacy of its pleadings.  If the plaintiff alleges that a policy

5    or rule is in service of a plan to restrain competition, then it must allege

6    enough additional facts to show that agreement to such a plan exists.  If, on

7    the other hand, the plaintiff adequately alleges that the policy or rule is the

8    agreement itself, then it need not allege any further agreement.

9         In dismissing Relevent's complaint, the District Court misapplied the

10    lesson of NASL.

11         B. **Application**

12         Relevent attacks the 2018 Policy directly as anticompetitive.  It alleges

13    that "this anticompetitive agreement was expressly formulated in 2018,"

14    App'x 494, and more specifically that "[o]n October 26, 2018, the FIFA

15    Council adopted a policy embodying the anticompetitive market division

16    agreement at issue in this case," App'x 502, and "issued a policy prohibiting

17    FIFA's National Association members, including USSF, from sanctioning any

18    official season games held outside of the participants' home territory," App'x

1   523.  "The FIFA geographic market division policy was, and is," Relevent

2   alleges, "a horizontal division of geographic markets agreement."  App'x 523;

3   see App'x 503 (alleging that the USSF president "participated in the FIFA

4   Council's consideration and adoption of the geographic market division

5   agreement in October 2018").

6        These allegations provide "enough factual matter (taken as true) to

7   suggest that an agreement was made," Twombly, 550 U.S. at 556, and the

8   District Court erred in concluding that the 2018 Policy was not itself direct

9   evidence of an agreement under Section 1.  The District Court held that "[i]n

10  order for an organizational decision or policy to constitute concerted action

11  and, therefore, to serve as direct evidence of an unlawful agreement, Plaintiff

12  must plausibly allege an antecedent 'agreement [among horizontal

13  competitors] to agree to vote a particular way' to adopt such a policy."

14  Special App'x 33 (alteration in original); see also id. at 34 n.15 ("Plaintiff also

15  fails to . . . include allegations that those unidentified [remaining members of

16  the FIFA Council] agreed with USSF (or with anyone else) to vote in favor of

17  the Policy.").  Applying this mistaken premise, the District Court concluded

1    that Relevent "fails entirely to allege any facts suggesting that there was an

2    'agreement to agree.'"  Special App'x 34.

3          A plaintiff challenging an association rule that governs the conduct of

4    members' separate businesses need not allege an antecedent agreement to

5    agree.  The promulgation of the rule, in conjunction with the members'

6    "surrender[] . . . to the control of the association," sufficiently demonstrates

7    concerted action.  <u>Associated Press</u>, 326 U.S. at 19; <u>see also</u> <u>Anderson v.</u>

8    <u>Shipowners' Ass'n of Pac. Coast</u>, 272 U.S. 359, 363 (1926) ("The absence of an

9    allegation that such was the specific intent is not important, since that is the

10   necessary and direct consequence of the combination and the acts of the

11   associations under it . . . .").  Here, Relevent alleges that the national

12   associations, leagues, and teams have "surrendered [their] freedom of action

13   . . . and agreed to abide by the will of the association[]."  <u>Anderson</u>, 272 U.S. at

14   364–65.  That is enough.  <u>See</u> <u>Board of Regents</u>, 468 U.S. at 99 ("By

15   participating in an association which prevents member institutions from

16   competing against each other . . . the NCAA member institutions have created

17   a horizontal restraint . . . ."); Amicus Br. of the United States at 11–12

18   ("Because the member has already agreed to abide by all association rules,

1    there would be no need for the member to agree to any particular rule to be

2    bound by it.").

3         This conclusion comports with our decisions in <u>NASL</u> and <u>AD/SAT</u>.  In

4    <u>NASL</u>, plaintiffs alleged an "overarching conspiracy" instead of challenging

5    "the Standards themselves."  883 F.3d at 41.  And in <u>AD/SAT</u>, plaintiffs

6    challenged an inferred policy as opposed to any specific written or

7    promulgated policy.  <u>See</u> 181 F.3d at 233.  Here, by contrast, Relevent

8    challenges a specific policy—the "policy embodying the anticompetitive

9    market division agreement" adopted by "the FIFA Council" on "October 26,

10   2018."  App'x 502.  In this circumstance, the "promulgation of [the policy]

11   constitute[s] direct evidence of § 1 concerted action."  <u>NASL</u>, 883 F.3d at 41.[7]

12        FIFA and USSF defend the District Court's decision against Relevent's

13   attacks by urging that the 2018 Policy is not direct evidence of concerted

14   action.  First, they contend that Relevent forfeited or waived its direct

---

[7] The District Court also observed that "Plaintiff in this case is <u>not</u> challenging
FIFA's standards as a whole, but merely the impact of a single FIFA Policy."  Special
App'x 32 n.12.  That distinction, presumably based on the words "in totality" in
<u>NASL</u>, is immaterial.  Neither <u>NASL</u> nor any other precedent of which we are aware
requires a plaintiff to challenge an association's entire set of by-laws.  <u>Cf.</u>, <u>e.g.</u>,
<u>Associated Press</u>, 326 U.S. at 9 (determining whether particular by-laws of the AP
violated antitrust laws).

1    evidence theory by raising it for the first time on appeal.  Not so.  The

2    amended complaint alleges that "[t]he FIFA geographic market division

3    policy was, and is, a horizontal division of geographic markets agreement."

4    App'x 523.  Relevent also advanced this argument in response to the

5    Defendants' motion to dismiss.  See Relevent Sports, LLC's Mem. of Law in

6    Opp'n to Mots. to Dismiss 34 n.9, Dist. Ct. ECF No. 77 ("Relevent . . . alleges,

7    among numerous other specific allegations, that the market division policy

8    itself is direct evidence of such an unlawful conspiracy."); Tr. of Oral Arg. on

9    Mots. to Dismiss 35, Dist. Ct. ECF No. 94 ("[The] main factual allegation" "is

10   that FIFA has a rule that says you can't play out of your own geographic

11   territory.").  And the District Court also specifically considered and rejected

12   this argument.  See Special App'x 32 ("Plaintiff argues that the FIFA Policy

13   itself constitutes direct evidence of . . . [a] common scheme.  The Court

14   disagrees." (alteration in original) (quotation marks omitted)); Jacques v.

15   DiMarzio, Inc., 386 F.3d 192, 201 (2d Cir. 2004) (holding that where "the

16   district court was made fully aware of [a] position . . . and the trial judge

17   discussed and explicitly rejected [the] position in its written opinion on the

18   motion," "the issue is not waived on appeal").

1      Next, the Defendants argue that leagues and teams are not members of

2  FIFA, and that the national associations that are members of FIFA are not

3  competitors.  But this argument runs headlong into Relevent's allegations,

4  which we must accept as true, that the FIFA Council's decisions bind the

5  various national associations, which in turn bind their respective leagues and

6  teams; that those leagues and teams would otherwise compete with each

7  other for fans and sponsors but dodge competition because FIFA and the

8  national associations enforce the 2018 Policy;[8] and that, as a result, "[t]he FIFA

9  geographic market division policy has created a barrier to entry which has

10  prevented leagues and teams that do not want to adhere to this policy from

11  competing in the relevant market," App'x 516.  Taken together, these

12  allegations clearly depict a rule governing how an association's separate

13  members' separate businesses compete.  As Relevent puts it, "[e]ffectively, the

14  National Associations and their respective leagues agreed to stay home, so

15  that each league will be free from competition within its own territory."

16  Relevent Br. 2.

[8] See App'x 498 (Alleging that "an official season game between La Liga teams in the U.S. would directly compete for fans and sponsors with the official season games of USSF-member MLS, which currently benefits from a monopoly position in the U.S. market").

Op. 23

1    Finally, the Defendants argue that the 2018 Policy was merely a non-

2    binding "sporting principle."  Once again, we consider the allegations in the

3    amended complaint.  According to Relevent, "the FIFA Council—one of

4    FIFA's decision-making bodies with authority to issue policies that each

5    National Association and their member leagues and teams have agreed to

6    follow—adopted a geographic market division policy."  App'x 523; see also

7    App'x 502 ("On October 26, 2018, the FIFA Council adopted a policy

8    embodying the anticompetitive market division agreement at issue in this

9    case . . . .").  And "because this was a formal policy announced by a FIFA

10   decision-making body, any leagues and teams who did not comply with it

11   would run the risk of FIFA penalties and all such leagues and teams were

12   required to agree to adhere to this policy."  App'x 523.  These allegations,

13   corroborated by the fact that the 2018 Policy does not on its face relate to

14   "things like how many players may be on the field or the time allotted for

15   play," Alston, 141 S. Ct. at 2156, but rather relates to a geographic limitation

16   on where various leagues can compete for ticket sales, plausibly allege that in

17   adopting the 2018 Policy, FIFA and its member associations adopted an

18   anticompetitive geographic market division.

Op. 24

1                                                   * * *

2          The District Court correctly observed that "the FIFA Council

3   announced a 'policy' that prohibits staging Official Games outside the

4   participants' home territory," and that "all National Associations, leagues,

5   clubs, and players must comply with FIFA directives."  Special App'x 23.

6   Relevent directly challenges the 2018 Policy as anticompetitive.  Under these

7   circumstances, the very promulgation of the 2018 Policy is direct evidence of

8   an agreement for purposes of Section 1 of the Sherman Act.

9                                          **CONCLUSION**

10         For the foregoing reasons, we **VACATE** the judgment of the District

11  Court and **REMAND** for further proceedings consistent with this opinion.