# 21-2088

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖❖

RELEVENT SPORTS, LLC,

*Plaintiff-Appellant,*

—against—

UNITED STATES SOCCER FEDERATION, INC.,
FÉDÉRATION INTERNATIONALE DE FOOTBALL ASSOCIATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*

CHRISTOPHER S. YATES
AARON T. CHIU
ELIZABETH H. YANDELL
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600

GREGORY G. GARRE
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207

LAWRENCE E. BUTERMAN
SAMIR DEGER-SEN
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

*Counsel for Defendant-Appellee*
*United States Soccer Federation, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND RULE 35(b) STATEMENT.............................................1

BACKGROUND ..........................................................................................4

    A.    Factual Background.........................................................................4

    B.    This Litigation ...............................................................................5

    C.    The Panel's Decision......................................................................6

ARGUMENT ..............................................................................................7

THE PANEL'S DECISION CONTRAVENES THE PRECEDENT OF THIS
COURT, OTHER CIRCUITS, AND THE SUPREME COURT ON AN
EXCEPTIONALLY IMPORTANT QUESTION OF LAW.........................7

    A.    The Panel's Decision Eradicates This Court's Requirements For
        Pleading Concerted Action By Association Members.........................7

    B.    The Panel's Decision Conflicts With The Precedent Of Other
        Circuits .....................................................................................10

    C.    The Panel's Decision Conflicts With Supreme Court Precedent........12

    D.    The Proper Standard For Pleading Concerted Action By
        Association Members Is Exceptionally Important.............................16

CONCLUSION ..........................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AD/SAT, a Division of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) .................................................................2, 6, 7, 9, 10

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)........................................................................................15, 16

*American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*,
456 U.S. 556 (1982)...............................................................................................15

*Associated Press v. United States*,
326 U.S. 1 (1945).................................................................................................14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................2, 13, 14, 16

*Comcast Corp. v. National Association of African American-Owned Media*,
140 S. Ct. 1009 (2020).....................................................................................2, 13

*Golden Bridge Technology, Inc. v. Motorola, Inc.*,
547 F.3d 266 (5th Cir. 2008) ...............................................................................16

*In re Insurance Brokerage Antitrust Litigation*,
618 F.3d 300 (3d Cir. 2010) .......................................................................11, 12

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ....................................................................10, 11

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)................................................................................................1

*Monsanto Co. v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984)..........................................................................................1, 13

*NCAA v. Alston*,
141 S. Ct. 2141 (2021).........................................................................................15

*North American Soccer League, LLC v. United States Soccer Federation*,
883 F.3d 32 (2d Cir. 2018) .............................................................2, 7, 8, 9, 10

ii

**Page(s)**

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015) ..........................................................12

*Phelps Dodge Refining Corp. v. FTC*,
    139 F.2d 393 (2d Cir. 1943) ...............................................................9

*Princo Corp. v. International Trade Commission*,
    616 F.3d 1318 (Fed. Cir. 2010) ........................................................16

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ............................................................11

*Summit Health, Ltd. v. Pinhas*,
    500 U.S. 322 (1991) ............................................................................8

*Visa Inc. v. Osborn*,
    137 S. Ct. 289 (2016) ........................................................................12

## OTHER AUTHORITIES

Fed. R. App. P. 35(b)(1) ...........................................................................7

Fed. R. App. P. 40(a)(2) ...........................................................................7

*Visa, Inc. v. Osborn*, SCOTUSblog, https://www.scotusblog.com/case-
    files/cases/visa-inc-v-osborn/ (last visited Apr. 4, 2023) ...................17

## INTRODUCTION AND RULE 35(b) STATEMENT

This case raises an issue of far-reaching importance regarding the requirements for pleading a claim that individual members of a membership association violated Section 1 of the Sherman Act based solely on an action taken by the association itself. In sweeping fashion, the panel in this case held that the critical threshold element of "concerted action" is automatically satisfied as to all of an association's members merely by alleging that a policy promulgated by the association violates the antitrust laws. That is so regardless of whether the member assented to the policy, or engaged in any affirmative act at all. In the panel's words, once a plaintiff alleges that a binding policy of a membership association violates the antitrust laws, "[n]o further allegation of an agreement is necessary"—and every member is a putative Sherman Act co-conspirator. Op. 4; *see id.* at 20, 25. That holding eradicates the requirements this Court has previously imposed on pleading concerted action in this context, conflicts with the decisions of other circuits, and violates long-standing principles of antitrust law and pleading requirements.

Heeding the "standards articulated by the Supreme Court in *Matsushita* [*Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986),] and *Monsanto* [*Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984)]," this Court had previously insisted that, to establish the element of conspiracy under Section 1, "an antitrust plaintiff must present evidence tending to show that association members, in their

individual capacities, *consciously committed* themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added); *see North Am. Soccer League, LLC. v. United States Soccer Fed'n* ("*NASL*"), 883 F.3d 32, 40 (2d Cir. 2018). Otherwise, the Court recognized, membership associations would become "walking conspirac[ies]" under the antitrust laws. *NASL*, 883 F.3d at 40 (citation omitted); *see also AD/SAT*, 181 F.3d at 234-35.

This substantive requirement, in turn, governs what a "plaintiff must plausibly allege at the outset of a lawsuit." *Comcast Corp. v. National Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). Thus, a plaintiff bringing a Section 1 claim must allege facts that, if true, plausibly suggest that the defendants took actions that reflect a "conscious commitment," in their individual capacities, to pursue a common scheme designed to achieve an unlawful objective. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553-56 (2007). Allegations that members merely agreed in advance to abide by an association's rules, or otherwise participate in an association's governance, cannot *alone* meet that standard, because such allegations are consistent with lawful unilateral conduct. *See id.* at 557.

The panel bulldozed these settled principles by holding that Plaintiff Relevent Sports, LLC ("Relevent") adequately pleaded that Defendant United States Soccer Federation, Inc. ("U.S. Soccer") engaged in a conspiracy with Defendant Fédération

Internationale De Football Association ("FIFA"), all of FIFA's 200-plus national association members, and countless leagues and teams around the world that are not even members of FIFA to violate the antitrust laws—based solely on an allegation that an arm of FIFA promulgated a policy in 2018 limiting the play of official season soccer matches outside of a league's home country. Op. 4, 20, 25. Under the panel's decision, the fact that members had previously agreed to be bound by the association's rules when they joined FIFA (in U.S. Soccer's case, back in 1914) made them automatic co-conspirators as to the challenged policy—a result that revives the discredited membership-ratification doctrine (*see infra* at 9-10).

Membership and standard-setting organizations are commonplace across a wide array of industries and serve many procompetitive ends. While this case arises from a dispute over a rule governing soccer matches, the broad legal rule established by the panel in this case is in no way limited to sports or associations with similar structures. The panel's decision puts the members of any association in the crosshairs of costly discovery and opens the door to crippling liability under the antitrust laws anytime a plaintiff claims a rule, policy, or other action by the association is unlawful, merely by virtue of association membership. Faced with that threat, market participants in many industries will simply refrain from participating in such associations. Rehearing is warranted.

## BACKGROUND

### A.    Factual Background

FIFA is a membership association comprising 211 national associations that oversee the game of soccer in their respective countries.  Op. 5; A590.  U.S. Soccer, a non-profit association that promotes soccer in the United States, has been a member of FIFA since 1914.  Op. 5-6; A501.  National associations like U.S. Soccer oversee professional soccer leagues and their teams in their countries.  Op. 5.  But the leagues and teams themselves are not members of FIFA.

FIFA members "agree to 'comply fully with the Statutes, regulations, directives and decisions of FIFA bodies at any time,'" including those issued by the FIFA Council—a thirty-seven-member body that is authorized to interpret FIFA statutes and adopt rules and policies.  *Id.* (quoting A500-01); A502.  National associations like U.S. Soccer, in turn, require their constituent leagues and teams to comply with FIFA's rules and policies.  Op. 6.  Failure to comply with FIFA's rules may result in sanctions, including exclusion from the FIFA World Cup.  *Id.*

In 2018, Relevent sought to stage an official season match for Spain's top-tier men's soccer league, La Liga, in Miami, Florida.  *Id.* at 7.  Relevent's proposed match implicated a FIFA "sporting principle" that official season games should usually be played in a league's home country.  Among other things, this principle reflects a desire to develop vibrant leagues throughout the world and promotes

competitive balance by ensuring that teams are not forced to sacrifice home-field advantage. Accordingly, before an official season match may be staged outside of league territory, the host and visiting national associations and regional confederations must approve the match. *Id.* at 6.

When Relevent requested such approval for the La Liga match, Spain's national association, U.S. Soccer, and the applicable regional confederation (Conacaf) sought guidance from FIFA. A522. On October 26, 2018, the FIFA Council responded by issuing a press release stating: "Consistent with the opinion expressed by the Football Stakeholders Committee, the [FIFA] Council emphasised the sporting principle that official league matches must be played within the territory of the respective member association." Op. 7 (quoting A601). The match Relevent wished to stage in Miami went forward in Spain. But Relevent sued U.S. Soccer and ultimately FIFA, alleging a broad-based conspiracy to divide the geographic markets for soccer in violation of Section 1 of the Sherman Act.

### B. This Litigation

Relevent's Amended Complaint alleges a conspiracy among FIFA, U.S. Soccer, the 210 other national associations that belong to FIFA, and countless leagues and teams around the world. A494. According to the Amended Complaint, "[t]hese leagues and teams have agreed, along with their respective FIFA-affiliated '[n]ational [a]ssociations,' to adhere to the FIFA rules and policies establishing and

enforcing the horizontal market division agreement." *Id.* The Amended Complaint further alleges that this conspiracy was "directly evidenced" by the 2018 policy reflected by the FIFA Council's press release—"among other things." A540.

The district court dismissed the Amended Complaint with prejudice. The court rejected the argument that the 2018 policy, standing alone, was "direct evidence" of the alleged conspiracy. SPA32-34. Rather, the court explained, Relevent was required to plead that "association members, *in their individual capacities*, consciously committed themselves to a common scheme designed to achieve an unlawful objective." SPA33 (quoting *AD/SAT*, 181 F.3d at 234). The court held that the Amended Complaint failed to make that showing. SPA36-39.

### C. The Panel's Decision

A panel of this Court vacated the district court's decision. According to the panel, because "Relevent directly challenges the 2018 [p]olicy as anticompetitive," "the very promulgation of the 2018 [p]olicy is direct evidence of an agreement for purposes of Section 1 of the Sherman Act" among every national association, league, and team that allegedly agreed in advance to adhere to FIFA's rules. Op. 25; *see id.* at 4, 20. "No further allegation of an agreement is necessary." *Id.* at 4. It does not matter, the panel held, that "leagues and teams are not members of FIFA, and that the national associations that are members of FIFA are not competitors," because

Relevent alleged that "the FIFA Council's decisions bind the various national associations, which in turn bind their respective leagues and teams." *Id.* at 23.

## ARGUMENT

**THE PANEL'S DECISION CONTRAVENES THE PRECEDENT OF THIS COURT, OTHER CIRCUITS, AND THE SUPREME COURT ON AN EXCEPTIONALLY IMPORTANT QUESTION OF LAW**

The panel's decision in this case meets each of this Court's criteria for panel rehearing and rehearing en banc. Fed. R. App. P. 35(b)(1), 40(a)(2).

### A. The Panel's Decision Eradicates This Court's Requirements For Pleading Concerted Action By Association Members

To establish concerted action in violation of the Sherman Act, this Court has long required a "show[ing] that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). Under this standard, Section 1 "defendants' status as members of" an association does not automatically establish a conspiracy whenever the association acts. *Id.* Instead, Section 1 plaintiffs must make "a factual showing that each defendant conspired in violation of the antitrust laws." *Id.* This requirement reflects the understanding that "'a trade association is not by its nature a "walking conspiracy."'" *North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.* ("*NASL*"), 883 F.3d 32, 40 (2d Cir. 2018) (citation omitted).

7

Under this precedent, market participants have long understood that simply agreeing to join an association that requires members to abide by its rules or standards does *not* make members Section 1 conspirators for every rule promulgated or action taken by the association. The panel's decision in this case upends that understanding by holding that a membership association's "promulgation of [a] rule" adequately pleads a conspiracy among all association members. Op. 20. Under the panel's ruling, a plaintiff who alleges that members agreed to join an association and be bound by its rules needs "[n]o further proof" to allege that a member is a conspirator subject to potential liability for any association rule. *Id.* at 15-16. And this rule reaches beyond the association's members, encompassing countless leagues and teams who are not themselves members of FIFA. *Id.* at 23. The panel's decision thus takes a drastic step beyond this Court's prior precedent.

In *NASL*, this Court suggested that a challenge to an association rule—"in totality"—could point to the rule's "promulgation" by the association's board as "direct evidence" of conspiracy where the suit was against the membership association itself. 883 F.3d at 41. The Court indicated that it was drawing a distinction between a case in which the rule was the "totality" of the conspiracy alleged, and one in which the rule was simply evidence of a broader conspiracy. *Id.* at 41 & n.11 (citing *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 339-40 (1991) (Scalia, J., dissenting)). As this Court explained, the complaint in *NASL* fell into the

latter category:  It alleged an "overarching conspiracy" in which the plaintiff simply pointed to the rule as evidence of that alleged conspiracy.  *Id.* at 41.

Relevent likewise did not bring this case as a challenge to the 2018 policy— "in totality."  That explains why Relevent has sued U.S. Soccer, not simply FIFA. Rather, Relevent pointed to the 2018 policy as evidence of a broader, overarching conspiracy—one allegedly among all 211 FIFA-member national associations, as well as countless leagues and teams around the world, to limit the permissible locations of official season games.  A494; *see* A521 (heading describing alleged conspiracy); *see also* SPA32 n.11.  Yet, the panel held that the Amended Complaint's reference to the 2018 policy, standing alone, sufficed to allege a conspiracy among all of FIFA's individual members as well as countless leagues and teams that are not even members of FIFA.  Op. 4, 20, 25.  The panel's decision thus allows a plaintiff to target individual association members based simply on the fact that they previously agreed to abide by an association's rules.

In so holding, the panel's decision also effectively resurrects, if not expands, the "membership-ratification" doctrine that this Court has disavowed.  *AD/SAT*, 181 F.3d at 233-34.  Under that discredited doctrine, "a member who knows or should know that his association is engaged in an unlawful enterprise and continues his membership without protest may be charged with complicity as a confederate." *Phelps Dodge Refin. Corp. v. FTC*, 139 F.2d 393, 396 (2d Cir. 1943).  This Court

rightly doubted "the continued viability of *Phelps*' membership-ratification theory as a basis for antitrust conspirator liability" because it did not "require a factual showing that each defendant conspired" in an individual capacity. *AD/SAT*, 181 F.3d at 233-34. Yet, under the panel's decision, all a plaintiff need allege is that association members previously agreed to be bound by an association's rules and that opens the door to expensive discovery and potentially crushing liability for every association member any time a plaintiff challenges an association's rules.

This new pleading rule treats membership associations as "walking conspiracies" under the Sherman Act, and their members as co-conspirators as to any rule promulgated by the association—the very result this Court has taken pains to avoid. *See AD/SAT*, 181 F.3d at 234; *NASL*, 883 F.3d at 40.

### B.     The Panel's Decision Conflicts With The Precedent Of Other Circuits

The panel's ruling also conflicts with the decisions of other circuits that have upheld the dismissal of Section 1 claims against association members where the alleged conspiracy consists only of an association's adoption of a rule or policy.

In *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), the Ninth Circuit upheld the dismissal of a Section 1 claim alleging a conspiracy among a consortium of credit card companies and various banks based on credit card network rules. The court held that allegations that the defendants merely "adopt[ed]" a rule governing fees for processing credit card transactions set by a consortium were

"insufficient as a matter of law" to plead a Section 1 conspiracy. *Id.* at 1048. These allegations failed, the court held, because "membership in an association does not render an association's members automatically liable for antitrust violations committed by the association." *Id.* Indeed, "[e]ven [defendants'] participation on the association's board of directors is not enough by itself." *Id.* Rather, a plaintiff must plead facts that plausibly allege the defendants—"in an individual capacity"—participated in the alleged conspiracy. *Id.* The panel here rejected that requirement.

The panel's decision also conflicts with *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015). In *SD3*, the plaintiff alleged, among other things, that members of trade associations conspired to adopt certain anticompetitive standards. *Id.* at 419-21. The plaintiff's standard-setting claim turned on allegations that "some of the defendants' representative[s] served on the relevant standard-setting panel." *Id.* at 436. But the Fourth Circuit refused "to infer malfeasance" from those allegations. *Id.* at 436-37. Simply asserting that "a collective decision was made," the court held, did not establish a conspiracy among all members. *Id.* at 437 (citation omitted). The panel in this case reached the opposite conclusion, ruling that Relevent's allegation that an arm of FIFA adopted an allegedly anticompetitive policy was "enough" to establish a Section 1 conspiracy. Op. 20.

The panel's decision breaks with *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010), too. There, the plaintiffs alleged a global

11

conspiracy based on insurance brokers' participation in a trade association; the brokers' "control" of the association's affairs; the association's "adopt[ion]" of an allegedly anticompetitive policy; and brokers' adherence to that policy. *Id.* at 349. But the Third Circuit held that "neither defendants' membership in the [association], nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy." *Id.* Rather than infer an agreement from an allegation that defendants "collaborated in crafting" the association's rule, the Third Circuit observed that industry participants had "ample independent motive[s]." *Id.* at 349-50. Here, by contrast, the panel held that an allegation that the FIFA Council adopted a policy that violated the antitrust laws was *alone* sufficient to plead concerted action, regardless of members' independent motives. Op. 4, 20, 25.

The Supreme Court granted certiorari to resolve the circuit conflict over this same pleading issue in *Osborn v. Visa Inc.*, 797 F.3d 1057 (D.C. Cir. 2015), *see* Cert. Pet. 11-19, *Visa Inc. v. Osborn*, 137 S. Ct. 289 (2016) (No. 15-961), 2016 WL 369962, but dismissed the writ as improvidently granted and so did not resolve the conflict, *Visa*, 137 S. Ct. at 289-90. The panel's decision deepens this conflict.

### C.    The Panel's Decision Conflicts With Supreme Court Precedent

The panel's decision also starkly departs from Supreme Court precedent on what is required to prove, and plead, concerted action under Section 1.

In *Bell Atlantic Corp. v. Twombly*, for example, this Court held that a Section 1 complaint must provide "plausible grounds to infer an agreement." 550 U.S. 544, 556 (2007). To do so, a complaint must allege facts that, if true, would show that each defendant, in an individual capacity, has displayed "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). *Monsanto*'s "conscious commitment" standard is an "element[]" of a Section 1 claim, and that "do[es] not change" just because a case is at the pleading stage. *Comcast Corp. v. National Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

As the district court explained, the Amended Complaint in this case flunks this requirement because there are no allegations, much less plausible allegations, that any of the hundreds of alleged co-conspirators—FIFA, U.S. Soccer, 210 other national associations, and countless leagues and teams around the world—consciously committed in an individual capacity to any unlawful agreement. A494, 499. The panel erred by holding that alleging membership in FIFA along with a prior agreement to abide by FIFA's rules, standing alone, automatically turned these discrete actors into co-conspirators potentially liable for the 2018 policy. Indeed, as noted, the leagues and teams themselves are not even members of FIFA to begin with.

13

*Twombly* also teaches that, because parallel conduct is often "just as much in line with a wide swath of rational and competitive business strategy," it is not enough simply to allege parallel conduct by other entities; "proof of a § 1 conspiracy must include evidence tending to *exclude* the possibility of independent action." *Twombly*, 550 U.S. at 554 (emphasis added). Here, there are many perfectly lawful reasons why entities would join FIFA and agree to abide by its rules. Likewise, there are many legitimate reasons why members of FIFA would decide, in their individual capacities, to follow the "sporting principle" underlying the 2018 policy, which, among other things, aims to promote competitive leagues around the world. *Supra* at 4-5. The fact that individual members agreed in advance to be bound by FIFA's rules, or chose, in particular, to follow the 2018 policy, therefore is insufficient, standing alone, to plausibly plead concerted action in violation of Section 1.

*Associated Press v. United States*, 326 U.S. 1 (1945), is not to the contrary. *AP* was decided long before (and without the benefit of) *Monsanto* and *Twombly*. Moreover, it is fundamentally different from this case. *AP* involved a challenge to a foundational set of by-laws specifically agreed to by horizontal competitors upon joining an association. *See id.* at 8-12. But this case does not involve a by-law to which members were required to agree to gain membership, or an association of horizontal competitors. *See* Op. 23. Moreover, the alleged conspiracy here extends to hundreds of *non*-members (*i.e.*, the leagues and teams) as well. Unlike *AP*, there

is no basis to plausibly infer that all of these actors consciously committed, in their individual capacities, to any agreement embodied in the 2018 policy.

In other cases, the Supreme Court has found concerted action where a plaintiff pleaded or proved that the defendants colluded in order to subvert an association process to achieve an unlawful end. *See, e.g.*, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 495-98 (1988) (competitors "collectively agreed" to exclude product and manipulated standard-setting vote); *American Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571-72 (1982) (misusing position on trade association subcommittee to injure competitor); *see also* SPA33 n.13 (distinguishing *NCAA v. Alston*, 141 S. Ct. 2141 (2021)). Each case has to be evaluated on its own. But the Supreme Court has never held that the mere adoption of an association rule automatically transforms all of the association's members into co-conspirators under the antitrust laws, without any plausible allegations (or showing) that members were consciously committed *in their individual capacities* to act through the association to advance the allegedly unlawful scheme.

The sheer implausibility of the conspiracy alleged in this case underscores how far the panel strayed from the Supreme Court's teachings. As noted, the alleged conspiracy included all 211 national associations around the world (most of whom joined FIFA at different times throughout the past century) as well as hundreds of additional leagues and teams—none of which is a member of FIFA. The Amended

15

Complaint is devoid of any allegations that plausibly connect all of these actors to a world-wide conspiracy to violate the U.S. antitrust laws, much less allegations showing that *each* of these entities, in their individual capacities, consciously committed to this unlawful objective. Yet, the panel held that simply alleging that U.S. Soccer joined FIFA more than a century ago and that the FIFA Council promulgated the challenged policy in 2018 sufficed to plead concerted action among U.S. Soccer and a host of independent actors. That ruling obliterates the guard rails that the Supreme Court has erected on pleading concerted action.

## D. The Proper Standard For Pleading Concerted Action By Association Members Is Exceptionally Important

The pleading question raised by this case is a recurring issue of undeniable importance. As courts and scholars have long recognized, associations that bring competitors together can provide "significant procompetitive advantages." *Allied Tube*, 486 U.S. at 501; *see also Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 273 (5th Cir. 2008) (explaining that standard setting "facilitat[es] economies of scale," "reduc[es] consumer search costs," and "increas[es] economic efficiency"); *Princo Corp. v. International Trade Comm'n*, 616 F.3d 1318, 1335 (Fed. Cir. 2010) (similar). The panel's ruling in this case places all members of any association at risk of costly discovery and potentially crippling liability under the antitrust laws essentially anytime an association acts. *See Twombly*, 550 U.S. at 558-59 (warning "that proceeding to antitrust discovery can be expensive"). This will

16

create a powerful deterrent against joining such organizations regardless of their purpose or structure, and thus hamper economically beneficial and procompetitive conduct of all sorts. The multiple amicus briefs filed in support of the petition for certiorari in *Osborn* underscore the importance of this issue.[1]

## CONCLUSION

The petition for rehearing should be granted.

Dated: April 4, 2023

Respectfully submitted,

*/s/ Gregory G. Garre*

Christopher S. Yates
Aaron T. Chiu
Elizabeth H. Yandell
LATHAM & WATKINS LLP
505 Montgomery Street
San Francisco, CA 94111
(415) 391-0600

Gregory G. Garre
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2207

Lawrence E. Buterman
Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

*Counsel for Defendant-Appellee United States Soccer Federation, Inc.*

---

[1] *Visa, Inc. v. Osborn*, SCOTUSblog, https://www.scotusblog.com/case-files/cases/visa-inc-v-osborn/ (last visited Apr. 4, 2023).

17

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this petition complies with the type-volume limitations of Federal Rules of Appellate Procedure 35(b)(2) and 40(b)(1) because it contains 3,871 words, excluding the parts of the foregoing exempted by Federal Rule of Appellate Procedure 32(f). The petition is prepared in a format, typeface, and type style that complies with Federal Rule of Appellate Procedure 32(a)(5)-(6).

Dated: April 4, 2023                         */s/ Gregory G. Garre*

                                             Gregory G. Garre

# ATTACHMENT PURSUANT TO LOCAL RULES 35.1(b) AND 40.1(a)

21-2088-cv
Relevent Sports v. U.S. Soccer Federation

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2021

(Argued: April 7, 2022        Decided: March 7, 2023)

Docket No. 21-2088-cv

———————————————————

RELEVENT SPORTS, LLC,

*Plaintiff-Appellant*,

v.

UNITED STATES SOCCER FEDERATION, INC.,
FÉDÉRATION INTERNATIONALE DE FOOTBALL ASSOCIATION,

*Defendants-Appellees*.

———————————————————

Before:

LIVINGSTON, *Chief Judge*, LYNCH, and LOHIER, *Circuit Judges*.

Relevent Sports, LLC, a U.S.-based soccer promoter, alleges that the
Fédération Internationale de Football Association (popularly known as FIFA)
and the United States Soccer Federation, Inc. adopted and enforced a
geographic market division policy in 2018 that unlawfully prohibits soccer
leagues and teams from playing official season games outside of their home
territory. Relevent claims that the 2018 policy represents an agreement
among direct competitors to restrict competition in violation of federal
antitrust laws. The United States District Court for the Southern District of
New York (Caproni, J) concluded that Relevent failed to allege that the

1    challenged anticompetitive conduct stemmed from a prior agreement to enter

2    into the 2018 policy.  But a plaintiff challenging an association policy or rule

3    that governs the conduct of the members' separate businesses need not allege

4    an antecedent "agreement to agree."  Because Relevent challenges the

5    allegedly monopolistic 2018 Policy directly, it has adequately alleged

6    concerted action.  The Sherman Antitrust Act and the Clayton Antitrust Act

7    require no further allegations of an agreement to engage in concerted action

8    for Relevent's complaint to survive a motion to dismiss.  VACATED and

9    REMANDED.

10

11                JEFFREY L. KESSLER (Linda T. Coberly, *on the brief*),

12                Winston & Strawn LLP, Chicago, IL, and New York,

13                NY, *for Plaintiff-Appellant* Relevent Sports, LLC.

14

15                KANNON K. SHANMUGAM (Williams T. Marks, H.

16                Christopher Boehning, Andrew C. Finch, *on the*

17                *brief*), Paul, Weiss, Rifkind, Wharton & Garrison

18                LLP, New York, NY and Washington, DC, *for*

19                *Defendant-Appellee* Fédération Internationale de

20                Football Association.

21

22                GREGORY G. GARRE (Lawrence E. Buterman, Samir

23                Deger-Sen, Christopher S. Yates, Aaron T. Chiu,

24                Elizabeth H. Yandell, *on the brief*), Latham & Watkins

25                LLP, Washington, DC, San Francisco, CA, and New

26                York, NY, *for Defendant-Appellee* United States Soccer

27                Federation, Inc.

28

29                PETER M. BOZZO, Attorney (Adam D. Chandler,

30                Daniel E. Haar, Nickolai G. Levin, Attorneys,

31                Kathleen S. O'Neill, Senior Director of Investigations

32                and Litigation, *on the brief*), *for* Richard A. Powers,

33                Acting Assistant Attorney General, Antitrust

34                Division, United States Department of Justice,

35                Washington, DC, *for Amicus Curiae* United States of

36                America, *in support of Neither Party*.

37

38                Randy M. Stutz, American Antitrust Institute,

39                Washington, DC, *for Amicus Curiae* American

40                Antitrust Institute, *in support of Plaintiff-Appellant*.

41

42                Steffen N. Johnson, Jonathan M. Jacobson, Wilson

43                Sonsini Goodrich & Rosati, P.C., Washington, DC,

1    and New York, NY, *for Amici Curiae* 14 Antitrust,
2    Sports Law, and Economics Professors, *in support of*
3    *Plaintiff-Appellant.*
4
5    LOHIER, *Circuit Judge*:

6    Soccer, also known as "the beautiful game," unites the world in shared

7    competition.  This case, by contrast, concerns an allegedly anticompetitive

8    policy that restricts access to the game by prohibiting soccer leagues and

9    teams from playing official season games outside of their home territory.

10   Relevent Sports, LLC ("Relevent"), a U.S.-based soccer promoter, alleges that

11   the Fédération Internationale de Football Association ("FIFA") and the United

12   States Soccer Federation, Inc. ("USSF") adopted and enforced this geographic

13   market division policy ("2018 Policy") in violation of Section 1 of the Sherman

14   Antitrust Act and Sections 4 and 16 of the Clayton Antitrust Act.

15   The United States District Court for the Southern District of New York

16   (Caproni, <u>J.</u>) determined that Section 1 required Relevent to present either

17   direct or circumstantial evidence of an "antecedent 'agreement [among

18   horizontal competitors] to agree to vote a particular way' to adopt such a

19   policy."  Special App'x 33 (alteration in original).  After concluding that

20   Relevent failed to allege that the 2018 Policy itself stemmed from or

3

1    constituted direct evidence of such a prior agreement among the Defendants,

2    the District Court dismissed Relevent's complaint for failure to state a claim.

3           We disagree with the District Court's conclusion.  Relevent plausibly

4    alleges that the 2018 Policy reflects a contractual commitment of head-to-head

5    competitors to restrict competition.  Because Relevent's complaint challenges

6    the 2018 Policy itself "as violative of the antitrust laws," the "promulgation of

7    [the policy] . . . constitute[s] direct evidence of § 1 concerted action."  N. Am.

8    Soccer League v. U.S. Soccer Fed'n, 883 F.3d 32, 41 (2d Cir. 2018) ("NASL");

9    see Associated Press v. United States, 326 U.S. 1, 12 (1945).  No further

10   allegation of an agreement is necessary.  In holding that no inference of

11   concerted activity can be drawn from the "promulgation" of the 2018 Policy,

12   the District Court's decision conflicts directly with this core principle.  The

13   judgment of the District Court is thus **VACATED** and the matter is

14   **REMANDED** for further proceedings consistent with this opinion.

1    **BACKGROUND**[1]

2        We start with an overview of the governance structure of international

3    soccer.  FIFA, a private membership-based association comprised of over 200

4    national associations, is the well-known international governing body for

5    soccer.  Each national association is itself membership-based and comprised

6    of professional soccer leagues and teams.  FIFA's legislative body, the FIFA

7    Congress, includes representatives from every national association in the

8    world and adopts and amends the FIFA Statutes, which contain many of

9    FIFA's rules and policies.  A smaller entity within FIFA, the FIFA Council,

10   "has authority to interpret the FIFA Statutes and to adopt rules and policies

11   not specifically addressed in the FIFA Statutes."  App'x 502.

12       National associations represent their members in FIFA decision-making

13   and agree to "comply fully with the Statutes, regulations, directives and

14   decisions of FIFA bodies at any time."  App'x 500–01.  In turn, the national

15   associations require their members to agree to comply with these same rules

16   and policies.  USSF is the FIFA-authorized national association for the United

---

[1] These facts are drawn from the amended complaint and assumed to be true for
purposes of our de novo review of the District Court's judgment dismissing the
complaint for failure to state a claim upon which relief can be granted.  See Schlosser
v. Kwak, 16 F.4th 1078, 1080 (2d Cir. 2021).

1   States.  "[USSF] and its members are, to the extent permitted by governing

2   law, obliged to respect the statutes, regulations, directives and decisions of

3   FIFA . . . and to ensure that these are likewise respected by their members."

4   App'x 502 n.12 (alterations in original) (quoting BYLAWS OF THE UNITED

5   STATES SOCCER FEDERATION, INC., Bylaw 103 § 1).  Leagues and players that

6   fail to comply with FIFA rules and policies are subject to discipline and

7   sanction, including exclusion from the FIFA World Cup.

8        Relevent organizes, promotes, and hosts soccer matches in the United

9   States and globally.  Because it is a violation of the FIFA Statutes for a soccer

10  club affiliated with a FIFA-sanctioned league to play in the United States

11  without USSF's approval, Relevent had to obtain approval from USSF to

12  organize a match in the United States between teams from other countries.

13  And third-party promoters such as Relevent must also obtain approval from

14  each team's national association, each team's regional confederation, and, of

15  course, FIFA.

16       In the past, Relevent has tried to host official season games for

17  international professional soccer leagues in the United States—including for

18  La Liga (Spain), Liga MX (Mexico) and LigaPro Serie A (Ecuador)—without

6

1   success.  Its efforts to host have been foiled by the FIFA Council each time.[2]

2   In 2018, for example, Relevent and La Liga, the Spanish professional soccer

3   league, agreed to host an official season game in Miami.  Given La Liga's

4   worldwide popularity, the game would undoubtedly have drawn a large

5   audience.  In response, the FIFA Council "issued a policy prohibiting FIFA's

6   National Association members, including USSF, from sanctioning any official

7   season games held outside of the participants' home territory."  App'x 523.  A

8   FIFA press release memorializing this policy stated:

9           Following a request for guidance . . . the FIFA Council discussed
10          La Liga's proposal to host an official 2018/19 regular season league
11          match outside Spain (in Miami).
12
13          Consistent with the opinion expressed by the Football
14          Stakeholders Committee, the Council emphasized the sporting
15          principle that official league matches must be played within the
16          territory of the respective member association.
17
18   App'x 601 (2018 Policy).  "[B]ecause this was a formal policy announced by a

19   FIFA decision-making body, any leagues and teams who did not comply with

20   it would run the risk of FIFA penalties and all such leagues and teams were

---

[2] As fans know, there is a difference between "friendly" (or exhibition) games, which
Relevent has organized, promoted, and hosted in the United States, and official
season games.  Official season games affect the standing of teams in their respective
leagues or tournaments.

7

1    required to agree to adhere to this policy."  App'x 523.  As a result, the game

2    in Miami never took place.

3          Relevent filed this action against USSF in 2019.  The District Court

4    dismissed Relevent's first complaint without prejudice for failing to allege an

5    unlawful vertical agreement between USSF and FIFA or an unlawful

6    horizontal agreement between USSF and other national associations, leagues,

7    and teams sufficient to support an antitrust violation.  The court added that

8    even if Relevent "had adequately alleged an agreement between USSF and

9    FIFA," its "claim for injunctive relief would be dismissed for failure to join"

10   FIFA as "an indispensable party."  Special App'x 15 n.12.  Relevent then filed

11   an amended complaint adding FIFA as a defendant.  In the amended

12   complaint, Relevent claimed that the Defendants violated Section 1 of the

13   Sherman Act and Sections 4 and 16 of the Clayton Act, and were liable under

14   New York law for tortious interference with business relationships.[3]  Relevent

15   principally alleged that "FIFA and USSF, in combination with numerous

16   FIFA-affiliated men's top-tier professional soccer leagues and teams,

17   including Major League Soccer ("MLS")[4] and its teams, have entered into an

---

[3] On appeal, Relevent pursues only its antitrust claims.
[4] MLS is the top-tier FIFA-affiliated professional soccer league in the United States.

1    agreement to divide geographic markets, including the United States market,

2    which stifles competition in the U.S."  App'x 493.

3         The District Court granted the Defendants' motion to dismiss

4    Relevent's amended complaint for failure to state a claim.  It again held that

5    Relevent failed to allege that USSF and other national associations in FIFA

6    entered into an unlawful vertical agreement with FIFA to apply the 2018

7    Policy against their member leagues and teams.  The District Court likewise

8    again held that Relevent failed to allege a horizontal conspiracy between

9    USSF and FIFA's other top-tier men's professional soccer leagues and their

10   teams outside the United States.  The 2018 Policy, the District Court

11   explained, did not constitute direct evidence of a horizontal conspiracy

12   because there was neither an antecedent "agreement to agree" among the

13   Defendants to adopt the policy, Special App'x 32 n.12, nor any circumstantial

14   evidence of an agreement among the members of the FIFA Council to adopt

15   the 2018 Policy.  Finally, the District Court determined that universal

16   adherence to the 2018 Policy was insufficient to support a claim that the

17   Defendants engaged in a horizontal conspiracy.

18        This appeal followed.

9

# DISCUSSION

I. **Personal Jurisdiction**

To start, the Defendants argue that FIFA is not subject to personal jurisdiction in New York. They contend that this action must therefore be dismissed because, in their view, FIFA is a necessary and indispensable party to the action. We conclude that FIFA is subject to personal jurisdiction in this case.

"A plaintiff must have a state-law statutory basis for jurisdiction and demonstrate that the exercise of personal jurisdiction comports with due process." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 82 (2d Cir. 2018). "New York's long-arm statute provides in relevant part that 'a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state,'" as to any cause of action arising from such a transaction or contract. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013) (alterations in original) (quoting N.Y. C.P.L.R 302(a)(1)).

1    On the record before us, FIFA is subject to personal jurisdiction in New

2    York under New York's long-arm statute.  According to Relevent's amended

3    complaint, FIFA "authorizes USSF . . . to act on its behalf to sanction

4    professional soccer leagues in the U.S. and this District."  App'x 513.  USSF,

5    which is incorporated as a New York not-for-profit, is FIFA's agent and

6    transacts substantial business on behalf of FIFA in New York.  For example,

7    FIFA authorized USSF's "refusal to sanction the official season games sought

8    to be promoted by Relevent from its headquarters in [New York]."  App'x

9    513–14; see also App'x 506–07 ("As FIFA's National Association in the U.S.,

10   USSF is vested with the exclusive authority to sanction, on behalf of FIFA, all

11   men's professional soccer leagues and games played in this country.").  These

12   allegations establish, at the pleading stage, that USSF "acted in New York for

13   the benefit of, with the knowledge and consent of, and under some control

14   by" FIFA.  Charles Schwab, 883 F.3d at 85.  No party disputes that USSF's

15   actions subject it to personal jurisdiction in New York on Relevent's claims.

16   That USSF undertook those actions as FIFA's agent is thus sufficient to subject

17   FIFA to personal jurisdiction in New York as well.  See id. at 85–86 ("[A]n

18   agency relationship between a parent corporation and a subsidiary that sells

11

1 securities on the parent's behalf could establish personal jurisdiction over the

2 parent in a state in which the parent 'indirectly' sells the securities.").

3       FIFA also has the minimum contacts with New York necessary to

4 satisfy constitutional due process principles.

5       Although the long-arm statute and the Due Process Clause are
6       not technically coextensive, the New York requirements (benefit,
7       knowledge, some control) are consonant with the due process
8       principle that a defendant must have purposefully availed itself
9       of the privilege of doing business in the forum. And where we
10       have found personal jurisdiction based on an agent's contacts, we
11       have never suggested that due process requires something more
12       than New York law.

13

14 Id. at 85 (cleaned up). Here, the same alleged contacts that subject FIFA to

15 New York's long-arm statute—including vesting USSF with the exclusive

16 authority to sanction all men's professional soccer leagues and games played

17 in the United States—satisfy the Constitution's due process requirement of

18 minimum contacts with New York such that the suit "does not offend

19 traditional notions of fair play and substantial justice." Ford Motor Co. v.

20 Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) (quoting Int'l Shoe Co.

21 v. Washington, 326 U.S. 310, 316 (1945)).

1    II.    **Antitrust Liability**

2         A. **Legal Standard**

3         Section 1 of the Sherman Act prohibits "[e]very contract, combination

4    . . . or conspiracy[] in restraint of trade or commerce."  15 U.S.C. § 1.  The first

5    question is "whether the challenged conduct stems from independent

6    decision or from an agreement, tacit or express."  United States v. Apple, Inc.,

7    791 F.3d 290, 314–15 (2d Cir. 2015) (cleaned up).  Distinguishing between

8    concerted action and independent individual behavior is important because

9    "concerted activity inherently is fraught with anticompetitive risk insofar as it

10   deprives the marketplace of independent centers of decisionmaking that

11   competition assumes and demands."  Am. Needle, Inc. v. NFL, 560 U.S. 183,

12   190 (2010) (cleaned up).  If the challenged conduct reflects concerted action,

13   then we consider whether that action unreasonably restrains trade.  Id. at

14   186.[5]

---

[5] The antecedent question of whether the inference of concerted action could be
drawn from the 2018 Policy itself is distinct from the subsequent question of
whether any concerted action was "unlawful."  Cf. Special App'x 34 (Dist. Ct. Op.)
("Plaintiff's Amended Complaint lacks any non-conclusory factual allegations [that]
. . . the FIFA Council unlawfully agreed to adopt the Policy." (emphasis added)).
We express no view on the latter question.  See Am. Needle, 560 U.S. at 202–03 ("The
fact that NFL teams share an interest in making the entire league successful and

1    At the pleading stage, a plaintiff need only allege "enough factual

2    matter (taken as true) to suggest that an agreement was made."  Bell Atl.

3    Corp. v. Twombly, 550 U.S. 544, 556 (2007).  In other words, a plaintiff must

4    allege facts that "reasonably tend[] to prove that the defendant and others

5    had a conscious commitment to a common scheme designed to achieve an

6    unlawful objective."  Apple, 791 F.3d at 315 (cleaned up).  Those facts can

7    constitute either "direct evidence that the defendants entered into an

8    agreement" or "circumstantial facts supporting the inference that a

9    conspiracy existed."  Id. (quotation marks omitted).

10    Competitors do not avoid antitrust liability by hiding behind or acting

11    through third-party intermediaries.  See Amici Br. of Antitrust, Sports Law,

12    and Economics Professors at 3–4.  Business, professional, trade, and sports

13    organizations and associations, for instance, are all subject to federal antitrust

14    laws if their members demonstrate "a conscious commitment to a common

15    scheme designed to achieve an unlawful objective." Apple, 791 F.3d at 315

16    (quotation marks omitted); see also Am. Needle, 560 U.S. at 190.  When an

---

profitable . . . provides a perfectly sensible justification for making a host of
collective decisions" that qualify as "concerted activity under the Sherman Act that
is subject to § 1 analysis.").

1  association member "surrender[s] himself completely to the control of the

2  association" in a "contractual restraint of interstate trade, designed in the

3  interest of preventing competition," then a rule that imposes "duties and

4  restrictions in the conduct of [the members'] separate businesses"

5  demonstrates an agreement for purposes of Section 1 of the Sherman Act.

6  Associated Press, 326 U.S. at 8, 19 (quotation marks omitted).

7        It follows from this precedent that the adoption of a binding association

8  rule designed to prevent competition is direct evidence of concerted action.

9  No further proof is necessary.  See, e.g., Nat'l Collegiate Athletic Ass'n v. Bd.

10 of Regents of Univ. of Oklahoma, 468 U.S. 85, 99 (1984) ("[T]he policies of the

11 NCAA with respect to television rights" give rise to "a horizontal restraint—

12 an agreement among competitors on the way in which they will compete with

13 one another."); Nat'l Collegiate Athletic Ass'n v. Alston, 141 S. Ct. 2141, 2154

14 (2021) ("[T]he NCAA [does not] dispute that its member schools . . . remain

15 subject to NCAA-issued-and-enforced limits on what compensation they can

16 offer. . . . [Accordingly,] this suit involves admitted horizontal price fixing in a

17 market where the defendants exercise monopoly control."); Nat'l Soc'y of Pro.

18 Eng'rs v. United States, 435 U.S. 679, 683 (1978) (finding "[e]vidence of" an

1     unlawful "agreement" in an engineering society's "Code of Ethics"); <u>Allied</u>

2     <u>Tube & Conduit Corp. v. Indian Head, Inc.</u>, 486 U.S. 492, 500 (1988)

3     ("Agreement on a product standard is, after all, implicitly an agreement not

4     to manufacture, distribute, or purchase certain types of products.").  Contrary

5     to the District Court's conclusion, there is no need for Relevent to allege a

6     prior "agreement to agree" or conspiracy to adopt the policy; the adoption of

7     the policy, combined with the member leagues' prior agreement, by joining

8     FIFA, to adhere to its policies, constitutes an agreement on the part of all—

9     whether they voted in favor of the policy or not—to adhere to the announced

10    restriction on competition.

11       Of course, not every decision by an association violates federal antitrust

12    laws.  As we have said, although a "trade association by its nature involves

13    collective action by competitors, a trade association is not by its nature a

14    walking conspiracy."  <u>NASL</u>, 883 F.3d at 40 (cleaned up).  Take sports

15    associations, for example.  "Without some agreement among rivals—on

16    things like how many players may be on the field or the time allotted for

17    play—the very competitions that consumers value would not be possible."

18    <u>Alston</u>, 141 S. Ct. at 2156.  For this reason, "we focus on those improprieties

1    reducing competition among the members or with their competitors," not the

2    "day-to-day operations of the organization" including "buying, selling,

3    hiring, renting, or investing decisions." AD/SAT, Div. of Skylight, Inc. v.

4    Associated Press, 181 F.3d 216, 234 (2d Cir. 1999) (quoting 7 Phillip E. Areeda

5    et al., Antitrust Law ¶ 1477, at 347 (1999)).

6        We recently applied these principles in NASL, where the NASL (a

7    second-tier soccer league in the United States)[6] brought an antitrust challenge

8    to USSF's application of its Professional League Standards, which establish

9    requirements for sanctioning professional soccer leagues in the United States.

10   See NASL, 883 F.3d at 35–36. We recognized that "[i]f NASL were

11   challenging the [Professional League] Standards themselves—in totality—as

12   violative of the antitrust laws, then the USSF Board's promulgation of them

13   would constitute direct evidence of § 1 concerted action in that undertaking."

14   Id. at 41. But the NASL, we explained, had opted to allege an "overarching

15   conspiracy to restrain competition in markets for top- and second-tier men's

---

[6] As we observed in NASL, "[t]he three most prominent men's professional soccer leagues have historically occupied their respective divisions in isolation. [MLS] has been the only Division I men's soccer league since MLS's start in 1995. NASL has existed since 2009 and has operated as a Division II league since 2011. The United Soccer Leagues, LLC . . . ordinarily has filled the Division III slot." NASL, 883 F.3d at 35.

1   professional soccer leagues in North America," so that "the promulgation of

2   the Standards" constituted only "circumstantial evidence of that conspiracy,"

3   not direct evidence.  Id.  So how the plaintiff frames a challenge affects how

4   we analyze the adequacy of its pleadings.  If the plaintiff alleges that a policy

5   or rule is in service of a plan to restrain competition, then it must allege

6   enough additional facts to show that agreement to such a plan exists.  If, on

7   the other hand, the plaintiff adequately alleges that the policy or rule is the

8   agreement itself, then it need not allege any further agreement.

9   In dismissing Relevent's complaint, the District Court misapplied the

10  lesson of NASL.

11       B. **Application**

12  Relevent attacks the 2018 Policy directly as anticompetitive.  It alleges

13  that "this anticompetitive agreement was expressly formulated in 2018,"

14  App'x 494, and more specifically that "[o]n October 26, 2018, the FIFA

15  Council adopted a policy embodying the anticompetitive market division

16  agreement at issue in this case," App'x 502, and "issued a policy prohibiting

17  FIFA's National Association members, including USSF, from sanctioning any

18  official season games held outside of the participants' home territory," App'x

523.  "The FIFA geographic market division policy was, and is," Relevent

alleges, "a horizontal division of geographic markets agreement."  App'x 523;

see App'x 503 (alleging that the USSF president "participated in the FIFA

Council's consideration and adoption of the geographic market division

agreement in October 2018").

These allegations provide "enough factual matter (taken as true) to

suggest that an agreement was made," Twombly, 550 U.S. at 556, and the

District Court erred in concluding that the 2018 Policy was not itself direct

evidence of an agreement under Section 1.  The District Court held that "[i]n

order for an organizational decision or policy to constitute concerted action

and, therefore, to serve as direct evidence of an unlawful agreement, Plaintiff

must plausibly allege an antecedent 'agreement [among horizontal

competitors] to agree to vote a particular way' to adopt such a policy."

Special App'x 33 (alteration in original); see also id. at 34 n.15 ("Plaintiff also

fails to . . . include allegations that those unidentified [remaining members of

the FIFA Council] agreed with USSF (or with anyone else) to vote in favor of

the Policy.").  Applying this mistaken premise, the District Court concluded

1    that Relevent "fails entirely to allege any facts suggesting that there was an

2    'agreement to agree.'"  Special App'x 34.

3        A plaintiff challenging an association rule that governs the conduct of

4    members' separate businesses need not allege an antecedent agreement to

5    agree.  The promulgation of the rule, in conjunction with the members'

6    "surrender[] . . . to the control of the association," sufficiently demonstrates

7    concerted action.  <u>Associated Press</u>, 326 U.S. at 19; <u>see also</u> <u>Anderson v.</u>

8    <u>Shipowners' Ass'n of Pac. Coast</u>, 272 U.S. 359, 363 (1926) ("The absence of an

9    allegation that such was the specific intent is not important, since that is the

10   necessary and direct consequence of the combination and the acts of the

11   associations under it . . . .").  Here, Relevent alleges that the national

12   associations, leagues, and teams have "surrendered [their] freedom of action

13   . . . and agreed to abide by the will of the association[]."  <u>Anderson</u>, 272 U.S. at

14   364–65.  That is enough.  <u>See</u> <u>Board of Regents</u>, 468 U.S. at 99 ("By

15   participating in an association which prevents member institutions from

16   competing against each other . . . the NCAA member institutions have created

17   a horizontal restraint . . . ."); Amicus Br. of the United States at 11–12

18   ("Because the member has already agreed to abide by all association rules,

1  there would be no need for the member to agree to any particular rule to be

2  bound by it.").

3      This conclusion comports with our decisions in <u>NASL</u> and <u>AD/SAT</u>.  In

4  <u>NASL</u>, plaintiffs alleged an "overarching conspiracy" instead of challenging

5  "the Standards themselves."  883 F.3d at 41.  And in <u>AD/SAT</u>, plaintiffs

6  challenged an inferred policy as opposed to any specific written or

7  promulgated policy.  <u>See</u> 181 F.3d at 233.  Here, by contrast, Relevent

8  challenges a specific policy—the "policy embodying the anticompetitive

9  market division agreement" adopted by "the FIFA Council" on "October 26,

10  2018."  App'x 502.  In this circumstance, the "promulgation of [the policy]

11  constitute[s] direct evidence of § 1 concerted action."  <u>NASL</u>, 883 F.3d at 41.[7]

12      FIFA and USSF defend the District Court's decision against Relevent's

13  attacks by urging that the 2018 Policy is not direct evidence of concerted

14  action.  First, they contend that Relevent forfeited or waived its direct

---

[7] The District Court also observed that "Plaintiff in this case is <u>not</u> challenging FIFA's standards as a whole, but merely the impact of a single FIFA Policy."  Special App'x 32 n.12.  That distinction, presumably based on the words "in totality" in <u>NASL</u>, is immaterial.  Neither <u>NASL</u> nor any other precedent of which we are aware requires a plaintiff to challenge an association's entire set of by-laws.  <u>Cf.</u>, <u>e.g.</u>, <u>Associated Press</u>, 326 U.S. at 9 (determining whether particular by-laws of the AP violated antitrust laws).

1    evidence theory by raising it for the first time on appeal.  Not so.  The

2    amended complaint alleges that "[t]he FIFA geographic market division

3    policy was, and is, a horizontal division of geographic markets agreement."

4    App'x 523.  Relevent also advanced this argument in response to the

5    Defendants' motion to dismiss.  <u>See</u> Relevent Sports, LLC's Mem. of Law in

6    Opp'n to Mots. to Dismiss 34 n.9, Dist. Ct. ECF No. 77 ("Relevent . . . alleges,

7    among numerous other specific allegations, that the market division policy

8    itself is direct evidence of such an unlawful conspiracy."); Tr. of Oral Arg. on

9    Mots. to Dismiss 35, Dist. Ct. ECF No. 94 ("[The] main factual allegation" "is

10   that FIFA has a rule that says you can't play out of your own geographic

11   territory.").  And the District Court also specifically considered and rejected

12   this argument.  <u>See</u> Special App'x 32 ("Plaintiff argues that the FIFA Policy

13   itself constitutes direct evidence of . . . [a] common scheme.  The Court

14   disagrees." (alteration in original) (quotation marks omitted)); <u>Jacques v.</u>

15   <u>DiMarzio, Inc.</u>, 386 F.3d 192, 201 (2d Cir. 2004) (holding that where "the

16   district court was made fully aware of [a] position . . . and the trial judge

17   discussed and explicitly rejected [the] position in its written opinion on the

18   motion," "the issue is not waived on appeal").

1    Next, the Defendants argue that leagues and teams are not members of

2  FIFA, and that the national associations that are members of FIFA are not

3  competitors.  But this argument runs headlong into Relevent's allegations,

4  which we must accept as true, that the FIFA Council's decisions bind the

5  various national associations, which in turn bind their respective leagues and

6  teams; that those leagues and teams would otherwise compete with each

7  other for fans and sponsors but dodge competition because FIFA and the

8  national associations enforce the 2018 Policy;[8] and that, as a result, "[t]he FIFA

9  geographic market division policy has created a barrier to entry which has

10  prevented leagues and teams that do not want to adhere to this policy from

11  competing in the relevant market," App'x 516.  Taken together, these

12  allegations clearly depict a rule governing how an association's separate

13  members' separate businesses compete.  As Relevent puts it, "[e]ffectively, the

14  National Associations and their respective leagues agreed to stay home, so

15  that each league will be free from competition within its own territory."

16  Relevent Br. 2.

---

[8] See App'x 498 (Alleging that "an official season game between La Liga teams in the U.S. would directly compete for fans and sponsors with the official season games of USSF-member MLS, which currently benefits from a monopoly position in the U.S. market").

1        Finally, the Defendants argue that the 2018 Policy was merely a non-

2    binding "sporting principle."  Once again, we consider the allegations in the

3    amended complaint.  According to Relevent, "the FIFA Council—one of

4    FIFA's decision-making bodies with authority to issue policies that each

5    National Association and their member leagues and teams have agreed to

6    follow—adopted a geographic market division policy."  App'x 523; see also

7    App'x 502 ("On October 26, 2018, the FIFA Council adopted a policy

8    embodying the anticompetitive market division agreement at issue in this

9    case . . . .").  And "because this was a formal policy announced by a FIFA

10    decision-making body, any leagues and teams who did not comply with it

11    would run the risk of FIFA penalties and all such leagues and teams were

12    required to agree to adhere to this policy."  App'x 523.  These allegations,

13    corroborated by the fact that the 2018 Policy does not on its face relate to

14    "things like how many players may be on the field or the time allotted for

15    play," Alston, 141 S. Ct. at 2156, but rather relates to a geographic limitation

16    on where various leagues can compete for ticket sales, plausibly allege that in

17    adopting the 2018 Policy, FIFA and its member associations adopted an

18    anticompetitive geographic market division.

1                                        * * *

2          The District Court correctly observed that "the FIFA Council

3   announced a 'policy' that prohibits staging Official Games outside the

4   participants' home territory," and that "all National Associations, leagues,

5   clubs, and players must comply with FIFA directives."  Special App'x 23.

6   Relevent directly challenges the 2018 Policy as anticompetitive.  Under these

7   circumstances, the very promulgation of the 2018 Policy is direct evidence of

8   an agreement for purposes of Section 1 of the Sherman Act.

9                                  **CONCLUSION**

10         For the foregoing reasons, we **VACATE** the judgment of the District

11  Court and **REMAND** for further proceedings consistent with this opinion.